**BROWN RUDNICK LLP**
SEVEN TIMES SQUARE
NEW YORK, NEW YORK 10036
TELEPHONE: (212) 209-4800

David J. Molton, Esq.
Andrew Dash, Esq.

**BEUS GILBERT PLLC**
4800 NORTH SCOTTSDALE ROAD
SUITE 6000
SCOTTSDALE, ARIZONA 85251
TELEPHONE: (480) 429-3000

Leo R. Beus, Esq.
Dennis K. Blackhurst, Esq.

*Co-Counsel to Plaintiffs*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------X
In re REFCO INC. SECURITIES LITIGATION   :   Case No. 07-md-1902 (JSR)
   :
-------------------------------------------------------------X

This Document Relates to:

-------------------------------------------------------------X
KENNETH M. KRYS, *et al.,*    :
   :   Case No. 10-cv-3594 (JSR)
   :
Plaintiffs,    :
   :   **COMPLAINT**
-against-    :
   :
DEUTSCHE BANK SECURITIES INC., *et al.,*    :
   :
Defendants.    :   <u>**Jury Trial Demanded**</u>
-------------------------------------------------------------X

## TABLE OF CONTENTS

**Pages**

TABLE OF CONTENTS.............................................................................................. i

I.     Introduction.................................................................................................. 1

II.     Parties.......................................................................................................... 11

      A.     Plaintiffs........................................................................................... 11
      B.     Defendants. ...................................................................................... 14

III.    Jurisdiction and Venue................................................................................ 15

IV.    The SPhinX Funds, PlusFunds and Deutsche............................................ 15

      A.     PlusFunds Built The SPhinX Investment Platform With An
            Exclusive License From S&P. ........................................................ 16
      B.     The SPhinX Funds Were Established In 2002.................................. 17

            1.     The SPhinX Funds were organized as Segregated Portfolio
                Companies to protect customer assets. ..................................... 18
            2.     SPhinX promised its investors customer-segregation to
                protect customer assets. ........................................................... 20
            3.     Refco promised to protect SPhinX and PlusFunds assets in
                customer-segregated accounts insulated from claims
                against the custodian. ................................................................ 23

      C.     Deutsche Had Actual Knowledge Of SPhinX's Customer-
            Segregation Requirements. ............................................................. 24
      D.     SPhinX Relied On A Number Of Fiduciaries To Manage The
            Funds And Invest And Protect Customer Assets.............................. 27

            1.     PlusFunds served as SPhinX's Investment Manager................ 27
            2.     Refco served as SPhinX's distributor, FCM and custodial
                agent........................................................................................ 28
            3.     Deutsche owed SPhinX and PlusFunds fiduciary and
                contractual duties in connection with extensive services and
                relationships. ........................................................................... 32

                (a)     Deutsche served as SPhinX's primary distributor. ....... 32
                (b)     Deutsche helped SPhinX and PlusFunds monitor
                     exposure to counterparties by providing risk
                     management services. ................................................... 35
                (c)     Deutsche held hundreds of millions of dollars of
                     SPhinX assets as SPhinX's prime broker. .................... 37
                (d)     With PlusFunds' approval, Deutsche obtained a
                     license to use S&P's marks to develop Deutsche's
                     own funds................................................................... 38
                (e)     Deutsche's other relationships with SPhinX................ 41

V.  Deutsche Breached Its Fiduciary Duties To SPhinX and PlusFunds and
    Actively Aided and Abetted Refco's Fraudulent Scheme. ................................ 46

    A.  Refco, With The Aid Of Its Professionals (Including Deutsche),
        Defrauded Its Investors And Customers, Including SPhinX And
        PlusFunds. ................................................................................................ 48

        1.  Refco diverted SMFF cash to RCM to fuel Refco's
            operations and fraud. ...................................................................... 49
        2.  SMFF received no benefit from the diversion of excess
            cash to RCM. ..................................................................................... 50
        3.  SPhinX and PlusFunds monitored their exposure to Refco. .................... 51

    B.  Refco And Its Conspirators Were At All Times Involved In A
        Fraudulent Scheme. ................................................................................... 53

        1.  Refco misrepresented its financial condition by issuing
            fraudulent financial statements. ...................................................... 54
        2.  Refco concealed its misrepresented financial condition
            through fraudulent round-trip loan transactions. ....................................... 56

            (a)  RTL Transactions. ................................................................. 56
            (b)  Looting SPhinX Cash. ............................................................ 57

        3.  Refco insiders cashed out their interests in the fraudulent
            2004 LBO and 2005 IPO transactions. ..................................................... 58

            (a)  The August 2004 LBO. ............................................................ 58
            (b)  The August 2005 IPO. ............................................................ 62

VI. Deutsche Had Actual Knowledge of Refco's Fraudulent Scheme and The
    Exposure of SphinX's Cash at RCM. ........................................................... 64

    A.  Deutsche Had Actual Knowledge That Hundreds Of Millions Of
        Dollars Of SPhinX Assets Were Exposed At RCM. ............................................ 65
    B.  Deutsche Had Actual Knowledge Of Refco's Fraud. ........................................ 70

        1.  Deutsche's CRM declines participation in the Refco LBO. ...................... 71

            (a)  Deutsche distrusted Refco. ............................................................ 71
            (b)  Deutsche's CRM rejected participation in the LBO. .................... 73
            (c)  Deutsche's business underwriting group overruled
                 the CRM's rejection of the LBO out of desire to
                 please Deutsche's client, THL. ....................................................... 76
            (d)  Deutsche proceeds with the LBO despite knowledge
                 of Refco's poor financial condition and fraud. ........................... 79
            (e)  Deutsche knew that Refco executives concealed $40
                 million in undisclosed compensation under a
                 proceeds participation agreement. ................................................ 86
            (f)  Additional evidence of Deutsche's knowledge of
                 Refco's fraudulent scheme. ............................................................ 87

C.      Deutsche Knew Refco Relied Upon Customer Assets To Finance
        Transactions. ................................................................... 88

D.      Impact On RCM Was Actively Concealed By Deutsche And The
        Other Investment Bankers.......................................................... 93

E.      Deutsche Knew Regulated Assets Were Also At Risk........................... 94

F.      The Harm Of The IPO To Refco .................................................. 98

VII.    Refco's Bankruptcy Filing. ......................................................... 99

VIII.   Causation........................................................................... 101

IX.     Causes of Action. ................................................................. 102

X.      Demand for Jury Trial.............................................................. 116

Plaintiffs Kenneth M. Krys and Margot MacInnis, as Joint Official Liquidators of SPhinX Ltd., SPhinX Macro Fund SPC, SPhinX Macro Ltd., SPhinX Managed Futures Fund SPC, SPhinX Long/Short Equity Fund SPC, SPhinX Convertible Arbitrage Fund SPC, SPhinX Fixed Income Arbitrage Fund SPC, SPhinX Distressed Fund SPC, SPhinX Merger Arbitrage Fund SPC, SPhinX Special Situations Fund SPC, SPhinX Equity Market Neutral Fund SPC, SPhinX Strategy Fund Ltd., SPhinX Plus SPC Ltd., SPhinX Managed Futures Ltd., SPhinX Long/Short Equity Ltd., SPhinX Convertible Arbitrage Ltd., SPhinX Fixed Income Arbitrage Ltd., SPhinX Distressed Ltd., SPhinX Merger Arbitrage Ltd., SPhinX Special Situations Ltd., SPhinX Equity Market Neutral Ltd. and PlusFunds Manager Access Fund SPC Ltd. (collectively, "SPhinX" or the "SPhinX Funds") and as assignees of claims assigned by Miami Children's Hospital Foundation, OFI Asset Management, Green & Smith Investment Management LLC, Thales Fund Management LLC, Kellner Dileo & Co. LLC, Martingale Asset Management LP, Longacre Fund Management LLC, Arnhold & S. Bleichroeder Advisers LLC, Pictet & Cie, RGA America Reinsurance Company, Arab Monetary Fund, Hansard International Ltd., Concordia Advisors LLC, Gabelli Securities Inc. and Citco Global Custody (collectively, the "Assignors") (the "JOLs"); and The Harbour Trust Company Ltd. as Trustee of the SPhinX Trust (the "Trustee," and, together with the JOLs, "Plaintiffs") created pursuant to the Fifth Amended Plan of Liquidation of PlusFunds Group, Inc., by and through their undersigned counsel, for their claims against Defendants Deutsche Bank Securities Inc., Deutsche Bank Trust Company Americas and Deutsche Bank AG (collectively, "Deutsche"), allege as follows:

## I.    INTRODUCTION.

1.   This is an action to recover (i) $263 million plus interest in damages suffered by the SPhinX family of hedge funds, (ii) the lost business enterprise value and deepening insolvency damages suffered by SPhinX's investment manager, PlusFunds Group, Inc. ("PlusFunds"), and

(iii) damages suffered by the Assignors, a group comprised of SPhinX investors, arising from the diversion of SPhinX's cash through protected, customer-segregated accounts to unprotected offshore accounts as part of the Refco scandal and breaches of duty described herein.

2.   Through a series of relationships between SPhinX/PlusFunds and Deutsche beginning in 2002, SPhinX and PlusFunds reposed confidence and trust in Deutsche, giving rise to a fiduciary relationship.   The overarching relationship between Deutsche and SPhinX/PlusFunds included the following features, each of which is discussed in greater detail below:

- o  Deutsche served as SPhinX's primary distributor and selling agent, soliciting investors, consulting and advising with SPhinX/PlusFunds, and assisting in the preparation of SPhinX offering materials.   In this role, Deutsche represented SPhinX to investors and communicated with investors regarding the structure of the SPhinX Funds and protections designed to safeguard customer assets, including, in particular, promises that customer assets would be protected in customer-segregated accounts. [*See* ¶¶ 3, 37, 71, 72, 98-107, 135 below];

- o  As SPhinX's distributor, Deutsche split management fees with PlusFunds as part of its compensation.  [*See* ¶¶ 18, 19, 37, 98, 99 below];

- o  Deutsche was given access to confidential and proprietary information regarding the SPhinX Funds, the S&P Hedge Fund Index and related index products, PlusFunds' business platform and books and records, and due diligence materials regarding SPhinX.  [*See* ¶¶ 96, 100, 101, 110, 133 below];

- o  SPhinX/PlusFunds could not dissolve the Funds or change any of SPhinX's key business terms without consulting Deutsche and obtaining its approval. [*See* ¶ 103 below];

2

o Deutsche provided risk analysis services, including risk reports that innocent PlusFunds agents serving on PlusFunds' risk committee reviewed weekly to monitor and assess SPhinX's exposure to counterparties such as Refco.  [*See* ¶¶ 5, 10, 108-14, 133, 156, 348 below];

o Deutsche provided prime brokerage and custodial services, holding hundreds of millions of dollars of SPhinX assets pursuant to SPhinX's offering materials.  [*See* ¶¶ 71, 74, 115-19 below];

o With PlusFunds' approval, Deutsche obtained a sub-license from Standard & Poor's to use the S&P Hedge Fund Index and related marks to establish its own funds offering returns related to the performance of the S&P Hedge Fund Index and SPhinX Funds.  [*See* ¶¶ 18, 120-29 below]; and

o Deutsche and SPhinX/PlusFunds executed dozens of additional agreements pursuant to which Deutsche provided various services to SPhinX and PlusFunds.  [*See* ¶¶ 76, 80, 130-33 below.]

3.  Deutsche functioned as a partner and fiduciary of SPhinX and PlusFunds in nearly every facet of their businesses, and, as a result, Deutsche owed SPhinX and PlusFunds fiduciary duties of loyalty, due care and disclosure.  SPhinX and PlusFunds relied upon Deutsche, and their success was to a large part dependent upon Deutsche, their primary distributor.  PlusFunds referred to Deutsche as its "partner" and considered it a fiduciary, and Deutsche was obligated to place and protect SPhinX's interests ahead of its own.

4.  In its own words, Deutsche had "unparalleled understanding" of the business of SPhinX and PlusFunds: Deutsche marketed and sold investments in SPhinX, advised and consulted with SPhinX and PlusFunds relating to the SPhinX platform, and otherwise played a key role in the development and business of SPhinX.  As SPhinX's distributor and PlusFunds'

3

partner, Deutsche understood SPhinX's business model, including protections built into the SPhinX platform to protect customer assets for SPhinX and its investors.  These structural protections, including promises to investors that assets would be maintained in customer-segregated accounts and insulated from claims against creditors of the custodian of customer assets, were fundamental features of the SPhinX Funds.

5.  Another crucial protection of SPhinX customer assets was the PlusFunds risk committee, which met weekly to review risk reports produced by PlusFunds' partner, Deutsche, analyzing SPhinX's risk exposure to various counterparties, including Refco Group Ltd. ("RGL" and, collectively with affiliated entities, "Refco").  Refco served as a futures commission merchant ("FCM") and custodian for SPhinX assets, and in that role owed fiduciary duties to SPhinX and PlusFunds, including duties arising from specific promises to maintain SPhinX assets in customer segregation.

6.  Refco breached these fiduciary duties and defrauded SPhinX and PlusFunds by converting SPhinX assets in the course of a massive, multi-faceted fraud orchestrated by Refco's president and CEO, Phillip Bennett.  Beginning in the 1990s, Refco and its customers suffered hundreds of millions of dollars in losses.  In order to conceal those losses and continue in business, Refco and its conspirators engaged in fraud to generate the liquidity needed for operations and conceal the fraud until Refco could be sold.

7.  In the course of this fraud, Refco lied to the public about its financial condition to attract business and the deposit of customer assets, which Refco then diverted to prop up its operations.  Refco used these misappropriated customer assets as operating liquidity, all the while conducting fraudulent transactions designed to conceal losses, bolster Refco's financial position, and attract additional customer deposits necessary to stay afloat until a fraudulent sale

of Refco would enrich Refco insiders and pin Refco's unrecoverable losses on Refco's customers and the investing public.

8.   SPhinX and PlusFunds were central and primary targets of the fraud.  SPhinX and PlusFunds relied upon contractual and oral representations that SPhinX's assets at Refco were protected in customer-segregated accounts, depositing hundreds of millions of dollars of customer assets at Refco LLC, a regulated affiliate of Refco.  In addition, SPhinX and PlusFunds relied upon Refco's reported, audited and represented financial strength and public filings in doing business with Refco.

9.   Unknown to innocent decision-makers at SPhinX and PlusFunds, SPhinX's cash was regularly swept from customer-segregated accounts at Refco LLC to non-segregated accounts at an offshore affiliate, Refco Capital Markets Ltd. ("RCM"), where SPhinX's cash was commingled with Refco assets and used to prop up Refco and finance its fraudulent operations. Refco needed cash and relied upon liquidity provided by SPhinX to bolster its fraudulent financial statements and stay in business, attracting additional deposits from SPhinX and other customers.

10. Although the weekly risk reports produced to PlusFunds by Deutsche represented that SPhinX's exposure to Refco was typically in the $10 to $25 million range, Deutsche possessed actual knowledge that in fact hundreds of millions of dollars of SPhinX cash were at risk in unprotected accounts at RCM.  Deutsche's September 2004 notes reflect Deutsche's actual knowledge that hundreds of millions of dollars of SPhinX cash was available as a source of liquidity and as a revenue stream to Refco "in non-regulated" accounts at RCM.  The notes reflect Deutsche's precise knowledge of the below-market interest rate RCM paid SPhinX on those amounts, as well as a reference to "reverse repo" transactions, the mechanism used by Refco to convert customer securities deposited with RCM into working capital for Refco.  Thus,

Deutsche knew that Refco used SPhinX cash at RCM as a source of liquidity and as a revenue stream – Deutsche knew SPhinX's cash at Refco was not maintained in regulated, customer-segregated accounts.

11. Notwithstanding this actual knowledge, Deutsche never disclosed this substantial risk – the exposure that ultimately destroyed SPhinX and PlusFunds – to its fiduciaries and partners. Instead of fulfilling its fiduciary duties, Deutsche pursued its own profits at every turn.

12. At the same time Deutsche was advising SPhinX and distributing its investment products, Deutsche also served as financial advisor, underwriter, and investment bank to Refco and/or Thomas H. Lee Partners (together with affiliated entities, "THL") on Refco's 2004 LBO and 2005 IPO transactions. Instead of examining Refco's financial condition with a critical eye and disclosing all relevant facts to the investing public and Refco's customers (including SPhinX and PlusFunds), Deutsche acquired actual knowledge of Refco's fraud and helped conceal it.

13. In the earliest stages of its due diligence investigation of Refco in April and May 2004, Deutsche's credit department rejected participation in the Refco LBO because *Deutsche did not trust Refco*, and because Deutsche did not believe Refco generated the revenues or cash flow necessary to repay the debt that would be incurred in the LBO.

14. These concerns were absolutely correct: Refco should not have been trusted, and it did not have the free cash flow to cover the LBO debt. Notwithstanding Deutsche's initial rejection, Deutsche approved participation in the LBO "through back channels" for several reasons: (1) the fees to be generated vs. Deutsche's exposure in the LBO were too good to pass up; (2) Deutsche wanted to strengthen its relationship with THL, an important client and Refco's purchaser in the LBO; and (3) additional profits could be earned on the $2 billion IPO that was already envisioned for Refco a year after completion of the LBO. Simply put, there was too

much money available to Deutsche from Refco and THL to turn down, and Deutsche saw an exit strategy a year away in the IPO.

15. Although Deutsche began its purported "due diligence" investigation of Refco with fundamental doubts about Refco's integrity and skepticism that Refco generated sufficient cash flow to cover the LBO debt, it failed to disclose proof of fraud and financial problems at Refco, including but not limited to the following facts, each of which is discussed in greater detail below:

- o Numerous high level members of Deutsche's team, based on years of experience, distrusted Refco.  [*See* ¶¶ 236, 241 below];

- o Refco had a poor reputation in the industry and a history of regulatory infractions.  [*See* ¶¶ 235, 250 below];

- o Deutsche limited its own exposure to Refco and gave it an internal non-investment grade rating of B+.  [*See* ¶¶ 18-20, 124, 128, 158, 226, 228, 244-46 below];

- o Deutsche's credit risk management committee ("CRM") rejected participation in Refco's LBO transaction out of concerns over the structure of the transaction, doubts that Refco could generate cashflow to repay the LBO debt and fears that if problems arose liquidity in Refco's unregulated subsidiaries would be sucked out to sustain Refco's regulated affiliates and other concerns.  [*See* ¶¶ 13, 242-52, 296-98 below];

- o Refco had insufficient cashflow to service the LBO debt.  Deutsche purported to rely on Refco's unrealistic projections in connection with the LBO, when in fact Deutsche analyzed Refco's financials and concluded that Refco had a

negative cashflow in 2003, the last complete year before the LBO.  [*See* ¶¶ 14, 137, 246-47, 298, 302 below];

o   Numerous intercompany transactions among Refco affiliates obscured Refco's true financial and capital condition.  [*See* ¶¶ 137, 245, 250, 297, 324 below];

o   Refco's management was dishonest and attempted to lie and conceal facts in due diligence.  [*See* ¶¶ 272, 275, 278-80, 282, 284 below];

o   Refco concealed losses and liabilities from the public and failed to disclose those liabilities in its financial statements and public filings.  [*See* ¶¶ 96, 357, 375, 385 below];

o   Refco misrepresented to the public that it did not engage in proprietary trading.  [*See* ¶¶ 96, 168, 243, 274-78 below];

o   Refco concealed the existence of material litigation claims against it in due diligence and failed to disclose that litigation in its public filings.  [*See* ¶¶ 279-80 below];

o   Members of Refco's management failed to disclose and lied in an attempt to conceal approximately $40 million in compensation they received individually under an undisclosed proceeds participation agreement.  [*See* ¶¶ 165, 289, 333 below];

o   Refco's CFO Robert Trosten and other high level accounting personnel resigned shortly after the LBO in August 2004.  [*See* ¶ 295 below];

o   Refco concealed the existence and terms of a letter to management from Refco's auditor, Grant Thornton, describing material control weaknesses in Refco's accounting and financial systems.  After the ultimate disclosure of

this management letter, Deutsche saw a draft of a second Grant Thornton management letter describing "significant deficiencies" in Refco's financial and accounting controls, indicating a likelihood that Refco's financials include material misstatements.  [*See* ¶¶ 281-86 below];

o Refco misrepresented intercompany transactions and obligations as "payables from customers" on Refco's financial statements and public filings.  [*See* ¶¶ 141, 167-73 below];

o Refco used customer assets held by RCM to generate liquidity for operations. [*See* ¶¶ 221, 307, 323 below];

o The LBO did not provide for the repayment of receivables owed to RCM – receivables that Deutsche knew represented customer assets diverted to provide liquidity to sustain Refco's operations.  [*See* ¶¶ 136, 140, 145-59, 291, 299, 301, 305, 317 below];

o Refco's SEC filings concealed an (understated) intercompany receivable owed by Refco Group Holdings, Inc. ("RGHI") in excess of $100 million.  [*See* ¶¶ 137-38, 198-205 below];

o Refco moved assets back and forth among regulated and non-regulated entity affiliates.  [*See* ¶¶ 10, 17, 223-25, 246-49, 250-52, 291-95, 301-303, 319-22, 324 below]; and, accordingly,

o Refco's public filings in connection with the LBO and IPO were materially inaccurate and fraudulent.

16. Despite its actual knowledge of fraud at Refco, Deutsche plowed ahead on the LBO and IPO, seeking its own profits at the expense of its fiduciaries, SPhinX and PlusFunds, and the investing public.

17. In fact, Deutsche relied upon the movement of SPhinX cash to non-regulated accounts at RCM as a source of revenue to overstate Refco's financial position and fraudulently increase Refco's purported valuation in connection with the IPO. Given Deutsche's knowledge that Refco lacked the free cashflow necessary to service the LBO debt, the availability of hundreds of millions of dollars of available cash at RCM was a significant piece of the fraudulent valuation of Refco. Because Deutsche's own profits in the IPO were linked to the ultimate value of Refco, Deutsche benefited from the movement of SPhinX cash to RCM and its ongoing availability to Refco.

18. Deutsche's self-interested concern with its own profits is evident from the way Deutsche structured its own exposure to SPhinX. Although Deutsche had its own assets at SPhinX, those investments were structured as a hedge such that the risk was borne by investors, not Deutsche itself. In 2004, strengthening the relationship among SPhinX, PlusFunds and Deutsche, PlusFunds allowed Deutsche to participate in PlusFunds' valuable license with Standard & Poor's – the license underlying the SPhinX Funds themselves. Using this sub-license, Deutsche sponsored its own funds that were linked to the S&P Hedge Fund Index. As investor money came in to the Deutsche-sponsored funds, Deutsche was required to invest corresponding amounts in SPhinX. This structure allowed Deutsche to earn management fees and rebate payments from SPhinX/PlusFunds on the assets deposited with SPhinX, as well as additional fees and payments on customer assets invested in Deutsche's separate funds. But because the performance of the Deutsche-sponsored funds was linked to the performance of the S&P Hedge Fund Index, Deutsche's own investment in the SPhinX Funds was designed so that Deutsche would face little or no actual exposure to SPhinX. Regardless of whether SPhinX investments increased or decreased in value, those gains or losses would be passed on to

Deutsche's investors, and Deutsche earned fees from those investors and its own investment at SPhinX either way.

19. Thus, Deutsche positioned itself to earn millions in management fees, rebates and other revenues in connection with Deutsche's SPhinX/PlusFunds relationship, additional revenues from its license with S&P, additional profits from the sale of Refco and additional revenues from future business relationships with THL.   The movement of SPhinX cash to unprotected accounts at RCM created an additional source of revenue and liquidity to Refco and thus increased Refco's value (and Deutsche's profits) in the IPO without creating additional exposure on Deutsche's cleverly hedged assets at SPhinX.   And if anything went wrong, the real losses would be suffered by investors, not Deutsche itself.

20. Had Deutsche fulfilled its fiduciary obligations of loyalty, due care and disclosure to SPhinX and PlusFunds, it would have disclosed to SPhinX and PlusFunds that SPhinX assets were at risk, and SPhinX's customer assets would have been removed from Refco.   Had Deutsche fulfilled its obligations to SPhinX and PlusFunds and the general public, it would have stopped the Refco LBO and/or the IPO, preventing the looting of millions of dollars and the plunging of Refco deeper into insolvency.   Instead, Deutsche sought profits at every turn from its relationships with SPhinX, PlusFunds, Refco, THL and other parties, while insulating itself from exposure.   As a result, SPhinX and its investors lost approximately $263 million in the Refco bankruptcy, and PlusFunds was forced into bankruptcy.

## II.   **PARTIES.**

### A.   **Plaintiffs.**

21. Plaintiffs Kenneth Krys and Margot MacInnis are the Joint Official Liquidators of each of the SPhinX Funds appointed by the Grand Court of the Cayman Islands.

22. SPhinX Macro Fund SPC, SPhinX Managed Futures Fund SPC, SPhinX Long/Short Equity Fund SPC, SPhinX Convertible Arbitrage Fund SPC, SPhinX Fixed Income Arbitrage Fund SPC, SPhinX Distressed Fund SPC, SPhinX Merger Arbitrage Fund SPC, SPhinX Special Situations Fund SPC and SPhinX Equity Market Neutral Fund SPC are each segregated portfolio companies organized and incorporated under Cayman Islands law.  Each of these SPhinX companies has its registered address at c/o Krys & Associates, Governor's Square, Building 6, 2nd Floor, 23 Lime Tree Bay Avenue, Grand Cayman, Cayman Islands.

23. SPhinX Managed Futures Ltd., SPhinX Long/Short Equity Ltd., SPhinX Convertible Arbitrage Ltd., SPhinX Fixed Income Arbitrage Ltd., SPhinX Distressed Ltd., SPhinX Merger Arbitrage Ltd., SPhinX Special Situations Ltd., SPhinX Equity Market Neutral Ltd., PlusFunds Manager Access Fund SPC Ltd., SPhinX Ltd., SPhinX Macro Ltd., SPhinX Strategy Fund Ltd. and SPhinX Plus SPC Ltd. are each limited liability companies organized and incorporated under Cayman Islands law.  Each of these SPhinX companies has its registered address at c/o Krys & Associates, Governor's Square, Building 6, 2nd Floor, 23 Lime Tree Bay Avenue, Grand Cayman, Cayman Islands.

24. The JOLs are assignees of claims assigned by Miami Children's Hospital Foundation, OFI Asset Management, Green & Smith Investment Management LLC, Thales Fund Management LLC, Kellner Dileo & Co. LLC, Martingale Asset Management LP, Longacre Fund Management LLC, Arnhold & S. Bleichroeder Advisers LLC, Pictet & CIE, RGA America Reinsurance Company, Arab Monetary Fund, Hansard International Ltd., Concordia Advisors LLC, Gabelli Securities Inc. and Citco Global Custody.  Each of the Assignors was an investor in the SPhinX Funds who has suffered damages as a result of the wrongdoing alleged herein.

25. On June 30, 2006, each of the SPhinX companies entered into voluntary liquidation by resolution of its founder shareholder, and Mr. Krys and Christopher Stride were appointed

Joint Voluntary Liquidators for each SPhinX company.  On July 4, 2006, Messrs. Krys and Stride filed, on behalf of each SPhinX entity except SPhinX Managed Futures Fund SPC ("SMFF"), petitions for court supervision in the Grand Court of the Cayman Islands (the "Cayman Court").  On July 28, 2006, the Cayman Court entered orders (the "Winding Up Orders") providing for the winding up of the SPhinX companies (other than SMFF) subject to the supervision of the Cayman Court.  Pursuant to the Winding Up Orders, Messrs. Krys and Stride were appointed JOLs of each of the SPhinX companies other than SMFF.  On July 28, 2006, the Cayman Court appointed Messrs. Krys and Stride to serve as Joint Provisional Liquidators of SMFF, and on August 8, 2006, the Cayman Court appointed Messrs. Krys and Stride to serve as SMFF's JOLs.  On November 10, 2009, Ms. MacInnis was appointed as successor to Mr. Stride as SPhinX's JOL.  Mr. Krys and Ms. MacInnis are authorized to bring each of the SPhinX Funds' claims in this litigation.

26. PlusFunds Group, Inc. was organized and incorporated as a Delaware corporation on or about March 25, 2002.  PlusFunds was a New York-based entity registered with the Securities Exchange Commission ("SEC") as an investment advisor and registered with the Commodity Futures Trading Commission ("CFTC") as a commodity pool operator.

27. On March 6, 2006, PlusFunds initiated Chapter 11 bankruptcy proceedings in the Southern District of New York.  On August 7, 2007, Bankruptcy Judge James M. Peck entered an order confirming PlusFunds' Fifth Amended Plan of Liquidation (the "PlusFunds Plan").  As contemplated and authorized under the PlusFunds Plan and the Confirmation Order, claims formerly belonging to the PlusFunds estate were assigned to the SPhinX Trust pursuant to a September 20, 2007 Assignment and Assumption Agreement and SPhinX Funds Trust Agreement, with James P. Sinclair acting as Trustee.  On November 24, 2009, Mr. Krys was appointed successor to Mr. Sinclair as SPhinX Trustee.  On June 3, 2010, The Harbour Trust

Company Ltd. was appointed successor to Mr. Krys as SPhinX Trustee. The Harbour Trust Company Ltd. is authorized to bring claims assigned to the SPhinX Trust in this litigation. The JOLs are the beneficiaries of recoveries obtained by the SPhinX Trust.

### B.     Defendants.

28. Defendant Deutsche Bank Securities Inc., a subsidiary and/or branch of Deutsche Bank AG, is an investment banking firm that provides securities underwriting, financial advisory, capital raising, sales and trading and financial products and services. Deutsche Bank Securities Inc. was a financial advisor to THL and joint book-running manager, joint lead arranger, underwriter and/or initial purchaser for the bond offering made as part of the August 2004 LBO and was a co-manager and underwriter of the August 2005 IPO. Deutsche Bank Securities Inc. is a Delaware corporation with a principal executive office at 60 Wall Street, New York, New York.

29. Defendant Deutsche Bank Trust Company Americas is a New York corporation with headquarters at 60 Wall Street, New York, New York.

30. Defendant Deutsche Bank AG is a financial services company headquartered in Germany with offices in New York. Deutsche Bank AG does business in New York, has a substantial presence in New York and routinely provides professional services to clients who reside in New York and/or provides professional services in connection with matters that affect property in New York or otherwise impact New York.

31. Defendants Deutsche Bank Securities Inc., Deutsche Bank Trust Company Americas and Deutsche Bank AG worked in concert and shared information and documents relating to SPhinX and PlusFunds. Various related Deutsche entities acted on behalf or as agent of Deutsche in connection with the services Deutsche provided SPhinX and/or PlusFunds. For purposes of the wrongs asserted herein, the act of one Deutsche entity is the act of the others.

### III.    JURISDICTION AND VENUE

32. This action was commenced on March 31, 2010, when Plaintiffs filed a Summons with Notice in the Supreme Court for the State of New York, County of New York.  On April 30, 2010, Deutsche removed this action to the United States District Court for the Southern District of New York, pursuant to 28 U.S.C. § 1452 and 28 U.S.C. § 1334(b).

33. Venue is appropriate in this District pursuant to, *inter alia*, 28 U.S.C. § 1391(b)(2) because a substantial part of the events and/or omissions giving rise to the claims asserted herein occurred within the Southern District of New York.

### IV.    THE SPHINX FUNDS, PLUSFUNDS AND DEUTSCHE.

34. In December 2001, PlusFunds and Standard & Poor's, a division of the McGraw-Hill Companies ("S&P"), agreed to create and market investment products designed to achieve returns consistent with the S&P Hedge Fund Index, a composite index measuring major hedge fund strategies.  Several months later, PlusFunds created the SPhinX Funds, a family of Cayman Islands-based hedge funds specifically designed to offer certain investors net asset value ("NAV") reports reflecting the value of investments on a daily basis.

35. A central and crucial component of SPhinX's business plan was the use of segregated portfolio companies ("SPCs") under Cayman Islands law.  The Cayman SPC structure required its assets to be protected by "ring fencing" such that assets of one segregated portfolio would be protected against claims on other segregated portfolios.  SPhinX's corporate documents and offering, marketing and promotional materials represented that SPhinX's customer assets would be protected in customer-segregated accounts where they would be immune from claims of creditors of the prime broker or custodian of SPhinX assets.  On a fundamental level, the SPhinX Funds were structured to preserve and protect assets for the benefit of SPhinX and its investors against the insolvency of other portfolios or of SPhinX's custodian or prime broker.

36. SPhinX and PlusFunds trusted and relied upon a number of fiduciaries in the conduct of their business.  Among these fiduciaries were SPhinX's distributors, including Deutsche.  As a SPhinX distributor, Deutsche fully understood the structural protections designed to protect SPhinX customer assets, as well as SPhinX's relationships with service providers such as Refco.  In fact, Deutsche touted these protections in its efforts to sell SPhinX to investors, using SPhinX's offering memorandum and marketing materials.

37. SPhinX/PlusFunds and Deutsche considered themselves partners.  Beginning in late 2002, Deutsche acted as SPhinX's primary distributor, with exclusive rights to distribute SPhinX investments in the U.S. and German markets and non-exclusive rights everywhere else.  In this role as distributor, Deutsche solicited investors, advised SPhinX and PlusFunds and marketed the SPhinX program, and split management fees with PlusFunds, receiving compensation on better terms than any of SPhinX's other distributors.  Deutsche acted as SPhinX's representative and agent and, to a great extent, SPhinX's success was dependent upon Deutsche.

A.    **PlusFunds Built The SPhinX Investment Platform With An Exclusive License From S&P.**

38. Diego Winegardner and Christopher Sugrue founded PlusFunds Ltd. as a Cayman Islands corporation in or about 1998.  From its inception, PlusFunds Ltd. sought to provide investors with accurate valuations of investments on a daily basis, services not then available to the investing public.  By late 2001, PlusFunds Ltd. had developed a comprehensive valuation and risk management platform for the hedge fund industry.

39. In 2001, PlusFunds Ltd. established a relationship with S&P, envisioning a new composite hedge fund index to represent the primary strategies of the hedge fund industry.  S&P agreed to publish the hedge fund index and identify and monitor individual portfolio managers for inclusion in the index.  The portfolio managers were to be identified and selected based upon a track record of investments in particular strategies represented in the S&P Hedge Fund Index.

16

40. On December 20, 2001, PlusFunds Ltd. entered into an exclusive license agreement with S&P (the "S&P License") that entitled PlusFunds Ltd. to develop and market hedge fund investment products designed to track the S&P Hedge Fund Index. The S&P License provided PlusFunds Ltd. with the right to use the S&P and S&P Hedge Fund Index marks to promote the new PlusFunds platform. The S&P License placed PlusFunds at the forefront of competing hedge funds and positioned PlusFunds for growth.

41. In March 2002, after an infusion of new capital from investors, PlusFunds was organized under Delaware law, and the S&P License was assigned to it.

**B.      The SPhinX Funds Were Established In 2002.**

42. Beginning in the spring of 2002, PlusFunds created the SPhinX Funds, deriving the name from the **S&P H**edge Fund **In**dex. The SPhinX Funds were designed to achieve returns consistent with the performance of the S&P Hedge Fund Index.

43. The SPhinX Funds were immediately successful. Assets under management ("AUM") increased steadily, rising to $3 billion in 2004 and 2005. PlusFunds' business plan was to increase AUM to over $15 to $20 billion. In October 2005, PlusFunds negotiated a relationship with Lehman Brothers to bring in an additional $500 million-plus in AUM.

44. At all times relevant, there were innocent decision-makers on the SPhinX board of directors, including but not limited to Stuart Drake, Martin Grennell and/or Andrew Feighery, that could have and would have taken steps to prevent the misconduct alleged herein, if the misconduct had not been actively concealed from them.

45. The SPhinX Funds were a group of investment vehicles comprised of separate investment portfolios corresponding to the investment strategies represented in the S&P Hedge Fund Index. Investors invested in SPhinX based upon offering materials and contract documents that governed how SPhinX and PlusFunds would deal with investor assets. A material term of

the SPhinX Funds' relationship with investors was the requirement that invested cash would be maintained in customer-segregated accounts.

46. The various SPhinX entities, which were collective investment vehicles, were divided into three categories:  (1) Feeder Funds, designed to support investments and issue subscriptions; (2) Master Funds, designed to capture operational efficiencies; and (3) Portfolio Funds, segregated portfolio companies organized under Cayman Islands law in which portfolio managers trade in securities and commodities.

<strong>1.   The SPhinX Funds were organized as Segregated Portfolio Companies to protect customer assets.</strong>

47. Cayman Islands law provides for a segregated portfolio company ("SPC") to segregate assets and liabilities within a single SPC.  Under Cayman Islands law, assets within each segregated portfolio, or "cell," within an SPC, are protected from cross-liability; *i.e.*, the assets maintained in one portfolio are protected from creditors of another cell or the general creditors of the SPC in the event of insolvency.

48. Cayman Islands Companies Law, referenced in SMFF's Articles of Association and SPhinX's offering materials, provides:

> A segregated portfolio company may create one or more segregated portfolios in order to segregate the assets and liabilities of the company held within or on behalf of the portfolio from the assets and liabilities of the company held within or on behalf of any other segregated portfolio of the company or the assets and liabilities of the company which are not held within or on behalf of any segregated portfolio of the company.

49. Cayman Islands Companies Law further provides:

Segregated portfolio assets-

(a)     shall only be available and used to meet liabilities to the creditors of the segregated portfolio company who are creditors in respect of that segregated portfolio and who shall thereby be entitled to have recourse to the segregated portfolio assets attributable to that segregated portfolio for such purposes; and

(b)     shall not be available or used to meet liabilities to, and shall be absolutely protected from, the creditors of the segregated portfolio company who are not

creditors in respect of that segregated portfolio, and who accordingly shall not be entitled to have recourse to the segregated portfolio assets attributable to that segregated portfolio.  [Emphasis added.]

50. The actual trading and investment activities of the SPhinX SPCs were performed by independent portfolio managers, with each portfolio manager directing investment activity within a single segregated portfolio.  Each of the individual portfolio managers was identified by S&P as representative of strategies represented on the S&P Hedge Fund Index.

51. Among the various SPhinX SPCs was SMFF, which at various times was comprised of 14 or 15 segregated portfolios, each managed by a separate portfolio manager.

52. Ordinarily, an investor in SPhinX was issued shares in a Feeder Fund, and the proceeds of the investment flowed through one or more Master Funds to one or more SPCs, where the proceeds were then allocated among different segregated portfolios or cells within the SPC, according to the investment strategy selected by the investor.

53. Thus, an investor who elected to invest in SPhinX Ltd. or SPhinX Strategy Fund Ltd., two feeder funds, could elect to have a portion of the invested proceeds flow into SMFF, where the proceeds would be allocated among the 14 or 15 segregated portfolios within SMFF. Investors in SPhinX Plus SPC Ltd. and PlusFunds Manager Access Fund SPC Ltd. might also have invested funds allocated to SMFF Portfolio Managers.

54. The SPhinX Funds' offering and marketing materials identified limitations, investment restrictions and protections designed to safeguard customer assets invested with SPhinX.  Because shares in SPhinX Ltd. and SPhinX Strategy Fund Ltd. were listed on the Irish Stock Exchange, the Funds were subject to investment restrictions and diversification requirements imposed by the Exchange, which were disclosed in the Offering Memoranda. Those regulations required that:

- no more than 20% of the value of the gross assets of each Portfolio of the Company may be lent to or invested in the securities of any one issuer or

may be exposed to the creditworthiness or solvency of any one counterparty and no more than 20% of the assets of a Series of a Class in respect of "hot issues" may be invested in the securities of any one issuer of "hot issues" or exposed to the creditworthiness or solvency of any one counterparty;"

\* \* \*

- the Company must observe the general principle of diversification of risk in its derivatives trading.

## 2. **SPhinX promised its investors customer-segregation to protect customer assets.**

55. Protection of customer assets, through such features as the SPC structure and customer-segregation requirements, was a key component of the SPhinX Funds and was prominent in SPhinX's marketing materials, corporate and organizational documents and Offering Memoranda.

56. SMFF's Articles of Association provide:

The Company may create one or more Segregated Portfolios in order to segregate the assets and liabilities of the Company held within or on behalf of a Segregated Portfolio from the assets and liabilities of the Company held within or on behalf of any other Segregated Portfolio or the General Assets.

Each Segregated Portfolio shall be separately designated or identified in accordance with Part XIV of the Law and shall include in its name the words 'Segregated Portfolio'.

57. The Cayman Islands Companies Law provides:

It shall be the duty of the directors of a segregated portfolio company to establish and maintain (or cause to be established and maintained) procedures –

(a) to segregate, and keep segregated, portfolio assets separate and separately identifiable from general assets;

(b) to segregate, and keep segregated, portfolio assets of each segregated portfolio separate and separately identifiable from segregated portfolio assets of any other segregated portfolio;

(c) to ensure that assets and liabilities are not transferred between segregated portfolios otherwise than at full value.

58. In addition to protection from cross liability, the SPC business structure and SPhinX business plan required customer assets be maintained in customer-segregated accounts so that the segregated portfolios were protected from the potential insolvency of the custodian or prime broker holding the assets.  SMFF's Articles of Association provide:

> The assets held in each Segregated Portfolio shall be held, subject to the provision of the Law and these Articles, for the benefit of the holders of the relevant Common Shares attributed to such Segregated Portfolio and applied solely in respect of the liabilities of such Segregated Portfolio in accordance with the provision of the [Cayman Island Companies] Law.

59. The Offering Memoranda of SPhinX Ltd. represented:

> That portion of a Portfolio Fund Series' assets which are fully paid and not Margin Securities may be physically commingled with other customer assets but will be properly identified in the name of the Portfolio Fund Series in a separate customer account on the prime broker's official books and records ("Customer Assets").  Customer Assets are held by the prime broker with the assets of other customers on a segregated basis from the prime broker's assets and are not subject to the claims of the prime broker's creditors.  Additionally, in order to ensure that assets of a prime broker's customers are not used by the prime broker to fund the prime broker's proprietary business operations, the prime broker is required to maintain a special segregated bank account for free cash balances (i.e., cash not subject to the claims of the prime broker) and must periodically post its own cash (or other qualified securities) in such account equal to the Margin Securities used to generate cash in excess of any loan to a Portfolio Fund Series.  In the event of insolvency of the prime broker, all customer assets will be for the exclusive benefit of the Portfolio Fund Series and other customers of the prime broker for whose benefit the accounts have been established, and will be unavailable to the creditors of the prime broker.  [Emphasis added.]

60. The Offering Memoranda of SPhinX Ltd. further represented:

> The Custodian will maintain all assets of the Company and ensure the safekeeping of the assets in a segregated client account and those assets will be separately identified and will be unavailable to the creditors of the Custodian in the event of its insolvency.

61. The Offering Memoranda for SPhinX Strategy Fund Ltd., SPhinX Plus SPC Ltd. and PlusFunds Manager Access Fund SPC Ltd. included similar language.

62. SPhinX marketing materials emphasized that SPC assets would be "ring-fenced" and maintained in customer-segregated accounts to protect those assets.  "Ring fencing" specifically

referred to the protection of segregated portfolios from cross-liability. Assets of segregated Portfolio A could not be used to satisfy claims against Portfolio B. In general terms, ring fencing also refers to the fact that SPC assets are protected by Cayman Islands law and by contract as provided in the Offering Memorandum and organizational documents.

63. Marketing and promotional materials PlusFunds provided to potential investors touted the protection from credit risk afforded SPhinX assets. For example, a PlusFunds document entitled "Frequently Asked Questions By Investors About SPhinX Products," dated May 24, 2004, stated:

**2.     What is a SPC?**

Segregated Portfolio Company ("SPC") is an exempted company which is registered under section 233(1) of the Companies Law (2002 Revision) and which, as a result, is able to separate its assets into general and portfolio assets, rather than having said assets commingled as was traditionally done in the past.

General assets, as the name suggests, are the general assets of the SPC (which is usually a nominal amount) that are subject to cross liability by all creditors of the SPC. However, the portfolio assets are protected from claims of creditors in other portfolios. Therefore, only creditors of a particular portfolio can bring a claim against the assets of that specific portfolio, and if the assets therein are insufficient to extinguish the claim that creditor can proceed against the general assets of the company.

* * *

**4.     Are the assets of each Portfolio Fund Series (PFS) commingled?**

No. The Portfolio Fund Series are separate and distinct entities with all assets segregated at various Prime Brokers or Futures Commission Merchant for each Portfolio Manager. The Portfolio Manager has full discretion to invest and trade those assets generally in accordance with the strategies they employ on behalf of their other accounts.

**5.     If a manager is unable to meet the liabilities to its creditors, do the creditors have recourse to other assets within that SPC?**

No. By Cayman Law definition, the general assets and the assets of that Portfolio Fund Series of a Segregated Portfolio Company shall only be used to satisfy liabilities to the Creditors of that Portfolio Fund Series. PlusFunds also goes one step further. To assure non recourse, we also include specific naming conventions

and ring fencing language in our counterparty and Prime Brokerage Documentation.  [Emphasis added.]

64. A PlusFunds' marketing brochure entitled "The SPhinX Investment Program:  A Prudent Path to Hedge Fund Investing" further stated:

> PlusFunds, a SEC-registered investment advisor, serves as investment manager of the SPhinX Investment Program and provides investors:
>
> Effective Legal Structure on Operational Control – Participating Managers trade within separate accounts established by PlusFunds and provide investors the benefits of their investment expertise.  PlusFunds, however, protects investors by establishing custody arrangements, counterparty agreements and cash movement controls that manage operational risk.  In addition, each separate account is legally and contractually ring-fenced to prevent cross-liability.
>
> *  *  *
>
> Central to PlusFunds' intelligent approach to hedge fund investing is the requirement that PlusFunds' assets are held in a separate account and not commingled with the assets of other fund investors.  [Emphasis added.]

### 3.    Refco promised to protect SPhinX and PlusFunds assets in customer-segregated accounts insulated from claims against the custodian.

65. On or about November 19, 2002, SMFF opened customer-segregated accounts for each of its cells at Refco LLC, Refco's regulated affiliate.  The account documentation provided:

> All property carried for Customer [SMFF] by Refco shall be segregated as required by the Commodity Exchange Act and the rules of the Commodity Futures Trading Commission (CFTC).  [Emphasis added.]

66. The Refco LLC account opening documents for SMFF further stated:

> If your security futures positions are carried in a futures account, they must be segregated from the brokerage firm's own funds and cannot be borrowed or otherwise used for the firm's own purposes.  If the funds are deposited with another entity (e.g., a bank, clearing broker, or clearing organization), that entity must acknowledge that the funds belong to customers and cannot be used to satisfy the firm's debts.  Moreover, although a brokerage firm may carry funds belonging to different customers in the same bank or clearing account, it may not use the funds of one customer to margin or guarantee the transactions of another customer.  As a result, the brokerage firm must add its own funds to its customers' segregated funds to cover customer debits and deficits.  Brokerage firms must calculate their segregation requirements daily.  [Emphasis added.]

67. All of SMFF's excess cash at issue in this litigation was deposited in Refco LLC securities accounts governed by the account opening documentation described above. Thus, Refco LLC assumed a duty to maintain SPhinX's assets in customer-segregated accounts. Refco LLC also, in accepting custody of SPhinX assets, assumed fiduciary duties to safeguard such assets and not to use them for Refco's own purposes or operations.

68. The Refco LLC account opening document specifically and explicitly reassured Refco customers that their funds would be segregated and protected from use by the custodian to satisfy creditor claims or otherwise, and further specifically reassured customers that

> customers with funds in segregation receive priority in bankruptcy proceedings. Furthermore, all customers whose funds are required to be segregated have the same priority in bankruptcy and there is no ceiling on the amount of funds that must be segregated for or can be recovered by a particular customer.

69. The protections afforded SPhinX's assets by virtue of SPhinX's agreement with Refco LLC entitled SPhinX to recovery of at least its pro rata share of all segregated assets in the event of the bankruptcy of the custodian of those assets.

70. The customer-segregation requirement was essential to the structure and purpose of the SPhinX Funds. This structure was mandated by the Offering Memoranda to protect customer assets as required under Cayman Islands law and relied upon by SPhinX's investors. Safeguarding the segregated nature of the assets provided a crucial level of protection to SPhinX's assets against the bankruptcy or insolvency of other investors, brokers, custodians and service providers. This structure and its safeguards brought investors to SPhinX.

## C. Deutsche Had Actual Knowledge Of SPhinX's Customer-Segregation Requirements.

71. Deutsche fully understood the Cayman SPC regime and the requirement that SPhinX's assets were to be maintained in customer-segregation. Beginning in 2002 and continuing through 2004 and 2005, Deutsche functioned as a SPhinX prime broker and

custodian, holding hundreds of millions of dollars of SPhinX assets, and so understood those requirements.  Deutsche also performed due diligence reviews of the SPhinX Funds on several occasions in 2002 and 2004, including review of SPhinX's offering materials, which were issued specifically to Deutsche.  In the course of these due diligence reviews, Deutsche specifically inquired about Cayman law and SPhinX's custody and prime brokerage agreements.

72. As SPhinX's distributor, Deutsche promoted investments in SPhinX from 2002 to 2005, using SPhinX's offering memoranda and other promotional documents, all of which described the Cayman SPC regime, customer-segregation and other protections designed to protect customer assets invested with SPhinX.

73. In an October 11, 2002 Rectification Agreement among several SPhinX entities and Deutsche Bank Securities Inc., Deutsche Bank AG London and Deutsche Bank AG New York, "each a branch of Deutsche Bank AG," Deutsche explicitly acknowledged the Cayman Islands Companies Law and its treatment of SPCs.  The parties to the agreement specifically "acknowledge[d] that each Segregated Portfolio is a segregated portfolio, as defined under the Companies Law."

74. Deutsche also understood the requirement that SPhinX assets were to be maintained and protected in customer-segregated accounts.  As discussed in greater detail below, Deutsche was identified in the offering memoranda as a prime broker and custodian for various SPhinX SPC entities, including SMFF and other segregated portfolio funds, holding hundreds of millions of dollars of SPhinX assets at relevant times in 2004 and 2005.  As discussed above, SPhinX's offering memoranda represented to investors that customer assets would be maintained in segregated customer accounts at the prime broker or custodian.

75. Various account statements for these assets reflect that Deutsche actually held these assets as regulated and customer-segregated assets.  With respect to some of these accounts, for

SPhinX Convertible Arbitrage Fund SPC for instance, assets were maintained at Deutsche with respect to futures trades such that the majority of the assets represented uninvested excess cash. In this respect, the assets were similar to the SMFF assets deposited at Refco. The account statements for SPhinX assets deposited with Deutsche reflect that they were maintained in "segregated/regulated" accounts.

76. Other agreements between SPhinX and Deutsche specifically discussed the customer-segregation requirements applicable to SPhinX assets. In a September 16, 2003 Securities Futures Addendum between Deutsche Bank Securities Inc. and SPhinX Macro (Epoch Overseas) Segregated Portfolio, one of the SPhinX cells, the parties agreed that assets deposited in certain Deutsche accounts "will be subject to the CFTC's customer-segregated funds rules."

77. Item No. 13 of the September 16, 2003 Addendum states that "[a]ll security futures contract transactions effected under this Addendum shall be subject to applicable federal and state laws, the rules of the SEC and CFTC, and the rules, interpretations, bylaws, constitutions, and customs and usages of all applicable self regulatory organizations . . . ."

78. The September 16, 2003 Addendum further disclosed that assets deposited in certain accounts would not be protected under the customer-segregation rules but included explicit disclosure of risks associated with maintaining those assets in non-segregated accounts. Before assets could be placed in non-customer-segregated accounts, Deutsche required explicit disclosure to SPhinX, approval of deposits outside of segregated accounts and waiver of the protections of customer-segregation protection. Thus, Deutsche's own treatment of SPhinX assets demonstrates that Deutsche understood that SPhinX SPC assets were to be maintained in customer-segregated accounts, separate and apart from assets of other customers and the assets of the custodian, and insulated from exposure to the custodian's own insolvency.

79. Deutsche's LBO due diligence documentation further demonstrates Deutsche's understanding of customer-segregation requirements.  In an April 27, 2004 document titled, "Project Royce Credit Memo," Deutsche indicated that it considered Refco's "top ten customers in each business segment" and noted the "competition for segregated funds."  In a footnote, Deutsche specifically discussed "Segregated Funds" as:

> funds required to be segregated and separately accounted for by Future Commission Merchants (FCM).  By this provision, an FCM must treat and deal with money, securities and property received from customers, or accruing to such customers as a result of trades, as belonging to such customers.  These segregation requirements protect the money, securities and property of customers of an FCM that are deposited to engage in commodity interest transactions.  They provide protection by requiring that the customer funds be segregated from the FCM's own funds and strictly limit the permitted uses of the funds to customer-related transactions.

80. Later, in early 2005, SPhinX and Deutsche specifically negotiated language in connection with prime brokerage agreements relating to ring-fencing language.

81. As SPhinX's distributor, prime broker and custodian, Deutsche fully understood the SPhinX program and the relevant protections designed to ensure the protection of SPhinX's assets, such as customer-segregation and ring-fencing.

### D.   SPhinX Relied On A Number Of Fiduciaries To Manage The Funds And Invest And Protect Customer Assets.

#### 1.   PlusFunds served as SPhinX's Investment Manager.

82. Beginning in or about July 2002, various SPhinX entities entered into Investment Management Agreements ("IMA") with PlusFunds.  Under the IMAs, PlusFunds was the exclusive investment manager for SPhinX, with authority and discretion to run SPhinX's daily operations.

83. As investment manager, PlusFunds owed SPhinX contractual and fiduciary duties, including duties to exercise due care and protect SPhinX's funds.  At all times, PlusFunds' board and management included innocent decision-makers, including but not limited to Gabriel

27

Bousbib, Paul Aaronson, Doug Morriss, John Wehrle, Chris Rose, Peter Ewing, Patrick McMahon, Michael Mikytuck and others, who could have and would have taken steps to prevent the misconduct alleged herein.

84. Under the IMAs, PlusFunds received a management fee equal to a percentage of AUM as of the beginning of each month.  Approximately 97% of PlusFunds' 2005 revenues were derived from SPhinX management fees.

85. Although PlusFunds and the various SPhinX entities maintained their separate legal existence, the business operations of SPhinX and PlusFunds were intertwined.  Service providers, contract parties and investors dealing with SPhinX generally communicated with PlusFunds agents and understood that PlusFunds acted as the investment manager for SPhinX.

## 2. **Refco served as SPhinX's distributor, FCM and custodial agent.**

86. Beginning in the 1990s, Refco provided execution and clearing services for exchange-traded derivatives and brokerage services in fixed income and foreign exchange markets.

87. In 2002, Refco agreed with SPhinX and PlusFunds to act as a distributor for SPhinX products trading in the Managed Futures Index.  Pursuant to a November 27, 2002 Agreement among RGL, SPhinX Strategy Fund Ltd., PlusFunds and SMFF, RGL and its affiliates were "appointed as worldwide, non-exclusive placement agents" for certain SPhinX shares that would effectuate investments in SMFF.

88. As part of this relationship, Refco was granted veto rights over the structuring, offering and operation of certain investment vehicles designed to invest in SPhinX and SMFF, and PlusFunds agreed to make its personnel available to assist Refco with product development. The agreement gave Refco access to confidential information regarding the performance of the shares for Refco to use in marketing its investment vehicles.

89. In addition, the November 27, 2002 Agreement contemplated that Refco would be granted a sub-license to use the S&P and S&P Managed Futures Index marks to promote its investment vehicles.  To promote investment in SPhinX and as contemplated in the Agreement, Refco established several investment vehicle funds that incorporated the S&P and SPhinX marks in their names, including S&P Managed Futures Index Fund LP, Refco SPhinX Managed Futures Index Fund Ltd. and SPhinX Managed Futures Index Fund LP.

90. The Agreement further provided that "Refco's affiliates shall serve as the exclusive global execution and clearing brokers" for SMFF.  Because of Refco's leading position in the industry, the engagement of Refco as execution and clearing broker for SMFF, which traded in futures and commodities, did not seem inappropriate to innocents at SPhinX or PlusFunds.  In November 2002, pursuant to this provision, PlusFunds retained Refco LLC as SMFF's futures commission merchant ("FCM") to provide execution, clearing and margin services in connection with futures and commodities trading activities.  As a registrant with the SEC, CFTC and NFA, Refco LLC was required by law to maintain customer assets in customer-segregated accounts, such that these assets were protected in the event of Refco LLC's insolvency.

91. SMFF's individual portfolios opened futures accounts at Refco LLC.  As discussed above, SMFF's account opening documentation for its accounts at Refco LLC mandated that SMFF's futures accounts would be maintained in customer-segregated accounts, and that if SMFF's funds were deposited with another entity, that entity would "acknowledge that the funds belong to customers and cannot be used to satisfy the firm's debts."

92. The sub-license and distributorship relationship between Refco and SPhinX/PlusFunds, coupled with Refco's role as custodian and FCM, created an agency and/or partnership relationship of trust and confidence among SPhinX, PlusFunds and Refco giving rise to fiduciary duties owed by Refco to SPhinX and PlusFunds, including duties of loyalty and

disclosure.   As SMFF's agent, custodian and distributor, Refco owed SMFF statutory, contractual and fiduciary duties in connection with SMFF's cash and assets, including duties to hold SMFF's assets and execute trades for SMFF's benefit and not to use those assets for the benefit of Refco LLC or its principals and affiliates.

93. PlusFunds also arranged for another Refco affiliate, RAI, a regulated commodity pool operator located in New York, to execute trades for SPhinX at the direction of PlusFunds.   In that role, RAI served as the primary contact and liaison between SPhinX/PlusFunds and the Refco entities holding SPhinX's customer assets.   As the agent of Refco LLC and RCM, RAI shared in Refco's fiduciary duties to SPhinX and PlusFunds.

94. In the course of the services it provided, RAI monitored SPhinX's assets, including SMFF's cash, held at Refco LLC and RCM and exercised discretion over the movement of assets between them.   As a result of this role of discretion and RAI's control over SPhinX's assets, RAI owed fiduciary duties to SPhinX/PlusFunds with respect to SPhinX's assets, including duties to use and hold those assets for SPhinX's benefit and not to misuse those assets for the benefit of RAI or its affiliates.

95. RAI was a relatively small operation created as an attempt to establish an investment management business for Refco.   As part of this effort, RAI created, marketed and managed the S&P Managed Futures Index Fund LP, Refco SPhinX Managed Futures Index Fund Ltd. and SPhinX Managed Futures Index Fund LP to invest directly in the SPhinX program.   The majority of RAI's business was the supervision of investments in the SPhinX Funds.

96. As a result of the totality of the facts and circumstances of the relationship between Refco and SPhinX/PlusFunds, Refco owed fiduciary duties to SPhinX and PlusFunds with respect to investment funds entrusted to Refco.   These facts and circumstances included, among others and without limitation:

(a)     Refco's role as agent for solicitation and distribution of investments in the SPhinX Funds;

(b)     Refco's access to confidential and proprietary SPhinX and PlusFunds data and PlusFunds personnel in connection with Refco's distributorship role;

(c)     Refco's influence, veto rights and discretionary role in connection with the issuance of certain shares and investment vehicles for investment in SPhinX;

(d)     Refco's access to and participation in PlusFunds' exclusive license to use the S&P, SPhinX and S&P Hedge Fund and Managed Futures Index proprietary marks in the marketing and promotion of Refco's investment vehicle funds;

(e)     Refco's agreement to market investments in SPhinX and SMFF pursuant to the terms of SPhinX's Offering Memoranda;

(f)     Refco's representations that SMFF's futures accounts would be protected, customer-segregated accounts and that other entities holding SMFF's customer accounts would acknowledge the customer-segregated nature of SMFF's accounts;

(g)     Refco's exclusive role as FCM and custodial agent for SPhinX and SMFF and its acceptance of responsibility to act on SPhinX's behalf and in its best interest;

(h)     the CFTC, NFA and SEC regulations requiring FCMs and registered entities to protect customer assets in customer-segregated accounts;

(i)     the custodial and entrustment nature of the relationship between Refco and SPhinX with respect to SPhinX funds;

(j)     the fact that SPhinX entrusted funds to Refco with the reasonable expectation that the funds would be returned to SPhinX at its instruction;

(k)     Refco's decision to make use of SPhinX customer funds for purposes unrelated to Refco's ability to service its customers and without any benefit to SPhinX;

(l)     the undisclosed risks to which SPhinX customer funds were exposed by virtue of the undisclosed, unsecured, uncollateralized transactions alleged herein;

(m)     the fact that Refco and RCM were insolvent at least as of 2002;

(n)     Refco's public statements concerning, among other things, its "focus on acting as an agent," its "customer-oriented philosophy," its appeal to "customers concerned about potential conflicts of interest" and its efforts to "avoid potential conflicts with [its] customers";

(o)     Refco's public statements, designed to foster greater trust and confidence with customers, that the business of Refco did not involve proprietary trading but rather involved acting as an agent and executing customer instructions;

(p)     Refco's statements to the effect that the relationships between Refco and other Refco entities were structured in such a way as to ensure that Refco would be able to satisfy its obligations to customers before funds from Refco could be made available to other Refco entities for other corporate purposes;

(q)     the lack of indicia that the relationship between Refco and SPhinX was a debtor/creditor relationship, in which SPhinX was a lender or investor in Refco;

(r)     Refco's failure to disclose to SPhinX or PlusFunds the existence, nature and extent of the massive intercompany transfers and diversion of SPhinX's assets;

(s)     the lack of any communications from Refco to SPhinX or PlusFunds to suggest that SPhinX customer funds were held in non-segregated accounts where they were subject to the risk of loss to Refco's creditors, and that Refco could not be relied upon to return funds when instructed to do so; and

(t)     Refco's superior knowledge of the underlying facts and fraud alleged herein.

### 3.     Deutsche owed SPhinX and PlusFunds fiduciary and contractual duties in connection with extensive services and relationships.

97. As a result of extensive and intimate relationships with SPhinX and PlusFunds, SPhinX and PlusFunds reposed trust and confidence in Deutsche, giving rise to a fiduciary relationship and fiduciary obligations from Deutsche to SPhinX and PlusFunds.

### (a)     Deutsche served as SPhinX's primary distributor.

98. Deutsche was intimately involved with the SPhinX Funds from their inception in 2002.  On November 22, 2002, Deutsche, SPhinX and PlusFunds executed a Distribution Agreement, under which Deutsche acted as the exclusive distributor of investments in SPhinX in the United States and German market segments and also as "global non-exclusive selling agent of SPhinX" to find investors for SPhinX shares world-wide.  The Distribution Agreement contemplated that Deutsche could form one or more investment vehicles to invest directly in SPhinX portfolio funds in exchange for a share in management fees, which were divided with PlusFunds.

99. The Distribution Agreement defined management fees based on the level of investments raised by Deutsche.  For instance, for the first $350 million of assets raised in the

United States, Deutsche would receive two-thirds (2/3) of the management fees and PlusFunds would receive one third (1/3).  The fees and profits Deutsche received in connection with its role as distributor exceeded the fees offered any other SPhinX distributor.  From 2002 to 2005, SPhinX and PlusFunds paid Deutsche distribution fees in excess of $3 million.

100.   The Distribution Agreement contemplated a close relationship among Deutsche, SPhinX and PlusFunds.  The Distribution Agreement expressly appointed Deutsche as SPhinX's "selling agent" and gave Deutsche broad access to both SPhinX's and PlusFunds' books and records and due diligence materials.  The Agreement provided for cooperation among SPhinX, PlusFunds and Deutsche to market the Funds.

101.   The Distribution Agreement contemplated that SPhinX and PlusFunds would share confidential, proprietary information with Deutsche in connection with the relationship, and SPhinX and PlusFunds in fact did share such sensitive information with Deutsche.  For example, in February 2004, PlusFunds prepared an analysis of the S&P Hedge Fund Index, comparing it to other similar index products.  The document was prominently marked, "Strictly Internal – Not for External Distribution."   In March 2004, PlusFunds' CEO Gabriel Bousbib circulated the document to Deutsche's Sunil Beri, noting that "this document is strictly confidential, should be distributed only internally at DB, on a 'need to know' basis."  PlusFunds trusted and confided Deutsche in connection with SPhinX business.

102.   The Distribution Agreement further contemplated that Deutsche's obligations could be fulfilled by or assigned to Deutsche affiliates, such that SPhinX and PlusFunds expected that any number of Deutsche entities or agents would participate in Deutsche's performance of the Agreement, and SPhinX and PlusFunds would benefit from the resources and expertise of Deutsche's worldwide organization.

103.    The Distribution Agreement provided that PlusFunds and SPhinX could not dissolve SPhinX, "change any of SPhinX's key business terms, or terminate PlusFunds' Advisory Agreement with SPhinX" without Deutsche's prior approval.

104.    The Distribution Agreement repeatedly referenced SPhinX's Offering Memoranda and subscription materials and represented that investments in SPhinX would be made in accordance with those documents.  Deutsche's role as distributor thus required it to present the SPhinX program to potential investors and to understand the SPhinX platform.  As distributor, Deutsche was thoroughly familiar with the SPC business structure and the protections built into the SPhinX program to protect SPhinX assets for SPhinX and its investors. Deutsche possessed, read and used SPhinX's Offering Memoranda and marketing and promotional materials to bring investors to SPhinX.

105.    SPhinX and PlusFunds consulted closely with Deutsche in connection with the business and management of the Funds.  For instance, in June 2004, PlusFunds and Deutsche exchanged e-mails in which Deutsche reviewed and proposed changes to SPhinX's Offering Memoranda.

106.    Deutsche was SPhinX's primary distributor.  As a result of the close relationship among the parties, SPhinX and PlusFunds considered Deutsche their partner.  In January 2003, PlusFunds' quarterly reports repeatedly referred to the Funds' relationship and "partnership with Deutsche Bank," and a December 8, 2003 e-mail specifically stated that SPhinX and PlusFunds were "highly dependent on Deutsche right now."

107.    Deutsche conducted an extensive study of PlusFunds and SPhinX in connection with Deutsche's agreement to distribute the SPhinX Funds.  In the course of this review, Deutsche specifically questioned why Refco was selected as the Funds' FCM and requested related due diligence materials from PlusFunds.  Accordingly, Deutsche was aware at all times

that Refco served as SPhinX's custodian and FCM and that SPhinX had hundreds of millions of dollars in customer assets deposited at Refco.

> **(b)** **Deutsche helped SPhinX and PlusFunds monitor exposure to counterparties by providing risk management services.**

108.    As a part of the services Deutsche offered SPhinX and PlusFunds, Deutsche agreed to "perform risk analyses" and provide risk management services, including weekly risk reports for PlusFunds' risk committee.  Under the "db Risk Office Service Agreement," executed by SPhinX and PlusFunds in February and March 2003, Deutsche agreed "to provide its db RiskOffice service" and "use the db RiskOffice methodology to perform risk analyses" on behalf of SPhinX.

109.    In a December 2002 press release regarding Deutsche's agreement to distribute SPhinX, Deutsche stated that it "chose the SPhinX investment program due to its low tracking error with the various S&P hedge fund indices, as well as its risk management and transparency platform."  Thus, Deutsche represented that its relationship with SPhinX was at least in part tied to SPhinX's use of db RiskOffice.

110.    In connection with its risk management services, Deutsche accessed detailed, otherwise confidential information regarding the business and operations of SPhinX and PlusFunds.  Beginning in late 2002 or early 2003, Deutsche provided weekly risk reports generated using a Deutsche risk management program, "db RiskOffice."  A 2004 PlusFunds due diligence questionnaire referred to Deutsche's db RiskOffice system as "the core tool" for monitoring SPhinX's risk exposure to various parties, including Refco.

111.    In connection with its "risk management services," Deutsche was responsible to produce and did produce relevant information for a number of reports distributed to PlusFunds and SPhinX, including the following:  SPhinX's Market Risk Report, Credit Risk Report, Leverage Reports, Equity-By-Region Reports and Managed Futures Risk Reports.  In addition to

providing the reports and/or information directly to SPhinX and PlusFunds, Deutsche published risk results on its website and provided user and password numbers to allow PlusFunds access to the risk reports on-line.  Deutsche's risk analysis established identification codes corresponding to 9 hedge fund investment strategies used by SPhinX and 40 identification codes into which all SPhinX positions could be placed.

112.   Deutsche's weekly risk reports were reviewed and reasonably relied upon by PlusFunds' risk committee, which included innocent PlusFunds agents.  Deutsche knew and understood that PlusFunds' risk committee relied upon the weekly risk reports to monitor and protect SPhinX's assets.  The weekly risk reports identified Deutsche as a source of the reports.

113.   Throughout the term of SPhinX's relationship with Refco, the weekly risk reports failed to reflect SPhinX's true exposure to Refco.  The reports typically reflected exposure to Refco in the $10 to $25 million range, which SPhinX and PlusFunds understood to be amounts not protected in customer-segregated accounts.  However, as discussed in greater detail below, Deutsche actually knew and recorded in its notes that hundreds of millions of dollars in SPhinX assets were maintained in unregulated accounts at RCM, where those assets were utilized by Refco to finance its operations.  Deutsche understood that hundreds of millions of dollars of SPhinX assets were therefore at risk but failed to disclose that risk in the weekly risk reports or elsewhere.

114.   At times, Deutsche received fees for providing risk services to SPhinX and PlusFunds, but at other times, Deutsche provided the risk management system to promote its business relationship with SPhinX and PlusFunds.  Internal 2003 PlusFunds e-mails record that PlusFunds offered Deutsche additional prime brokerage business "in order to get Deutsche comfortable with our long-term relationship (and the ongoing use of DB Risk)."

       (c)      **Deutsche held hundreds of millions of dollars of SPhinX assets as SPhinX's prime broker.**

115.    Deutsche profited from its relationship with SPhinX and PlusFunds by providing other services as well.  From the inception of the SPhinX Funds, Deutsche acted as prime broker and custodian for certain SPhinX assets, including customer assets invested with SMFF, SPhinX Strategy Fund Ltd., SPhinX Long/Short Equity Fund SPC, SPhinX Equity Market Neutral Fund SPC, SPhinX Distressed Fund SPC, SPhinX Convertible Arbitrage Fund SPC, SPhinX Macro Fund SPC, SPhinX Fixed Income Arbitrage Fund SPC, SPhinX Merger Arbitrage Fund SPC and SPhinX Special Situations Fund SPC.  Each of these SPC funds received assets invested pursuant to the SPhinX Ltd. Offering Memorandum, which included specific representations regarding customer-segregation and protection of customer assets.

116.    The SPhinX Ltd. Offering Memoranda identifies Deutsche as "Custodian" and discloses that the assets of the SPhinX Portfolio Fund Series would be held at various prime brokers, including "Deutsche Bank–Alex Brown."  As Custodian, Deutsche was required to "maintain all assets of the Company, including securities and assets other than cash, in a segregated client account and those assets will be separately identified and will be unavailable to the creditors of the Custodian in the event of its insolvency."  The Offering Memorandum further required prime brokers to ensure safekeeping of assets, which were to be held on a "segregated basis from the prime broker's assets and are not subject to the claims of the prime broker's creditors."  Accordingly, Deutsche, as a SPhinX custodian and prime broker, owed a fiduciary duty to SPhinX and PlusFunds regarding the custody of SPhinX assets and understood the requirement that SPhinX assets be maintained in customer-segregated accounts, protected from exposure to the custodian's insolvency.

117.    As a custodian and prime broker, the relationship between SPhinX and Deutsche was fiduciary in nature.  Deutsche's website states, "as a fiduciary, [Deutsche] always acts in the

best interests of our institutional clients."  The website further states, "every relationship begins with a thorough understanding of each institutional client's specific situation, including regulatory constraints, investment objectives, risk parameters and liquidity requirements."

118.   The placement of customer-segregated assets was a significant benefit to Deutsche.  In an April 27, 2004 "Project Royce Credit Memo" relating to the Refco LBO, Deutsche noted the "competition for segregated funds" and that "Significant customer 'seg funds' are a valuable asset."  The same document, prepared by Deutsche in connection with its due diligence investigation of Refco, discusses the Commodity Exchange Act's provisions regarding "Segregated Funds," which requires an FCM to "treat and deal with money, securities received from customers, or accruing to such customers as a result of trades, as belonging to such customers."  The document further notes the requirement that "customer funds be segregated from the FCM's own funds."  Deutsche clearly understood the statutory and regulatory customer-segregation requirements.

119.   At relevant times in 2004 and 2005, Deutsche, acting as prime broker and/or custodian, held in excess of $500-$600 million in SPhinX customer assets, earning substantial brokerage fees, commissions and transaction-based fees in connection with its prime brokerage services.

### (d)   With PlusFunds' approval, Deutsche obtained a license to use S&P's marks to develop Deutsche's own funds.

120.   Throughout the existence of the SPhinX Funds, Deutsche sought and obtained closer ties with SPhinX, PlusFunds and S&P.  As a result of its efforts to market the SPhinX Funds, and in likely recognition of the initial success enjoyed by the SPhinX Funds, PlusFunds and S&P agreed to help Deutsche sponsor its own funds tied to the S&P and SPhinX marks and the S&P Hedge Fund Indices.  Establishing these funds would allow Deutsche to earn additional management fees and strengthen the relationship among Deutsche, SPhinX, PlusFunds and S&P.

121.    On or about April 1, 2004, Deutsche entered into a License Agreement with S&P. With the agreement and permission of SPhinX and PlusFunds, S&P granted Deutsche rights to use the S&P and S&P Hedge Fund Index marks to promote and market Deutsche's own investment vehicles.

122.    PlusFunds' license agreement with S&P, acquired in 2001 and at that time exclusive to PlusFunds, was one of the key features of the SPhinX Funds.  The decision of PlusFunds to share the S&P mark with Deutsche demonstrates Deutsche's important role in marketing and promoting SPhinX and underscores the trust and reliance PlusFunds placed in Deutsche.

123.    Under the April 1, 2004 License Agreement, S&P granted Deutsche "a non-transferable, non-exclusive license (i) to use the S&P Hedge Fund Index as a component of the Product(s) to be issued, entered into, written, sold and/or purchased by Licensee [Deutsche] and (ii) to use and refer to the S&P Marks in connection with the marketing and promotion of the Product(s)."  In exchange, Deutsche agreed to "invest its own assets in one or more series or classes of shares of a Fund managed by PlusFunds in accordance with the terms of the offering memorandum and subscription documentation . . ."

124.    Prior to the April 1, 2004 License Agreement, Deutsche's own proprietary investment in SPhinX ranged between zero and $10 million.  After the April 1, 2004 License Agreement, Deutsche's proprietary investment in SPhinX increased significantly but was structured to limit Deutsche's exposure.

125.    As contemplated in the license agreement, Deutsche was authorized to issue to its customers derivative products that were linked to the S&P Hedge Fund Index, including the Deutsche Bank Dynamic Alternative Portfolio Fund and Dynamic Focus Fund (the "Dynamic Funds").  The Dynamic Funds were designed to track the performance of a proprietary Deutsche

index, which included a 60% allocation to hedge fund strategies represented by various indices in the S&P Hedge Fund series.  The license agreement with S&P enabled Deutsche's Dynamic Funds to gain exposure to the various indices in the S&P Hedge Fund series, to use the S&P marks in promoting the Dynamic Funds and generate substantial fee income to Deutsche.

126.    Deutsche viewed its investment in SPhinX under the license agreement as a fully hedged investment.  Deutsche received investor monies into the Dynamic Funds and promised investors returns that correlated in substantial part to the returns reported in the S&P Hedge Fund Index and related indices.  Under the License Agreement, Deutsche was then required to invest its own funds in SPhinX in an amount corresponding to the amounts Deutsche's investors invested in the Dynamic Funds.  If SPhinX declined in value, Deutsche's proprietary investment in SPhinX declined, but its obligations to investors in the Dynamic Funds also declined correspondingly, because both SPhinX and the Dynamic Funds followed the S&P indices.  The loss would be passed on to Dynamic Fund investors, whose investments were linked to the values reported in the Index.  If Deutsche's investment in SPhinX increased in value, Deutsche would likewise pass that gain along to its investors.  Either way, Deutsche earned significant management fees on assets deposited with SPhinX, without actual risk on Deutsche's proprietary investment in SPhinX.

127.    PlusFunds had knowledge of the S&P-Deutsche License Agreement and consented to it.  Attached as "Exhibit C" to the License Agreement was a form "PlusFunds Agreement" to be executed by Deutsche and PlusFunds under certain circumstances discussed in the License Agreement.  The form PlusFunds Agreement included the following language:

Licensee hereby covenants to PlusFunds as follows:

It will promptly inform PlusFunds of any fact after the date hereof indicating (i) the existence of any material action, claim or proceeding threatened or pending against Licensee or (ii) indicating that there may be (as a result of a change of circumstances or otherwise) a misstatement of a material fact or an omission to

state a material fact in any of the Offering Documents required to be stated therein or necessary to make the statements therein not misleading in light of the circumstances under which such statements or omissions were made…"

Although the "Offering Documents" referred to in this paragraph referred specifically to the offering materials for Deutsche's funds, it remains clear that the parties contemplated disclosure of facts necessary to ensure that representations to investors would be accurate.

128.    In May 2004, following the S&P License Agreement, Deutsche publicly announced that it would use SPhinX to hedge its exposure to the Dynamic Alternative Portfolio Fund. Shortly thereafter, Deutsche sent in a subscription for various SPhinX shares.

129.    Later, on August 20, 2004, Deutsche, SPhinX and PlusFunds entered into a Memorandum of Agreement that provided for Deutsche to arrange and enter into transactions linked to the S&P Hedge Fund Index. The initial amount of shares purchased by Deutsche in connection with this Agreement was $245 million with a management fee of 125 basis points. The Memorandum of Agreement provided for PlusFunds to pay Deutsche a rebate payment of 40 basis points per annum calculated from the aggregate net asset value of all shares held by investors. Again, this was a very profitable arrangement for Deutsche and was more profitable to Deutsche than SPhinX's agreements with other distributors. Notably, the Memorandum of Agreement provided Deutsche with "enhanced liquidity," a short redemption period that gave Deutsche the ability to redeem its SPhinX investment on terms more favorable than those provided in the general SPhinX offering materials to other investors. As a result, Deutsche anticipated that it could redeem its investment in SPhinX on quicker terms than SPhinX's other investors if problems arose.

**(e)    Deutsche's other relationships with SPhinX.**

130.    Deutsche sought additional roles and entered into numerous contracts with PlusFunds and SPhinX, including but not limited to the following:

- July 2, 2002 – Margin Lending, Securities Lending, Custody Account and Sweep Account Agreement;

- July 16, 2002 – International Swap Dealers Association Master Agreement;

- October 22, 2002 – Deutsche Bank Trust Company Americas Custodian Agreement Global Custody;

- May 16, 2003 – Master Confirmation Equity Swap Transactions;

- March 29, 2004 – Master Confirmation for Equity Swap Transactions;

- November 30, 2004 – Master Confirmation for Equity Swap and Bullet Swap Transactions;

- September 9, 2005 – Master Confirmation for Equity Swap and Bullet Swap Transactions;

- 2 July 2002 – Margin Lending, Securities Lending, Custody Account and Sweep Account Agreement between Deutsche Bank AG, London Deutsche Bank Securities Inc. and each of the Portfolio Fund Series, each Series a segregated portfolio fund of the SPhinX Equity Market Neutral Fund SPC;

- 2 July 2002 – Prime Broker Margin Account Agreement between Deutsche Bank Securities Inc. and SPhinX Equity Market Neutral (Salus Capital);

- 2 July 2002 – Prime Broker Margin Account Agreement between Deutsche Bank Securities Inc. and SPhinX Equity Market Neutral; Salus Capital, Jemmco International, First Quadrant, Thales Fund Management, Zeus Equity Arbitrage segregated portfolios;

- 12 July 2002 – Custodian Agreement and Global Custody between Deutsche Bank Trust Company Americas and SPhinX Ltd.;

- 22 July 2002 – Prime Broker Margin Account Agreement between Deutsche Bank Securities Inc and SPhinX Long Short Equity (Sparx Long/Short);

- 22 July 2002 – Margin Lending, Securities Lending, Custody Account and Sweep Account Agreement between Deutsche Bank AG New York Branch, Deutsche Bank AG London, Deutsche Bank Securities Inc. and SPhinX Long /Short Equity, Sparx Long/Short and Cumberland segregated portfolios;

- 23 July 2002 – Futures and Options Agreement for Institutional Customers between Deutsche Bank Securities Inc. and affiliates and SPhinX Long/Short Equity Fund SPC;

- 16 July 2002 – ISDA Master Agreement between Deutsche Bank AG and SPhinX Managed Futures Fund SPC for and on behalf of SPhinX Managed Futures (Campbell FME Large) Segregated Portfolio;

- 30 July 2002 – Prime Broker Margin Account Agreement between Deutsche Bank Securities Inc. and SPhinX Special Situations (Halcyon Event-Driven Strats) Segregated Portfolio;

- 29 August 2002 – Fee Agreement between Deutsche Bank AG and SPhinX Managed Futures Fund SPC for and on behalf of SPhinX Managed Futures (Campbell FME Large);

- 1 October 2002 – ISDA Master Agreement between Deutsche Bank AG and SPhinX Equity Market Neutral Fund SPC;

- 11 October 2002 – Rectification Agreement between Deutsche Bank Securities Inc, Deutsche Bank AG London, Deutsche Bank AG New York Branch and SPhinX Macro Fund SPC, SPhinX Long/Short Equity Fund SPC, SPhinX Equity Market Neutral Fund SPC, SPhinX Convertible Arbitrage Fund SPC;

- 22 October 2002 – Custodian Agreement and Global Custody between Deutsche Bank Trust Company Americas and SPhinX Strategy Fund LTD;

- 22 November 2002 – Distribution Agreement between Deutsche Bank Trust Americas, PlusFunds and SPhinX Ltd.;

- 20 February 2003 – Agreement between SPhinX Convertible Arbitrage Fund SPC and Deutsche Bank Securities Inc, Deutsche Bank AG London, Deutsche Bank AG New York;

- 11 March 2003 – db RiskOffice Service Agreement between Deutsche Bank Securities Inc and PlusFunds Group pertaining to SPhinX Macro Fund SPC, SPhinX Long/Short Equity Fund SPC, SPhinX Equity Market Neutral Fund SPC, SPhinX Convertible Arbitrage Fund SPC, SPhinX Distressed Fwd SPC, SPhinX Merger Arbitrage Fund SPC, SPhinX Special Situations Fund SPC, SPhinX Manager Futures Fund SPC, and SPhinX Fixed Income Arbitrage Fund SPC;

- 2 May 2003 – Amendment to Distribution Agreement between Deutsche Bank, PlusFunds and SPhinX Ltd.;

- 16 May 2003 – Master Confirmation for Equity Swap Transactions between Deutsche Bank AG and SPhinX Special Situations Fund SPC for and on behalf of SPhinX Special Situations (Halcyon Event-Driven Strats) Segregated Portfolio;

- 17 July 2003 – Foreign Exchange and Options Agreement between Deutsche Bank AG and SPhinX Managed Futures Fund on behalf of SPhinX Managed Futures Fund (Millburn) Segregated Portfolio;

- 30 July 2003 – Prime Broker Margin Account Agreement between Deutsche Bank Securities and SPhinX Special Situations (Halcyon);

- 16 September 2003 – Security Futures Addendum, supplementing Futures and Options Agreement for Institutional Customers between SPhinX Macro (Epoch Overseas) and Deutsche Bank Securities Inc. and affiliates;

- 8 January 2004 – Prime Broker Margin Account Agreement between Deutsche Bank Alex Brown Inc. and SPhinX Convertible Arbitrage Segregated Portfolio;

- 29 March 2004 – Master Confirmation for Equity Swap Transactions between Deutsche Bank AG London, Deutsche Bank Securities Inc., SPhinX Macro Fund SPC for SPhinX Macro (Epoch Overseas) Segregated Portfolio and RHG Capital, L.P.;

- 7 April 2004 – Security Futures Addendum Agreement between Deutsche Bank Securities and affiliates and SPhinX Fixed Income Arbitrage (DCM) Segregated Portfolio;

- 7 April 2004 – Electronic Trading Authorization between Deutsche Bank Securities and SPhinX Fixed Income Arbitrage (DCM) Segregated Portfolio;

- 7 April 2004 – Hedging Account Designation between Deutsche Bank Securities Inc and SPhinX Fixed Income Arbitrage (DCM) Segregated Portfolio;

- 1 June 2004 – Side letter to Agreement between SPhinX Ltd., SPhinX Strategy Fund Ltd., PlusFunds Group Inc. and Deutsche Bank AG;

- 20 August 2004 – Memorandum of Agreement between Deutsche Bank AG German Company and SPhinX Ltd., SPhinX Strategy Fund Ltd. and PlusFunds Group Inc.;

- 30 November 2004 – Master Confirmation for Equity Swap and Bullet Swap Transactions between Deutsche Bank AG London, Deutsche Bank Securities Inc., SPhinX Equity Market Netral Fund SPC for SPhinX Equity Market Neutral (Thales International) Segregated Portfolio;

- 9 September 2005 – Purchase and Sale Agreement for Distressed Trades between Deutsche Bank Trust Company Americas and SPhinX Distressed (Longacre) Segregated Portfolio;

- 19 August 2005 – ISDA Master Agreement between Deutsche Bank AG and SPhinX Managed Futures Fund SPC for SPhinX Managed Futures (Hyman Beck) Segregated Portfolio;

- 8 September 2005 – Termination Agreement for the Credit Derivative Transaction between Deutsche Bank AG, London Branch and SPhinX Convertible Arbitrage SPC (Forest Global Convertible Series A Class 5) Segregated Portfolio; and

- 9 September 2005 – Master Confirmation for Equity Swap and Bullet Swap Transactions between Deutsche Bank AG London, Deutsche Bank Securities Inc., SPhinX Merger Arbitrage Fund SPC for and on behalf of SPhinX Merger Arbitrage, PlusFunds Group Inc. and Green and Smith Investment Management L.L.C.

131.   In connection with one of these contracts, a 2002 Deutsche document titled "Terms of Business" referred to a "group of companies controlled by Deutsche Bank AG ('Connected Companies')."  According to the Terms of Business,

> Personnel of all Connected Companies work closely together to ensure that you benefit from all of the relevant expertise within the Deutsche Bank group. Accordingly, information made available by you to one Connected Company, including information which may be relevant for credit and other prudential purposes may be made available to other Connected Companies.  You hereby consent to and authorize such disclosure of information and acknowledge that any duties of confidentiality owed by DB Group, howsoever arising, will not be regarded as being breached by any such disclosure . . .

Accordingly, SPhinX and PlusFunds understood that the various entities "controlled by Deutsche Bank AG" would share information and participate in services Deutsche would provide to SPhinX.

132.   Other contracts between the parties, including the November 22, 2002 Distribution Agreement, contemplated that Deutsche's obligations could be performed by or assigned to related Deutsche entities.  Deutsche holds itself out in its website and marketing materials as a global organization.  Accordingly, SPhinX and PlusFunds understood that their relationship was with Deutsche, as opposed to a particular Deutsche legal entity.

133.   As a result of the totality of the facts and circumstances of the relationship between SPhinX/PlusFunds and Deutsche, Deutsche owed agency, contract and fiduciary duties to SPhinX and PlusFunds.  SPhinX and PlusFunds reposed confidence and trust in Deutsche and relied upon Deutsche's superior knowledge, expertise and resources.  As a result of Deutsche's extensive and intimate business relationships with SPhinX and PlusFunds, including its access to key confidential business information of SPhinX and PlusFunds, its role as a partner and co-venturer with SPhinX and PlusFunds, its distributorship role, and its provision of risk management services, Deutsche owed direct fiduciary duties to SPhinX and PlusFunds, requiring Deutsche to place the interests of SPhinX and PlusFunds ahead of its own.  Deutsche's fiduciary duties to SPhinX and PlusFunds included the duty to speak as to facts relevant to the management of SPhinX and PlusFunds and risks to SPhinX's assets.

## V.   **DEUTSCHE BREACHED ITS FIDUCIARY DUTIES TO SPHINX AND PLUSFUNDS AND ACTIVELY AIDED AND ABETTED REFCO'S FRAUDULENT SCHEME.**

134.   Deutsche breached its fiduciary duties by placing its own selfish interests ahead of the interests of its fiduciaries, SPhinX and PlusFunds.  At every turn, Deutsche pursued its own profits at the expense of SPhinX and PlusFunds and the public.

135.   Because of its close relationship with SPhinX and PlusFunds, Deutsche knew that SPhinX deposited hundreds of millions of dollars of customer assets at Refco, and specifically at Refco LLC and RCM.  Deutsche was also well acquainted with the structure and organization of the SPhinX Funds, including protections designed to ensure the protection and segregation of SPhinX customer assets.  In fact, by using SPhinX's offering materials to market investments in SPhinX and PlusFunds, Deutsche made those very representations to investors itself.

136.   Through its relationship with Refco, Deutsche knew that in fact, hundreds of millions of dollars of SPhinX assets were maintained outside of regulated, segregated accounts at

Refco and were therefore at risk, in violation of representations made to SPhinX investors. Deutsche knew that those assets were available for use by Refco and were in fact used as liquidity to finance Refco's operations, and Deutsche relied upon the availability of SPhinX cash at RCM in valuing Refco for the IPO.  The knowledge that hundreds of millions of dollars of SPhinX cash was at risk at RCM required Deutsche to speak.

137.    Making matters worse, Deutsche also knew that Refco was a fraud and in no position to conduct the August 2004 LBO and August 2005 IPO transactions.  As discussed in greater detail below, Deutsche participated in the LBO and IPO transactions, in support of which Deutsche purported to perform an extensive due diligence investigation of Refco.  In May 2004, early in Deutsche's due diligence investigation, Deutsche's credit risk management committee rejected participation in the LBO because Deutsche distrusted Refco, intercompany receivables obscured Refco's true financial position and threatened its ability to repay the LBO debt, and Refco had negative cash flow.

138.    Brushing aside concerns regarding Refco, Deutsche approved participation in the LBO over CRM objection and moved forward with an eye to complete the LBO and please THL, the LBO purchaser.  Instead of refusing to participate in the LBO and IPO transactions and disclosing its concerns about Refco to SPhinX or PlusFunds, Deutsche approved and promoted transactions that ultimately contributed to the collapse of Refco, SPhinX and PlusFunds, without disclosure of Deutsche's actual knowledge of fraud.  In so doing, Deutsche joined in a conspiracy to defraud and participated in the misrepresentation of Refco's financial condition, misrepresentations that SPhinX/PlusFunds agents actually saw and relied upon in continuing to do business with Refco.

139.    Deutsche's breaches of duty to SPhinX, its investors and PlusFunds were caused at least in part by Deutsche's conflicts of interest and constituted intentional, knowing and fraudulent acts, willful misconduct, gross negligence and/or a violation of law.

### A.    Refco, With The Aid Of Its Professionals (Including Deutsche), Defrauded Its Investors And Customers, Including SPhinX And PlusFunds.

140.    Beginning in the late 1990s and continuing through 2005, Refco was involved in a massive scheme to conceal hundreds of millions of dollars in unrecoverable customer and proprietary losses and falsify Refco's financial statements.   At all times relevant to this Complaint, Refco was insolvent but presented a false image of financial strength by concealing undisclosed losses, inflating its perceived financial condition and diverting and stealing SPhinX's customer assets to support Refco's operations.

141.    SPhinX was a crucial component and primary target of Refco's fraudulent scheme.  Essential to this scheme was ready access to cash, which was used to prop up Refco, fund its operations and conceal its losses.   Refco promised customer-segregation and misrepresented Refco's financial health to induce SPhinX and other customers to deposit assets with Refco, and then misappropriated those customer assets to attract additional business (including SPhinX's customer assets) and stay afloat until Refco could be sold.

142.    The movement of SMFF's excess cash to unregulated accounts at RCM was crucial to Refco's survival.  Because of its undisclosed losses, Refco was desperate for cash to sustain its operations.  The movement of SMFF's excess cash to RCM provided Refco with access to hundreds of millions of dollars of SMFF cash, without which Refco would not have been able to continue its operations and would have collapsed.

143.    Plaintiffs' damages were therefore caused by a single fraud with various constituent elements.  Plaintiffs' damages do not arise from separate frauds inflicting separate harms; rather, they arise from the tortious conduct (including fraud, breach of fiduciary duty and

conversion, among other wrongdoing) by several entities and individuals, including Deutsche, which contributed to a single loss.[1]

144.    Refco and its co-conspirators devised and implemented an elaborate scheme through which Refco maintained the illusion that it was highly successful and financially secure. The illusion of a thriving company enabled Refco to steal billions of dollars by positioning Refco for, and ultimately carrying out, the "buy-out" of insiders' interests in RGL.

### 1.    Refco diverted SMFF cash to RCM to fuel Refco's operations and fraud.

145.    SMFF's portfolio managers traded in futures and commodities on behalf of SMFF's Portfolio Funds.   SMFF's portfolio managers often utilized margin trading in these accounts, such that SMFF was only required to post a percentage of the value of the positions in cash.   The remaining free cash balance, or excess cash, could be used to generate additional returns for SPhinX and its investors.   At most times, due to the highly leveraged and volatile nature of SMFF's trading strategy, over 70% of SMFF's assets consisted of excess cash.

146.    Beginning in December 2002, SMFF's excess cash was moved on a regular basis from customer-segregated accounts at Refco LLC to accounts at RCM, where SMFF's cash was commingled with assets belonging to other RCM customers and RCM's own assets.

147.    Neither PlusFunds nor any of the SPhinX entities executed master account opening documentation with Refco to provide for the maintenance of SMFF's excess cash at RCM.   The RCM accounts relating to SMFF's excess cash were opened pursuant to instructions from Santo Maggio, one of the primary players in Refco's fraudulent scheme.   The only master account opening documents executed by SMFF for accounts at RCM were designated as foreign

---

[1] In related proceedings, Special Master Daniel Capra has recommended, and the District Court has accepted, that SPhinX and PlusFunds were the victims of two separate frauds, a "SPhinX Fraud" comprised of the wrongful movement of SMFF cash from segregated to non-segregated accounts, and the "Refco Fraud," including the concealment of Refco's losses at RGHI, the round-trip loans used to conceal the RGHI Receivable and the

currency exchange accounts – accounts that by their nature did not require customer-segregation. Only marginal amounts – generally, $10-$20 million typically – were deposited with RCM in these foreign currency exchange accounts, and none of the damages plaintiffs seek to recover in this litigation was lost in those RCM foreign currency exchange accounts.

148.    Thus, SPhinX had three types of accounts at Refco: (1) customer-segregated accounts at Refco LLC opened pursuant to master account opening documents that promised customer-segregation; (2) RCM "sub-accounts" opened by Santo Maggio, one of the architects of the fraud, without RCM master account opening documentation; and (3) RCM foreign currency exchange accounts, into which SPhinX deposited very limited amounts at relevant times.  All SMFF excess cash placed in the RCM sub-accounts was initially deposited in SMFF's Refco LLC accounts pursuant to the master account opening documentation.

149.    Although certain PlusFunds agents were aware of the arrangement by which SMFF's cash was moved between the Refco LLC and RCM sub-accounts, the true nature of the RCM accounts as non-segregated, commingled accounts was not known to innocent PlusFunds agents.  Innocent members of SPhinX's board were unaware that SMFF cash was moved to RCM or that SMFF's cash was not protected in customer-segregated accounts.

### 2.    SMFF received no benefit from the diversion of excess cash to RCM.

150.    More than 70 percent of SMFF's assets were held as excess cash at RCM at most times relevant, but there was no *bona fide* business reason for allowing assets to be maintained at RCM.  The movement of SMFF's excess cash to RCM subjected the cash to risk of loss in the event of insolvency and resulted in the commingling of SMFF's cash in RCM's account but offered no offsetting advantage to SPhinX or PlusFunds.

---

fraudulent LBO and IPO transactions.  Plaintiffs disagree with this distinction but allege Deutsche's knowing participation in both the so-called "SPhinX Fraud" and "Refco Fraud".

151.    From the time customer money first came into SMFF in December 2002 until the end of 2003, SMFF cash held at RCM yielded no interest income for the benefit of SPhinX. SMFF received no benefit from moving its cash to RCM.

152.    Beginning in or about December 2003, cash held with RCM yielded income at the rate of one-month LIBOR minus 35 basis points.  Beginning in or about December 2004, cash held with RCM yielded interest at the rate of 90% of the 90-day Treasury Bill rate.  These rates were significantly below what could have been earned in the market and did not justify the placement of cash at RCM in non-segregated accounts where the cash was exposed to the risk of RCM's insolvency.  The low interest rate on SMFF's excess cash at RCM was consistent with SPhinX and PlusFunds innocent decision-makers' understanding that SMFF's excess cash was held in customer-segregation.

153.    Refco LLC typically paid 90% of the two-year Treasury Bill rate, which was typically higher than the 90-day Treasury Bill rate paid by RCM to customers that had at least $10,000 excess cash in segregated accounts.  Thus, for instance, on September 30, 2005, the interest rate on SMFF's non-segregated cash held at RCM was 3.184%, and the interest rate on SMFF's customer-segregated cash at Refco LLC was 3.595%.  As a result, there was no benefit to SMFF at any time from having its excess cash swept to RCM.

### 3.    SPhinX and PlusFunds monitored their exposure to Refco.

154.    Although SPhinX had contracted to use Refco LLC, RAI and RCM for various services, innocent members of PlusFunds' management team carefully monitored the Funds' credit exposure to Refco and other counterparties on a weekly basis.

155.    Throughout SPhinX's existence, PlusFunds' management and S&P convened a risk committee to analyze SPhinX's credit risk exposure to trading counterparties and providers, including Refco.  The risk committee met weekly to monitor the Funds' risk exposure and

review reports reflecting the amount of exposure the Funds faced with respect to various counterparties and custodians, including Refco.

156.    To monitor SPhinX's exposure to Refco, PlusFunds' risk committee relied upon weekly risk reports prepared by Deutsche and others.   The weekly "Risk Management Summary" generated by Deutsche detailed risk factors affecting the SPhinX investments and was intended to inform the risk committee of SPhinX's total exposure to counterparties and custodians, including Refco.

157.    Because Refco did not have a credit rating from a recognized credit agency, PlusFunds' risk committee conducted an analysis of Refco's financial position and calculated a "shadow rating" designed to estimate Refco's credit rating.  PlusFunds relied upon publicly available information, including Refco's financial statements and public filings, to generate the shadow rating.  Based upon PlusFunds' shadow rating of Refco, PlusFunds calculated guidelines to limit SPhinX's exposure on transactions with or assets entrusted to Refco.

158.    Innocent members of PlusFunds' board and management were also aware of Refco transactions, including the August 2004 LBO and August 2005 IPO transactions underwritten by Deutsche.  In fact, the participation of Deutsche in the LBO and IPO was a source of comfort to PlusFunds precisely because of its extensive and close business relationship with Deutsche.  Innocent decision-makers at PlusFunds reviewed publicly available information, including Refco's financial statements and public filings in connection with the LBO and IPO, which suggested that Refco's financial position was strong.   Deutsche, however, had undisclosed, additional inside knowledge that Refco's financial position was poor and had an internal projection of Refco's credit rating at a non-investment grade "B+" in May 2004.

159.    Had PlusFunds' risk committee been aware that Refco's financial position was far worse than what Refco represented to the public, or that Refco was actively concealing in excess

of $400 million in uncollectible losses, PlusFunds and SPhinX would have refused to do business with Refco or allow any of SPhinX's assets to be maintained with any Refco entity.  As discussed in greater detail below, Deutsche actually knew, but failed to disclose, that Refco was in dire financial straits and that SPhinX's assets at Refco were in jeopardy.

**B.**     **Refco And Its Conspirators Were At All Times Involved In A Fraudulent Scheme.**

160.    To maintain the illusion of financial and operational strength and stability, Refco and its agents, professionals and advisors conspired to conceal Refco's trading losses, operating expenses and true financial condition by fraudulently inflating Refco's revenues and funding Refco's operations with assets belonging to customers of RCM, including SMFF.

161.    Refco created the illusion that it was financially solid by concealing losses and operating expenses from Refco's financial statements, recording them as receivables owed by RGHI (a related-party company owned and controlled by Bennett and, prior to the LBO, by Bennett and Tone Grant) and inflating Refco's revenues by recording hundreds of millions of dollars in accrued interest income on these phantom receivables.

162.    Once these losses and operating expenses were concealed, Refco designed and implemented sham loan transactions involving third parties that served to pay down the RGHI Receivable at the end of Refco's reporting periods and temporarily conceal the Receivable from Refco's books.  At the same time, Refco funded its operations by diverting RCM customer assets (including SMFF cash) to finance Refco affiliates that had no ability and no intention of returning the RCM customer funds.

163.    At least as of 2002, Refco and RCM were insolvent.   At all relevant times, Refco concealed hundreds of millions of dollars of undisclosed losses from its financials and relied upon phantom revenue and fictitious income to create the appearance of profitability.  Refco's CFO, Santo Maggio, has testified that in fact Refco never made money.  As a direct result of the

fraud and the diversion of customer assets, Refco owed in excess of a billion dollars to RCM and its customers, a debt Refco had no intention or means of ever satisfying. Refco was insolvent.

164.    Having successfully maintained the illusion of Refco's financial health, Refco borrowed $1.4 billion of bank and bond debt to fund the August 2004 LBO, which enriched Refco's insiders at the expense of customers and creditors. RCM was thrust deeper into insolvency and unable to repay its customers, including SMFF, from whose accounts assets had been stolen to fund Refco's business and dividends paid to Refco's co-conspirators in the LBO.

165.    As was always Refco's plan, the LBO was followed up with an IPO that further impaired Refco's assets. The IPO (i) impaired Refco's financial condition through the fraudulent sale of more than $583 million of shares of common stock, (ii) caused Refco Inc. to pay down over $230 million of RGL's LBO debt (despite the fact that RGL was insolvent) and to pay approximately $40 million in underwriting fees and expenses and more than $80 million in the form of a "greenshoe" dividend, for which Refco received no value, and (iii) thereby allowed insiders to strip out all of Refco's remaining assets, leaving RCM with insufficient assets to repay customers whose assets were stolen.

166.    Deutsche and Refco's other investment bankers structured and facilitated the lucrative and fraudulent LBO and IPO transactions. Deutsche received significant fees and other payments in return for its participation in the fraud.

### 1.    Refco misrepresented its financial condition by issuing fraudulent financial statements.

167.    Refco avoided writing off hundreds of millions of dollars in trading losses and misallocated operating expenses and inflated Refco's revenue with phantom interest income by booking these amounts as receivables owed by RGHI to various Refco entities. This, in turn, distorted Refco's financials and allowed Refco to (i) overstate assets, understate liabilities and overstate profit and loss statements, and (ii) fraudulently project an illusion of financial health

and strength—falsely securing customer confidence and ensuring deposits of cash and securities from customers, including SPhinX, needed to facilitate and fund the Refco scheme.

168.    Refco's customer and proprietary trading losses in 1997-1999 alone amounted to hundreds of millions of dollars.  If disclosed, trading losses of this magnitude would have forced Refco to discontinue its business, and customers such as SPhinX and PlusFunds would never have done business with Refco at all.  Refco knew that it would lose customers and considerable goodwill if the public did not believe that Refco had sound internal risk management controls, was appropriately capitalized and was financially healthy.

169.    Instead of disclosing and writing off losses as bad debts, Refco caused losses and uncollectible obligations to be transferred to RGHI and acknowledged a receivable owed to Refco by RGHI.  This was done without appropriate reserves and thus overstated the overall enterprise's financial results.  If the truth had been disclosed, Refco would have violated its debt covenants, would have had to report its insolvency and would have had insufficient regulatory capital to continue to do business.

170.    Refco further fraudulently inflated its revenues and financial results by charging RGHI usurious interest of as much as 35% on the RGHI Receivable.  This was fictitious income recorded (but not received) on the hundreds of millions of dollars in trading losses, operating expenses and other transactions that comprised the RGHI Receivable.  Between 2001 and 2005 alone, fictitious recorded interest income on the RGHI Receivable amounted to at least $250 million.

171.    Between the trading losses, operating expenses and other transactions that made up the RGHI Receivable and the accrued interest on the RGHI Receivable, the RGHI Receivable ballooned to nearly $1 billion just before the LBO.

### 2. Refco concealed its misrepresented financial condition through fraudulent round-trip loan transactions.

172.    After losses and expenses were moved from Refco's books, Refco concealed the fictitious RGHI Receivable and Refco's true financial condition.  Refco accomplished this through fraudulent round-trip loan ("RTL") transactions and by funding Refco's operations with RCM customer assets, which included SMFF's cash.

173.    A large receivable owed to Refco by a related party owned by Refco's current and former CEO would have to be disclosed on Refco's financials and would have invited scrutiny.  To conceal the magnitude and related-party nature of the receivable, Refco devised and implemented a series of sham "loans" timed to straddle Refco's reporting and audit periods.

### (a) RTL Transactions.

174.    The RTLs enabled Refco temporarily to remove related-party receivables off Refco's books by shifting them between Refco subsidiaries, RGHI and third-party Refco customers (or their affiliates) who agreed to serve, for a fee, as conduits in the RTLs.

175.    The RTLs were implemented at the end of each fiscal year starting in 1998 (and beginning in 2004 at the end of fiscal quarters) to pay down temporarily the RGHI Receivable and replace it on Refco's books with a receivable purportedly owed by an unrelated third-party customer of Refco.  In order to conceal the size of the RGHI Receivable, a number of RTLs were often employed, temporarily reducing or eliminating the nearly $1 billion RGHI Receivable from Refco's books.

176.    Thus, at the end of every relevant reporting and audit period, a Refco entity (sometimes RCM) would "loan" up to $720 million to a third-party.  That third-party entity would then "loan" the same amount to RGHI (typically via a credit transferred to one of RGHI's accounts at Refco).  The RTL was completed when the credit to RGHI was netted against the

debt it owed Refco. Thus, on Refco's financial statements, the RGHI Receivable was transformed into a payable on a loan owed to Refco from an unrelated third-party.

177. Right after the start of each new reporting or audit period, the RTL was "unwound" by reversing the entire process. Once the transaction was unwound, the RGHI Receivable was restored to its full value plus the amount of the payment made to the RTL Participants of the "spread" between the interest rates of the two "loans." Refco and the RTL Participants engaged in at least 18 RTLs from 2000 to 2005. In addition, from 2000 to 2005, Refco engaged in approximately 12 additional RTLs with Refco's conspirator, BAWAG.

178. In this manner, at the end of each relevant reporting or audit period, Refco falsified its financial statements to suggest that the RGHI Receivable had been repaid or never existed. By doing so, Refco concealed its trading losses, true operating expenses and the fictitious nature of hundreds of millions of dollars in revenue.

**(b)    Looting SPhinX Cash.**

179. Refco needed cash to maintain its appearance as a fast-growing group of companies and to maintain the illusion that it was highly profitable, healthy and able to satisfy its substantial working capital needs from what it called its "internally generated cash flow and available funds." As Refco itself stated, "[r]eady access to cash is essential to our business."

180. Because Refco's other operating units were regulated entities, RCM became Refco's primary source of cash. The movement of customer assets, including SPhinX cash, to RCM became crucial to Refco's ongoing operations and fraudulent activities. In violation of its fiduciary duties, Refco simply took money and property entrusted to Refco by its customers, including SPhinX and PlusFunds, and sent the funds to other Refco entities.

181. On a daily basis, RCM customer assets, commingled in one account at Chase Bank, were transferred out of RCM to other Refco entities. Even though RCM purported to hold

billions of dollars of customer assets, it in fact maintained only about $50 million in cash and securities. The diverted RCM customer assets were used by various Refco affiliates that would not have been able to sustain their operations without RCM customer funds. This was readily apparent to parties such as Deutsche.

182.    These transfers, which purportedly took the form of unsecured "intercompany loans" from RCM to other Refco entities, often occurred without any documentation.

183.    That the fraudulent scheme perpetrated on RCM's customers, including SPhinX and PlusFunds, was fundamental to the operation and financing of Refco was understood by Deutsche and the other Investment Bankers. The volume and size of the transfers involved, on many occasions hundreds of millions of dollars each, ensured that the amounts stolen in RCM customer assets outsized Refco's total capital. By the time Refco filed for bankruptcy, the net uncollectible RCM transfers totaled over $2 billion, while RGL claimed only $515 million in capital in 2002, $566 million in 2003, $616 million in 2004 and only $150 million in 2005.

**3.      Refco insiders cashed out their interests in the fraudulent 2004 LBO and 2005 IPO transactions.**

184.    The purpose of the entire scheme was to allow Refco's insiders to sell their interests in Refco at fraudulently inflated prices. These goals were realized in Refco's 2004 LBO and 2005 IPO.

**(a)      The August 2004 LBO.**

185.    In November 2003, Refco began negotiations with THL, a private equity firm headquartered in Boston, regarding the purchase of a controlling stake in Refco as part of a leveraged buyout transaction.

186.    The LBO was carried out on August 5, 2004. THL purchased a 57% ownership interest in Refco for approximately $507 million; at the same time, Refco sold $600 million in notes and obtained $800 million in financing from a syndicate of banks. Bennett and others

acting in concert received $106 million, and hundreds of millions of dollars were transferred to RGHI.

187.    By the time of the LBO, the trading losses and operational expenses that had been pushed onto RGHI's books and hidden through the RTLs had grown to over $700 million and the diversion of RCM property had grown to approximately $2 billion.

188.    In the LBO, Refco borrowed $1.4 billion of bank and bond debt to fund THL's buyout of control of Refco.  The LBO proceeds were not used to retire the full amount of the RGHI Receivable, pay the operating expenses that had been concealed on RGHI's books or repay any of the loans owed to RCM.  Instead, Refco used the proceeds to cash-out its insiders.

189.    Nowhere in the LBO Offering Circular was Refco's use of RCM's assets or the RGHI Receivable disclosed.  Thus, Refco and its professionals, including Deutsche, concealed from the world both:  (1) the misuse of RCM customer assets (including SPhinX cash), and (2) Refco's precarious financial condition and risk to customers of Refco and RCM.

190.    Nowhere did the Offering Circular explain: (i) that RCM customer assets (including SPhinX's cash) were routinely diverted from RCM and distributed to other Refco entities without security or collateral and without regard for RCM's obligations to its customers; (ii) that RCM's most significant assets were approximately $2 billion of undocumented, uncollateralized receivables from RGL and other Refco affiliates who were obligated to repay the LBO borrowings; (iii) that Refco's business plan did not provide for repayment of these receivables; and (iv) that the LBO transactions resulted in "priming" these receivables with $1.4 billion of new bank and bond debt without regard for the interests of RCM or its customers.

191.    Instead, the Offering Circular falsely stated that the LBO bond debt was "effectively junior to all existing and future liabilities of our subsidiaries [including RCM] that have not guaranteed the notes."  The Offering Circular stated elsewhere that "[t]he effect of this

subordination is that, in the event of a bankruptcy ... , the assets of [RCM] could not be used to pay you [bondholders] until after all other claims against [RCM], including trade payables, have been fully paid."   These and similar statements describe how the LBO should have been structured—*i.e*., ensuring that any obligations incurred by any Refco affiliate in connection with the new LBO debt would not be satisfied until after all of RCM's intercompany obligations were satisfied.

192.    Refco's professionals on the LBO, including Deutsche, each knew the magnitude and significance of Refco's financial problems.  Deutsche and the other underwriters reviewed, helped prepare and/or were aware of the following information set forth in the "payable to customers" line of the condensed consolidating balance sheet to Note O of the financial statements attached to the LBO Offering Circular, which is labeled Condensed Consolidating Financial Information:

| Condensed consolidating balance sheet | | | | | |
| --- | --- | --- | --- | --- | --- |
| **February 29, 2004** | | | | | |
| | Parent [RGL] | Guarantor Subsidiaries [Includes RCC] | Non-Guarantor Subsidiaries [Includes RCM and RGF] | Consolidation Adjustments | Consolidation Totals |
| Liabilities (in thousands) Payable to customers | $465,681 | $1,556,529 | $6,647,453 | ($3,573,946) | $5,095,717 |

193.    By performing professional services and/or "due diligence" of Refco in connection with the LBO, Refco's professionals, including Deutsche, were familiar with Refco's corporate structure and operations.  While an outsider would have been unable to discern from the condensed consolidating information the full extent to which RCM funds had been siphoned

off to RGL and affiliates, these professionals, including Deutsche, understood, at least, the following:

> (a)    that in order to obfuscate Refco's financial statements and conceal the fraudulent scheme, Refco's financial statements misleadingly referred to intercompany and related-party obligations as receivables and payables owed to and from "customers";
>
> (b)    as a result, when the condensed consolidating financial statement referred to RGL's liabilities of approximately $465,681,000 as a "Payable to customers," Refco's professionals, including Deutsche, knew and/or consciously avoided knowing that this $465,681,000 liability represented RGL's payable on intercompany obligations to its subsidiaries because RGL was a holding company with no trading operations or "customers";
>
> (c)    RCC (Refco Capital LLC), the principal guarantor of the LBO debt, and the other guarantor subsidiaries could not have had $1.556 billion of payables to "customers" because RCC did not have any significant customer obligations and the other guarantors did not engage in business that had the potential to generate that magnitude of customer payables; and
>
> (d)    that only RCM had the volume of non-segregated customer assets necessary to fund billions of dollars in intercompany loans.

194.    Furthermore, as Refco's professionals, including Deutsche, knew, each intercompany transfer by RCM to RCC was booked in a back-to-back fashion through a non-guarantor subsidiary, RGF (Refco Global Finance LLC).  Thus, Deutsche knew that the $3.573 billion in consolidation adjustments were the result of eliminating approximately $465,681,000 of RGL's intercompany debt owed to RCM, approximately $1.556 billion of RGF's intercompany debt owed to RCM and approximately $1.556 billion of RCC's intercompany debt owed to RGF, and that RCM was thus owed $2 billion ($465 million owed from RGL and $1.556 billion owed from RCC, which when booked in a back-to-back fashion through RGF, added another $1.556 billion to the consolidation adjustment).

195.    Given its due diligence, detailed in-depth understanding of Refco's financial structure and operations and access to and preparation of the type of condensed consolidating financial information set forth in Note O, Deutsche, who assisted and advised Refco in

connection with the LBO, was aware of the $2 billion payable owed by RGL and its affiliates to RCM. Deutsche therefore knew that RCM's creditors and customers, including SPhinX, would never recover their investments from RCM.

196. The ultimate effect of the LBO was to pledge RGL's and RCM's asset base in favor of bank and bond lenders, leaving RCM without assets to satisfy its outstanding obligations to its customers and creditors, including SPhinX.

197. Given Refco's true financial condition, the LBO irreparably undermined Refco's already precarious financial condition. Refco and RCM were insolvent at least as of the consummation of the LBO in August 2004.

### (b)    The August 2005 IPO.

198. Less than one year after the LBO, Refco and THL led Refco through an initial public offering. A "greenshoe" option was also exercised whereby Deutsche and the other investment bankers agreed to purchase approximately 4 million shares of Refco common stock for over $80 million. The proceeds from the over allotment sale were used to pay an aggregate dividend to Refco's pre-IPO shareholders, including THL.

199. As evidenced by this dividend, the IPO was structured with the principal goal of allowing Refco's insiders to cash-out, as opposed to raising funds for Refco to reduce Refco's enormous debt. Furthermore, because Refco and RCM were insolvent at the time of the LBO, the $231 million in proceeds from the IPO that Refco Inc. used to retire part of RGL's LBO debt was wasted; Refco spent over $200 million dollars on RGL – an insolvent subsidiary that filed for bankruptcy merely weeks later.

200. As a result of the IPO, Refco faced hundreds of millions of dollars in liabilities to the purchasers of Refco stock in the IPO who had claims against Refco based on its false and misleading registration statement and prospectus. The IPO forced Refco deeper into insolvency.

201.    The professionals, including Deutsche, who advised the company in connection with the IPO knew and/or consciously avoided knowing that Refco was in no state to undertake an IPO and that the IPO as structured would cause irreversible harm to Refco's customers, including SPhinX.

202.    The most blatant indication that Refco's professionals understood that Refco was hiding hundreds of millions of dollars in related-party receivables was the conscious editing of SEC disclosure documents to conceal the RGHI Receivable.

203.    Given the planned IPO, Refco had to file an S-4 with the SEC to register the $600 million of senior subordinated notes issued in the LBO.  Early drafts of the S-4 registration statement, which were reviewed and commented on by Deutsche, and subsequently submitted to the SEC for comment, disclosed a (grossly understated) $105 million receivable owed from RGHI to Refco, which was characterized as a "customer receivable."  As this was a related-party receivable owed to Refco from RGHI, the SEC questioned the characterizing of "amounts due from equity members (RGHI) as receivable from customers."  Given the SEC's comment, Refco was forced to amend subsequent drafts and the final October 12, 2004 version of the S-4 registration statement to reflect that the receivables were due from "equity members," not customers.

204.    The professionals involved in the LBO, including Deutsche, thus substantially assisted Refco in trying to deceive the SEC and the investing public about the RGHI Receivable. Despite being aware of these related-party receivables, none of Refco's professionals disclosed the RGHI Receivable in Refco's IPO S-1 registration statement.

205.    The S-1 was reviewed by and prepared in consultation with Refco's professionals and investment bankers, including Deutsche.  While early drafts of the S-1 included the $105 million intercompany receivable reflected in the S-4 and the reference to the receivable being

owed by "equity members," the final version of the S-1 filed with the SEC on August 8, 2005 omitted any reference to any portion of the RGHI Receivable.  Nevertheless, the IPO went forward on August 10, 2005.

## VI.   DEUTSCHE HAD ACTUAL KNOWLEDGE OF REFCO'S FRAUDULENT SCHEME AND THE EXPOSURE OF SPHINX'S CASH AT RCM.

206.   Deutsche served as a financial advisor, joint book-running manager, underwriter and/or initial purchaser in connection with the bond offering on Refco's August 2004 LBO and as co-manager and underwriter of the August 2005 Refco IPO.  By assuming these roles in the LBO and IPO transactions, Deutsche assumed due diligence and disclosure obligations in connection with Refco's public filings related to those transactions.

207.   Deutsche performed its services on behalf of THL and Refco in conjunction with other investment banks, underwriters and financial institutions, including Credit Suisse, Bank of America Securities, Goldman Sachs and JP Morgan Chase, among others.  The investment bankers coordinated and combined their due diligence investigations and shared information regarding Refco, such that the knowledge of one can be imputed among the investment banks.

208.   Deutsche's investigation of Refco was conducted in two main phases.  In March and April 2004, BofA, Deutsche and JP Morgan Chase conducted a due diligence of Refco while preparing debt financing proposals for THL in connection with the leveraged buyout of Refco. In May 2004, Deutsche continued its diligence along with BofA and CSFB after being selected as joint lead arrangers of the bank loans and joint book-runners of the non-registered 144A note offering that would comprise the debt portion of the Refco LBO.

209.   The second due diligence phase commenced in the fall of 2004, when CSFB, BofA and Goldman Sachs were selected as lead managers of Refco's IPO, and Deutsche was selected as one of the co-managers.

210.   As a result of Deutsche's investigation, it gained actual knowledge that hundreds of millions of dollars of SMFF assets were held at RCM in non-segregated accounts, where they were commingled and used in Refco's operations.  In addition, Deutsche also possessed actual knowledge that Refco was a fraud and should never have consummated the LBO and IPO.

### A.   Deutsche Had Actual Knowledge That Hundreds Of Millions Of Dollars Of SPhinX Assets Were Exposed At RCM.

211.   Refco perpetrated a single, massive fraud.  Although Special Master Daniel Capra has distinguished the so-called "SPhinX Fraud," including the improper movement of SMFF's excess cash from customer-segregated accounts at Refco LLC to commingled accounts at RCM, from the so-called "Refco Fraud," including Refco's concealment of losses and misrepresentation of its financial condition, Plaintiffs disagree with that characterization. Regardless, Deutsche was fully aware of both the "SPhinX Fraud" and "Refco Fraud," as those terms are used by the Special Master.

212.   As alleged above, Deutsche was intimately aware of all relevant features of the SPhinX platform, including the SPC regime, customer-segregation requirements and other protections designed to protect SPhinX's customer assets.  Deutsche knew that SPhinX's assets were to be maintained in customer-segregation.  As a result of the extensive relationships among SPhinX, PlusFunds and Deutsche, Deutsche owed SPhinX and PlusFunds fiduciary duties of due care, disclosure and loyalty.

213.   Deutsche looked at Refco's relationship with SPhinX in its LBO and IPO diligence work.  For example, in an April 27, 2004 document titled "Project Royce Credit Memo," Deutsche specifically analyzed RAI and discussed a "managed futures index [] created in early 2003 under the brand name Sphinx" with "approximately $500 million" in assets. Deutsche noted that "these offerings generate enhanced fee potential and in the case of managed futures drive transaction volume to the Company's core transaction processing platform."

[Emphasis added.]  These are references not only to SPhinX, but to SMFF (SPhinX <u>Managed</u> <u>Futures</u> Fund SPC) in particular.

214.    In a May 19, 2004 document titled "Follow up credit materials," Deutsche examined RAI "activity that could have been misconstrued as a direct investment in a hedge fund" relating to an "S&P branded fund of hedge funds" connected to SPhinX and the "S&P Hedge Fund Index."  The document references the fund's use of "fourteen Commodity Trading Advisors" and the fact that "Royce earns clearing fees, as all derivatives trading through this fund is contracted to be cleared through Royce [Refco]."  Thus, Deutsche looked at Refco's relationship with SPhinX, and SMFF in particular, in its due diligence.

215.    With regard to the movement of SMFF cash to RCM, Deutsche knew that hundreds of millions of dollars of SPhinX cash was maintained in non-segregated accounts at RCM and was available to Refco to finance its operations and provided an additional source of revenue to Refco.  As an underwriter on Deutsche's LBO and IPO, Deutsche analyzed every source of revenue and cash available to Refco to service the IPO debt, to improve Refco's financial position and to increase the valuation of Refco for the IPO.  Deutsche's own profits from the LBO and IPO would be greater depending upon the valuation of Refco, so Deutsche benefited from an increased valuation.

216.    Deutsche scrutinized Refco's financials for sources of revenue.  Several Deutsche witnesses have testified that Deutsche looked closely at sources of cash and deposits at Refco's regulated and unregulated affiliates.  Several hundred million dollars of unencumbered cash sitting in non-segregated accounts at RCM, which Refco in fact used in its operations, was something Deutsche necessarily considered in its analysis, and Deutsche's own notes demonstrate that Deutsche in fact considered SMFF's excess cash at RCM.

217.    In that process, Deutsche specifically looked at Refco Alternative Investments, Refco's investment management business line.   In September 30, 2004 handwritten notes prepared by Deutsche in connection with Refco and produced by Deutsche in this litigation, Deutsche recorded information regarding a discussion of "Refco Alt Investments" (RAI), Refco's "asset mgmt biz."

218.    The notes specifically reference a "managed future product" and "Sphinx," both references to SMFF (SPhinX Managed Futures Fund SPC).   As Deutsche understood, SMFF represented the managed futures strategy component of the S&P Hedge Fund Index, and the three funds sponsored by RAI invested either exclusively or predominantly in SMFF.

219.    The notes specifically reflect $800 million "in non regulated."   This demonstrates that Deutsche specifically looked at SPhinX in connection with its LBO due diligence and had actual knowledge that hundreds of millions of dollars of SMFF cash was not maintained in regulated, customer-segregated accounts at Refco.

220.    The notes further establish Deutsche's actual knowledge of SMFF's cash being at RCM.   In a discussion of rising interest rates, the notes correctly reflect the terms of interest RCM paid SMFF on excess cash held at RCM: "never pay more than 90% of 3 mos. treas."   The notes reflect a discussion of the "spread" Refco could earn on $800 million of SPhinX cash at Refco if interest rates increase.

221.    The September 30, 2004 date suggests that the discussion of Refco and RAI occurred in preparation for the IPO, or possibly the S-4 review in connection with the LBO.   As part of its IPO work, Deutsche examined Refco's assets and business lines and specifically relied upon SMFF's cash deposits at RCM -- and their value to Refco -- as a factor in the valuation of Refco.   Another portion of the notes refers to "reverse repo" transactions, the process by which Refco utilized customer securities deposited at RCM to generate cash used in Refco's operations.

The notes establish that Deutsche examined Refco for sources of capital and liquidity to fund Refco's operations.

222.    Deutsche also knew and relied upon the fact that hundreds of millions of dollars of SPhinX cash would continue to be available to Refco through RCM in valuing and promoting Refco.  In Refco's July 2004 Confidential Offering Memorandum, underwritten by Deutsche and prepared in consultation with Deutsche on the LBO, it states,

> In June 2002, the Company [Refco] created Refco Alternative Investments to develop product offerings using alternative assets, such as managed futures, for distribution to its customers.  These offerings result in the creation of an asset management fund, utilizing both Refco's sales force and third-party distributors to raise assets.  All investment decisions are made by third party managers, and <u>all brokerage activity of the funds is directed exclusively to the Company's derivatives and cash brokerage affiliates</u>, driving transaction volume to the Company's core transaction processing platform.  Additionally, such funds typically earn an asset management fee.  An important milestone was reached following the negotiation with S&P for the branding of a portfolio of Commodity Trading Advisors and the subsequent <u>creation of a managed futures index, which is marketed under the brand name SPhinX</u>.  This product, which took advantage of weaker equity markets and the non-correlated performance of derivatives investing to equity market performance, was successfully launched in March 2003.  As of May 31, 2004, $543 million had been raised for this product.

223.    The Confidential Offering Memorandum establishes Deutsche's understanding that RAI's promotion of the "managed futures index" and SPhinX was designed at least in part to channel brokerage activity to Refco entities.  Given Refco's reliance on SPhinX cash "in non-regulated" accounts, it is clear that Deutsche looked at SPhinX assets at RCM and relied upon the continuing availability of those assets to valuate Refco.

224.    Thus, not only was Deutsche aware that SPhinX cash was held in unprotected accounts at RCM, Deutsche relied upon and benefited from the movement of cash to RCM as it allowed Deutsche to increase its valuation of Refco in the LBO and IPO.

225.    It is entirely plausible that Deutsche would breach its fiduciary and professional duties by allowing SPhinX assets held in non-segregated accounts at RCM to be used by Refco.

Deutsche reaped great profits from its relationship with SPhinX and PlusFunds. Deutsche received management fees and rebates on management fees from AUM controlled by PlusFunds. Thus, Deutsche received substantial revenues from its investment in SPhinX regardless of gains or losses on the underlying investments in the SPhinX Funds.

226. At the same time, Deutsche's investments with SPhinX were hedged against investments by investors in Deutsche's Dynamic Funds. Deutsche received additional management fees on assets invested by Deutsche's investors, while at the same time limiting Deutsche's actual exposure to SPhinX through its hedged investment. Thus, Deutsche's direct investment in SPhinX generated management fees and rebates on its investors' investment in the Dynamic Funds and on Deutsche's own direct investment in SPhinX, without actual exposure to SPhinX.

227. At the same time, Deutsche profited enormously from its relationship with THL, receiving millions of dollars on various other transactions with its valued client. Deutsche did not want to let down THL and so pressed forward on the LBO and IPO, both of which were profitable to Deutsche, despite the Deutsche CRM's distrust of Refco and concerns over the LBO transaction. The availability of SPhinX's excess cash at RCM was simply another way for Deutsche to squeeze revenues out of its competing relationships. The use of hundreds of millions of dollars of SPhinX cash at RCM assisted Deutsche's efforts to promote the LBO for its favored client THL while increasing the value of Refco, which would directly benefit Deutsche through its participation in the IPO.

228. And if something were to go wrong at Refco, from Deutsche's perspective, the loss would be suffered by investors in the Dynamic Funds, not by Deutsche itself. Although Deutsche would ultimately suffer losses from its competing roles, Deutsche believed itself to be

insulated and postured to generate different sources of revenues regardless of the performance of the SPhinX Funds.

229.    Deutsche at all times sought its own profits and protected its own interests, and by doing so breached its fiduciary duties and aided and abetted the Refco's fraudulent scheme.

### B.    Deutsche Had Actual Knowledge Of Refco's Fraud.

230.    In addition to its knowledge that hundreds of millions of dollars in SMFF's cash was maintained in non-segregated accounts at RCM, Deutsche had actual knowledge that Refco was involved in a fraudulent scheme.

231.    As an underwriter, Deutsche undertook the duty to become sufficiently knowledgeable about Refco to ensure that disclosures in Refco's offering documents were accurate and complete and did not contain any material misstatements or omissions. One of the underwriter's duties is to protect the public from frauds such as those committed by Refco.

232.    As an underwriter, Deutsche was required to tailor its investigation to the business of the issuer, but Deutsche was required to exercise heightened scrutiny if presented with red flags or warning signs of potential fraud. In addition, a diligent underwriter performs heightened scrutiny and rigorous investigation in the context of an IPO because it involves the issuer's first public offering of stock.

233.    Deutsche's own due diligence policies and procedures state:

In performing the due diligence review, reliance on the representations of management does not satisfy the obligations imposed upon an underwriter to independently investigate the statements to be made and manner of disclosure under the registration statement, prospectus or offering circular. In a sense, the underwriter must assume the role of devil's advocate in testing the adequacy of disclosure under such documents through independent verifications. This is a matter that calls for discretion and tact in dealing with issuer's management.

In preparing offering documents, the investment banker should be concerned not only with factors presently affecting the issuer, but also those which may arise in the future. Thus, in performing due diligence, the investment banker must

determine those material events which may be detrimental to the issuer in the future, and where appropriate, ensure disclosure of such potential problems in the prospectus. [Emphasis added.]

234.    As discussed in greater detail below, Deutsche deliberately ignored these standards and overruled its own CRM's explicitly stated concerns regarding Refco's financial strength and open distrust of Refco in exchange for lucrative underwriting fees and an enhanced relationship with THL.

### 1.    Deutsche's CRM declines participation in the Refco LBO.

#### (a)    Deutsche distrusted Refco.

235.    Deutsche distrusted Refco from the start.   Going into the LBO diligence, Deutsche and the other banks all understood that Refco had a poor reputation in the industry and a history of regulatory compliance problems.  This rightfully concerned Deutsche.

236.    At least three high level Deutsche executives openly expressed their distrust of Refco.  On May 13, 2004, just weeks into Deutsche's due diligence investigation of Refco, Hugo Banziger stated in an e-mail, "I do not trust Refco," later describing Refco as an "intransparent group with a troubled past."   Anne Binstock, Deutsche's director of credit risk management, expressed similar distrust of Refco in April and May 2004.  Michael Morrell, a Deutsche Credit Risk Management analyst, was the individual at Deutsche with the most background and the greatest knowledge of Refco, and he openly expressed his distrust of Refco.

237.    In the midst of Deutsche's due diligence investigation in May 2004, Deutsche's Lothar Weber stated in an e-mail that "A point to mention is the Refco (past) reputation and the related reputational risk DB is taking."   On May 5, 2004, Weber commented, "Refco had some problems in the past; they were not always good citizens."

238.    Similarly, Deutsche's May 12, 2004 CRM Minutes noted Refco's "[p]ast regulatory and legal issues" and commented that "the firm continues to suffer from a negative reputation within the financial community."

239.    The other bankers also expressed distrust of Refco, and particularly its CFO, Robert Trosten.  One BofA Securities employee noted in an email dated April 23, 2004, that he could not "look at the CFO [Trosten] without thinking of [John] Lovitz and his pathological liar routine on [Saturday Night Live]."

240.    This distrust of Refco should have caused Deutsche and the other underwriters to withdraw from the LBO financing and to disclose their district of Refco to SPhinX and PlusFunds.  According to Deutsche's own Due diligence Policies and Procedures,

> No amount of due diligence can assure an accurate registration statement if the issuer's management does not intend to make full and fair disclosure.  If in the course of preparing or reviewing the offering documents, the investment banker perceives an unwillingness on the part of issuer's management or the managing firm to make full disclosure or participate in the disclosure process in an open and forthright manner, this matter should be brought to the immediate attention of the senior banker assigned to the deal and underwriter's counsel.  If appropriate, consideration should be given to termination of the investment banking relationship.

241.    After disclosure of the fraud in October 2005, a number of Deutsche agents discussed Deutsche's exposure resulting from Deutsche's role on Refco's offerings.  In an October 11, 2005 exchange, Deutsche's Astrid Grey commented on a summary of the Refco situation, "no concern on Refco."  Another Deutsche agent, Stephen Wade, responded, "Not sure I agree with the comment.  We were one of the lead underwriters in the IPO.  Could be some shareholder lawsuits.  Separately, Peter and Ryan will speak with Hugo on the specifics of the LBO, <u>UWC's position regarding the credit (did not support) and our feelings about management</u>" (emphasis added).  It is clear that high level agents within Deutsche doubted

Refco's management at the time of the LBO and that their concerns were ignored in light of the opportunity to pursue profits on the LBO and IPO.

### (b)   Deutsche's CRM rejected participation in the LBO.

242.   In part because of this distrust of Refco, Deutsche was not comfortable putting its own money into the LBO, and its internal credit department opposed participation in the LBO. After several weeks of due diligence investigation, Deutsche's Credit Risk Management committee (the "CRM") rejected Deutsche's participation in the LBO.

243.   On May 4, 2004, Deutsche's Susan Isquith summarized the CRM's concerns regarding Refco.  She noted the potential risk of "subordination of cashflow at the holding company level from regulated subsidiaries … exacerbated by the transaction's very high leverage."  She further noted Refco's proprietary trading and the fact that it had "no control over its primary revenue drivers."   "Should Royce experience financial distress through external market forces or experience pressure on confidence sensitive funding (i.e., liquidity squeeze), how does the firm expect to repay debt as there is no secondary source of repayment other than cash flow?"

244.   Isquith further commented, "CRM has covered Royce for over eight years internally, the company is rated iB+.  We have restricted DB's credit exposure to trading limits (repo, fixed income forwards, fx and otc derivatives) exclusively to the broker/dealer operating subsidiaries.  Currently our limits are capped at USD 30 mm and are structured conservatively." Deutsche's CRM, from long experience, knew Refco and did not trust it.

245.   Specifically, the Deutsche CRM recognized that an entity whose assets Refco was not segregating, such as RCM, might have its assets siphoned out through intercompany loans that Refco regulated entities would be unable to pay back.  As the CRM observed in a May 12, 2004 memorandum rejecting Deutsche's involvement in the LBO,

there are constant inter-company receivables/payables which can obscure the true capital position of any particular entity.  This type of liquidity deployment is of particular concern when the receivable is from a regulated subsidiary.  Should [Refco] enter into financial difficulty, regulators would not allow payment of these inter-company receivables which would adversely impact debt service anticipated from the unregulated subsidiary.

246.   Deutsche also understood that the LBO was based on overly optimistic financial projections, another reason the CRM declined participation.  On May 4, 2004, Isquith articulated the credit risk management concerns: "CRM doesn't lend to broker/dealer holding companies without credit protection due to cash flow at the holding company level from regulated subsidiaries; need to see list of subsidiaries both regulated and non-regulated;'' "schedule of all regulatory bodies over Refco and its subsidiaries; no second source of repayment other than cash flow."  Significantly, Isquith noted, "Refco is rated B+," an internal non-investment grade rating.

247.   On May 6, 2004, Isquith articulated Deutsche's rejection of participation in the proposed Refco loans because of insufficient cash flow at non-regulated subsidiaries, reliance on favorable trading volumes and/or market volatility and no reliable secondary/tertiary repayment sources.   She stated as reason not to participate: "Structural subordination lending to holding company – insufficient cash flow at non-regulated subsidiaries to service scheduled principal and interest payments."

248.   Deutsche's director of credit risk management, Anne Binstock, commented on the LBO on May 12, 2004, "I think this would be a serious mistake for the bank.  It has post mortem written all over it and I could easily write the post mortem in anticipation."  Binstock further commented that she could "not get there on this name and this risk."

249.   In deposition testimony in these MDL proceedings, Binstock testified that "they could have offered me the moon, I would not have approved this deal."  She explained that her primary concern was "if given the structure something were to go wrong and the regulated entity were in trouble, that all the liquidity would be sucked out of the unregulated entities towards the

regulated entities and possibly fail."   [Emphasis added.]   That, of course, was exactly what happened.  Refco sucked the liquidity in the form of customer assets (SMFF cash included) from its unregulated subsidiary, RCM, to sustain its regulated affiliates.

250.   On May 12, 2004 the Deutsche CRM formally declined the Refco bank debt underwriting, identifying a number of reasons:  structural subordination concerns; inter-company transactions between regulated and non-regulated subsidiaries; "constant inter-company receivables/payables which can obscure the true capital position of any particular entity;" questionable liquidity deployment; should Refco have financial difficulty regulators would not allow payment of inter-company receivables which would adversely impact debt service from unregulated subsidiaries; cash flow was the sole means of repayment; and past regulatory and legal issues and Refco's poor reputation in the industry.

251.   Because of the importance of the THL relationship to Deutsche, the CRM refusal was appealed to Deutsche's chief credit officer, Hugo Banziger.  He reported to Deutsche's Global Head of Investment Banking Michael Cohrs that he did not believe Deutsche should go forward with the transaction.  In a May 13, 2004 e-mail to Cohrs, Banziger summarized his position by stating, "I want to decline the Refco underwriting . . . I do not trust Refco (have a long history with them)" and "the deal structure is wrong (deal is with the holding company)." He considered the Refco transaction as "one bridge too far" and concluded that "we should let this one go."

252.   Deutsche clearly understood that Refco lacked the financial resources and cash flow to support the LBO.  It also understood that inter-company transactions drained Refco's unregulated subsidiaries of capital, leaving Refco with insufficient capital to satisfy its LBO obligations.

**(c)** **Deutsche's business underwriting group overruled the CRM's rejection of the LBO out of desire to please Deutsche's client, THL.**

253.     Deutsche's initial analysis of the LBO was correct; Deutsche should not have participated.  However, Deutsche's professional judgment was compromised by its own greed and desire to please THL.  Notwithstanding the Deutsche CRM's rejection of the LBO, high level Deutsche executives approved participation in the LBO based on (1) expected profits vs. exposure; (2) future participation in Refco's anticipated IPO; and (3) professional relationships with THL, the buyer in the LBO.

254.     Deutsche knew going in that its CRM would reject the transaction and that its business executives would move forward nonetheless.  On April 28, 2004, Deutsche talked with Credit Suisse and said that its credit department was expected to decline the deal but that "they'll get it approved through back channels."

255.     Deutsche was motivated not to disappoint THL on the LBO financing even though "they were clearly baffled trying to figure out how to sell the story."  Deutsche was determined to go forward with the LBO in light of the important THL relationship, described in Deutsche's leveraged finance credit report:

> DB has a strong relationship with THL having most recently financed (left books on bonds, Lead Arranger and Agent on bank) the $2.5 billion LBO of Warner Music for THL/Bain/Providence consortia
>
> -- over $26 million in fees in the last four transactions (Warner, Michael Foods, Simmons, Houghton Mifflin
>
> Pitched for financing in connection with its bids for recent high-profile auction properties:  PanAmSat and TransDigm.

256.     On May 4, 2004, before CRM rejected the transaction, Sawhney wrote, "Fyi, credit an absolute nightmare on this, but paasche working for us and toscano helping as well. May need to go to cohrs (paasche may already have put it on his radar screen).  Tough deal but we can't fall down, given everything else going on w/thl.  Ultimately this is a close to a best

efforts deal and we'll work with thl/ceo to make bank deal saleable."  In a later e-mail the same day, Sawhney wrote, "A glimmer of light.  Ultimately, credit will say no, then tommy/cohrs override.  Tough bank deal but thl will make it work."

257.   Deutsche and the other investment bankers also knew that THL intended to buy Refco in the LBO and then sell a portion of its interests in Refco at the IPO.  At the time participation in the LBO was approved, Deutsche noted that THL was "already anticipating exiting vis a vis an IPO – based on current trading multiples equity alone would be north of $2 billion."

258.   In response to the Deutsche CRM's decision to decline participation in the LBO, Lothar Weber of Deutsche noted CRM's decision must stand although it may be overturned for business reasons:  "I suggest that this be elevated to Michael Cohrs/ExCo directly for business decision.  Paasche has had intensive discussions with Cohrs and he seems to be supportive on business reason, i.e. <u>limited risk (hold)/high reward</u>."  [Emphasis added.]

259.   On May 4, 2004, Michael Paasche, a Deutsche banker, pleaded with a senior Deutsche executive to override the CRM's rejection of the Refco LBO transaction as too risky (first emphasis in original):

> Preliminary feedback from credit suggests we will have an important transaction for TH Lee DECLINED by crm middle of this week.  We need your help in preparing to appeal that decision . . . .
>
> * * *
>
> So in broad summary, we anticipate being one of three banks providing committing to the term loan conditioned upon successfully placing $600 mm of bonds on a best effort basis.  In other words, after successful placement of the bonds, a max underwrite to DB of $250 mm of B loan with a hold target of zero and take a hold of $25 mm on the revolver.  <u>The ultimate hold of $25 mm compares very favorably with expected fees of about $10 mm</u>.  Furthermore, the bank debt is a very acceptable 35% of total purchase price protected by substantial amounts of equity and sub debt.

Unfortunately, it looks like we will get a DECLINE from credit on the grounds that <u>levering FIG [financial institutions group] counterparties isn't good due to the potential for "double leverage"</u> and the difficulty in collecting payments from a regulated entity to pay interest and amortize debt in periods of market declines….

I think this structure is responsive to the concerns of credit but as no one has levered a transaction like this, its not easy for CRM to signoff.  Furthermore, <u>the hold of $25 mm is very attractive for a deal of this size and in light of the $10 mm fee potential</u>. . . .

260.    Deutsche did not assess the CRM objections and satisfy itself that the CRM was mistaken.  To the contrary, Deutsche's mind to proceed was made up regardless of CRM's concerns.  Deutsche approved participation in the LBO based on the profits Deutsche expected to receive if the transactions went forward and the profits Deutsche expected from future transactions with THL.  Deutsche took comfort in the expected IPO, which provided an exit strategy just a year after the LBO.

261.    In a May 5, 2004 e-mail to Weber, Paasche commented, "Its been tough to work with crm when questions get answered but response seems to be lack of belief.  Would be happy to include a balanced credit officer in due dili if helps….  There are at least 3 sep bus here.  If banks need to push asset sales on one to offset prob with others is as viable a second way out as we have with any industrial.  <u>We expect actual way out is ipo with increased credibility brought by thlee.</u>"  [Emphasis added.]

262.    On May 7, 2004, Weber wrote, "We all agree that this is a difficult ask and that we need to think out of the box to find a potential way to do this.  Nothwithstanding this a final NO is definitely a high likelihood, but we owe it to our premier franchise to look for a ways to get this done with no undue risk for us as we always do."

263.    On or about May 12, 2004, the CRM met, and its Minutes reflect that "CRM does not support approval of the bank debt underwriting."  The Minutes were forwarded to Deutsche's Michael Paasche by Michael Cohrs, who the next day commented, "This is pretty strong."  On

May 13, 2004, Deutsche's Michael Paasche sent a follow-up e-mail to Cohrs, stating, "Please respond directly to Susan overriding the rejection."

> ### (d)    Deutsche proceeds with the LBO despite knowledge of Refco's poor financial condition and fraud.

264.    Despite the CRM's decision to pass on the Refco deal, Deutsche business executives overrode the decision for financial and relationship issues.  Accordingly, on May 12, 2004, the underwriting committee sent a memorandum asking for approval of the Refco financing and highlighted the following:  Deutsche executives supported the financing; the market would be receptive to Refco's transaction; Refco had a global market leadership position and there was the possibility of strong cash flow generation.

265.    In an internal Deutsche document titled, "Leveraged Finance Credit Report," Deutsche analyzed its participation in the Refco LBO despite the initial disapproval of the transaction by the CRM.  Deutsche noted that the underwriting proposal "was declined by CRM in May 2004," but approval of participation was later approved by Hugo Banziger.  Risk factors identified in the Report included "the high level of leverage in the transaction, the structural subordination issues in the holding company structure of Refco, and the tenor of the commitment."

266.    Not only did Deutsche agree to participate, it looked for ways to increase its involvement and take a lead role among the banks.  In a May 26, 2004 e-mail, Sawhney emphasized to the Deutsche team that it was "important that we play a very active [sic] throughout the entire process (much more than would be typical)."  Sawhney emphasized the importance that CSFB and BofA understand that Deutsche had an "equal vote b/c we are taking equal capital risk."  Sawhney assigned Deutsche's Jamie Lewis to

> quarterback DB participation in drafting sessions, prep of marketing materials, etc.  I think we know the business as well/better than the other guys, and we can add a lot of value/show well in drafting of bond docs, w/out stepping on CSFB's

toes or slowing things down.  Important that the client sees us as an active participant, given how much noise we've made about needing to play a very active role, having done so much DD, etc.  Also, we should make sure senior DB team members get some airtime with management during the marketing process, so we start building some inroads for IPO participation.

267.    In light of Deutsche's previous conclusion that Refco lacked the cashflow necessary to service the LBO debt, Deutsche had to search for cashflow elsewhere in Refco's operations to justify participation in the LBO financing.  Deutsche's due diligence was not a skeptical examination of Refco's financial position but advocacy; Deutsche sought to justify the transaction and sweep any problems under the rug.  That this is true is evidenced by the numerous facts withheld, concealed or misrepresented in the due diligence process by Refco and its agents and auditors, and the fact that Deutsche went forward with the LBO and IPO anyway.

268.    Deutsche was always more concerned about upsetting Refco's management than they were about the potential harm to pre-existing creditors (like RCM and its customers, including SPhinX) who would be devastated by layering $1.4 billion of "senior" debt onto Refco.  Deutsche remained completely focused on securing a lead role and the related fees in the transaction, putting aside concerns about Refco's financial condition.  The strategy always was to "keep the list [of due diligence] very short," as "[w]e didn't want to frighten management with a 4-page list."

269.    Deutsche's decision to abandon its professional standards and attempt to push the LBO through instead of examining it with a critical eye is evident from a number of facts discovered in due diligence.

### (i)      Deutsche had actual knowledge that Refco concealed undisclosed losses.

270.    In April 2004, during the LBO due diligence process, Refco's management gave a presentation to ratings agencies, copies of which were provided to the underwriters, including Deutsche.  The presentation represented that "Refco sustain[ed] no credit losses during Russian

debt crisis/LTCM incident" in 1998 and touted Refco's "[p]roactive risk management – minimal credit losses."  In relation, Refco management told the underwriters, including Deutsche, that Refco suffered $1 million or less in losses over the last five years.  These were important facts in light of Refco's checkered history of regulatory compliance problems.

271.    A month later, Deutsche and the other banks received a May 21, 2004 report from KPMG, which exposed these representations as false.  The KPMG report described Refco's credit risk in relation to "financial instruments owned and proprietary investments" of Refco:

- Market risks arise primarily from changes in market or fair value of financial instruments owned and proprietary investments (included with other assets) held by Refco….

**Customer receivables – derivatives brokerage (international)**

- [Refco's] Canadian subsidiary has a receivable balance which resulted from a customer's failure to meet its margin requirements

- As at February 29, 2004, net customer receivable relating to this matter amounted to CAD 28.7 million (approximately $20 million), after a CAD 5 million provision for doubtful debts.

**Reserves for credit risk losses**

- Per our discussions with Rob Trosten, we understand:

- Customer receivable balances at RCM are stated net of $42 million reserve for unsecured customer receivable balances that arose during the 1997 Asian economic crisis.

- A reserve of $10 million is held at the parent level for potential losses against $20 million net exposure at the Canadian subsidiary.

- In addition, a general "contingency" reserve of approximately $10 million is held within "other liabilities" to cover for potential credit risk losses.

272.    Deutsche and the other banks immediately recognized that Refco's representations in the ratings agency presentation were inconsistent with the KPMG report and were misleading.  An internal Deutsche e-mail dated May 24, 2004 stated:

Why did they tell us actual write-offs over past 5 years were less than $1m total when we asked how good they are at managing customer risk and if they've ever had problems?

p. 20 of KPMG report outlines that one customer alone has exposed [Refco] to a $20m write-off from a failure to meet a margin requirement

$42m reserve for unsec'd customer receivable balances resulting from '97 Asian economic crisis (timeline in Ratings Agency presentation now seems a little misleading).

273.    Although Deutsche and the other underwriters caught Refco in these misrepresentations, Deutsche itself participated in similar misrepresentations to investors in presenting the IPO roadshow materials, which claimed "Less than $1 million of losses over the past 5 years through several market dislocations" and "No losses in Russian Debt Crisis, September 11th, Long-Term Capital Management."

### (ii)    Deutsche had actual knowledge that Refco falsely represented that it did not engage in proprietary trading.

274.    The KPMG Report disclosed additional Refco misrepresentations, including Refco's risk from its own proprietary trading.  A frequent theme in Refco's public statements is that it did not engage in proprietary trading.  For instance, Refco's confidential offering circular in connection with the LBO notes offering, prepared by Deutsche and the other banks, stated, "we [Refco] only undertake transactions on behalf of our customers and consequently are not exposed to market risk as a result of proprietary trading."

275.    The lie that Refco did not engage in proprietary trading was repeated in the IPO roadshow materials, which represented that Refco participated in "No proprietary Trading" and was "Unconflicted with Customers."  Deutsche also participated in drafting the IPO Registration Statement, which represented, "As we [Refco] do not engage in strategy-based or directional proprietary trading, we do not face the same conflicts of interest with our customers as our

competition that engages in both agency and proprietary trading.  We therefore provide our customers with unconflicted market access."

276.   Deutsche knew these representations were false.  In an April 27, 2004 e-mail, Deutsche's William Addas reported on a meeting of Deutsche's CRM, stating, "Credit mtg didn't go well.  Concerns about reputation, trading for their own account (they don't believe that the co takes no positions) …"  Similarly, the handwritten notes from an April 20, 2004 Deutsche meeting specifically state, "They do take some proprietary trading" and that there was "substantial operational risk: by and large the risk is significant."  On April 29, 2004, Deutsche's Vikrant Sawhney of e-mailed Addas discussing the key issues for Deutsche's credit risk management as the "nature/level of prop trading risk [Refco] takes."

277.   Proprietary trading was not a minor issue to the banks.  A number of witnesses in Refco MDL litigation have testified that Refco's lack of proprietary trading was a key issue, and in fact, Refco's own proprietary losses were one of the sources of the RGHI Receivable.

278.   Although Deutsche knew Refco's representations that it did not engage in proprietary trading were false, Deutsche aided and abetted Refco's "no proprietary trading" misrepresentation by participating in the preparation of the IPO Registration Statement, which explicitly represented that Refco did "not engage in strategy-based or directional proprietary trading."

### (iii)   Deutsche had actual knowledge that Refco concealed undisclosed litigation matters.

279.   As due diligence continued, Deutsche and the other banks discovered additional examples of Refco's dishonesty and concealment of material facts.  Among the materials specifically requested by the underwriters in the LBO diligence was pending litigation and arbitration claims against Refco.  In June 2004, at the end of due diligence but before the LBO, the underwriters learned of a jury verdict awarded against Refco on a $45 million claim in favor

of a hedge fund called Tradewinds Financial.  The existence of this lawsuit was not disclosed by Refco's management.

280.     Deutsche immediately recognized that Refco's management had withheld the existence of the litigation from the underwriters.  In a June 21, 2004 e-mail, Deutsche commented, "I don't recall any reference to this lawsuit (obviously well advanced when we [sic] the deal came to UWC) in the Refco presentation materials or our discussions."

> **(iv)**  **Deutsche had actual knowledge that Refco concealed Grant Thornton's Management Letter, which identified material accounting and control deficiencies at Refco.**

281.     Another specific category of document requested by the underwriters was letters to Refco management from auditors or accountants regarding internal control deficiencies or similar issues.  On March 30, 2005, after six months of IPO due diligence and completion of the LBO, the underwriters received what was described as a "horrendous" management letter written by Refco's auditor, Grant Thornton, dated October 15, 2004.  The Grant Thornton management letter described in detail operational, financial and accounting control problems at Refco.

282.     Although the underwriters had specifically requested the production of all management letters in October 2004, and had made similar requests in connection with the LBO diligence, the letter was concealed until March 2005.

283.     Among other things, the Grant Thornton management letter disclosed,

*Formalized Reporting and Closing Process*

There is no formalized closing of the book procedures for legal entity or consolidated entity reporting, which details the procedures essential to close the books and records.  Furthermore, the Company did not prepare monthly consolidated financial statements until recently….

*Internal Audit Function*

The Company has grown to the point where it has become essential to establish an internal audit function….  An internal audit function is a critical component of effective corporate governance and oversight….

*Accounting Procedures and Policies*

The Company's accounting procedures and policies are not formalized.  This could possible [sic] contribute to duplication of work, overlapping of functions, omissions of important functions, misunderstandings and other conditions that might result in inefficiency or weak internal control….

*Accounting Function*

At present, the accounting function does not have the necessary resources or expertise in accounting and financial reporting expected of a public issuer.  Although the Company has taken stopgap measures in engaging PWC to fill these gaps, it is not a solution.  The Company need to hire qualified people with necessary skills and expertise to handle these accounting and reporting requirements.

284.    On March 30, 2005, the same day the underwriters received the Grant Thornton

management letter, their counsel received an e-mail from Grant Thornton that stated,

Our duties and obligations are to our client only, and we are not acting as an advisor to the underwriters, who should perform their own due diligence.  Accordingly, we do not acknowledge that the underwriter is relying upon our report or any information disclosed on the call in connection with an underwriting decision….  Our audit and the discussions should not be taken as sufficient to supplant the due diligence procedures that the underwriters should perform to satisfy themselves regarding any issues raised.

285.    The substance of the Grant Thornton management letter, its concealment and the

March 30, 2005 letter from Grant Thornton put Deutsche and the other underwriters on notice

that Refco's financial statements were unreliable.

286.    As if these representations from Refco's auditors were not enough, in May 2005,

Deutsche and the other underwriters obtained a draft of a 2005 management letter written by

Grant Thornton that described Refco's lack of formalized reporting and closing process and lack

of an adequate accounting function as "significant deficiencies" in Refco's accounting controls.

The draft management letter defined "significant deficiency" as

A control deficiency, or combination of control deficiencies, that adversely affects a company's ability to initiate, authorize, record, process or report external financial data reliably in accordance with generally accepted accounting principles such that there is more than a remote likelihood that a misstatement of

the entity's annual or interim financial statements that is more than inconsequential will not be prevented or detected.

287.    Deutsche did not follow up on the management letters.  Although there were a few conference calls with Grant Thornton and Refco management to discuss the letters, Deutsche did nothing to verify the information received on the calls.  An internal THL e-mail at the time described the follow-up calls regarding that management letters as a formality: "For the most part the underwriters and the underwriter counsel were quiet on the call.  I think it was mostly a 'check the box' call for the underwriters to make sure they at least followed up on the auditor letter."

288.    In breach of its duties, Deutsche failed to disclose concrete evidence of Refco's fraud and its false financials and poor accounting controls.

> **(e)**    **Deutsche knew that Refco executives concealed $40 million in undisclosed compensation under a proceeds participation agreement.**

289.    In April 2005, the underwriters, including Deutsche, discovered that several Refco executives concealed profit sharing agreements between the executives and Refco, pursuant to which those executives collectively received approximately $40 million in connection with the LBO.  Although the underwriters specifically asked about whether such agreements existed, at least four Refco separate officers lied regarding the existence of such agreements.  When Refco's general counsel, Dennis Klejna, was confronted about the discovery of two of the profit sharing agreements, he was asked whether other similar agreements existed and he lied because he himself had such an agreement that had not been disclosed.

**(f)      Additional evidence of Deutsche's knowledge of Refco's fraudulent scheme.**

290.     There are numerous other fact examples that demonstrate that Deutsche approached the due diligence process with the goal of completing the transactions and not examining Refco with a critical eye.

291.     Although Deutsche purported to conduct an extensive review of Refco's operations and financial position, information Deutsche did not review demonstrates that Deutsche had no intention to fulfill its diligence and disclosure duties to the public and Deutsche's fiduciaries.

292.     For example, Deutsche and the other underwriters did not examine the most basic and critical document used in due diligence, the analysis of budget versus actual performance. Although the 2004 Grant Thornton management letter included an advisory comment questioning Refco's budgeting process, Deutsche and the other underwriters allowed the IPO to go forward without an analysis of Refco's budgets and budgeting process.

293.     At another point, Refco told its underwriters that it had $500 million of cash available to dividend to RGHI contemporaneously with the LBO.  In fact, Refco financed the $500 million with $390 million borrowed from its co-conspirator BAWAG and $110 million in customer assets taken from RCM.

294.     A Deutsche agent noticed that the numbers did not add up and sent an e-mail asking questions about the source of the cash to the Deutsche team.  The e-mail went unanswered, and Deutsche never followed up to determine the source of the cash.

295.     Shortly after the completion of the LBO, in October 2004, Refco announced the resignation of its CFO, Robert Trosten.  A few months later, in early 2005, Refco's corporate controller, Frank Mutterer, and Refco LLC's controller, Alex Bobinski, also resigned.  Neither Deutsche nor the other underwriters investigated these departures or attempted to interview

Trosten, Mutterer or Bobinski.  Deutsche did not investigate Refco; it promoted the LBO/IPO and failed to disclose relevant facts and evidence of fraud.

C.      **Deutsche Knew Refco Relied Upon Customer Assets To Finance Transactions.**

296.    Deutsche's CRM rejected participation in the LBO because Refco's lacked the resources to service the substantial debt Refco would incur in connection with the bond offering. Specifically, Deutsche doubted Refco's cash flow projections.  In an April 25, 2004 e-mail, Deutsche's Jamie Lewis stated, "I am worried about credit, though.  There are no real 'sources' to point to to justify the projections and growth assumptions."

297.    Deutsche's CRM rejected participation precisely because it recognized that an entity whose assets Refco was not segregating, such as RCM, might have its assets siphoned out through intercompany loans that Refco regulated entities would be unable to pay back.  As the CRM observed in a May 12, 2004 memorandum initially rejecting Deutsche's involvement in the LBO,

> there are constant inter-company receivables/payables which can obscure the true capital position of any particular entity.  This type of liquidity deployment is of particular concern when the receivable is from a regulated subsidiary.  Should [Refco] enter into financial difficulty, regulators would not allow payment of these inter-company receivables which would adversely impact debt service anticipated from the unregulated subsidiary.

298.    In a May 14, 2004 e-mail, Deutsche's William Frauen recognized problems with Refco's cash flow estimates, commenting, "We have worked through the audits and cannot reconcile to their working capital numbers in the FCF."  In a responsive e-mail on May 14, 2004, Deutsche's Anne-Marie Peterson e-mailed William Frauen regarding Refco's insufficient cash flow, stating, "We can calculate FCF [free cash flow] and do understand the audits.  The actual calculation has negative FCF in 2003."  Thus, Deutsche concluded that Refco had a negative cash flow for 2003, the last complete year before the LBO.

299.    Nevertheless, Deutsche approved participation in the LBO.  In light of the voiced concerns regarding Refco's capital position, Deutsche and the other investment bankers adopted and used patently unreasonable projections prepared by management in arranging and facilitating the LBO and IPO.  None of the projections used by the investment bankers included any repayment of RCM's pre-existing receivables. The investment bankers who had been studying Refco's cash flows knew that significant cash was taken and could still be taken from RCM, yet never took into account how the $1.4 billion of additional leverage on Refco or the payout of RGL's assets to Refco would impact repayment of RCM.  Unlike a properly executed leveraged buy-out, the investment bankers knowingly left behind over a billion dollars of unpaid debts.

300.    Instead of assessing Refco's financial position with a skeptical eye as it was required to do, Deutsche looked instead to justify the LBO, striving for ways to show that Refco had free cash flow that could be used to service the LBO debt.  Deutsche discovered that it could not recreate management's projected free cash flows and that they could not rely on cash distributions from the regulated subsidiaries.  Fortunately for those with a stake in the LBO, Refco had been and would continue to make RCM's customer assets available to Refco for cash flow purposes.  Although Deutsche knew that a credit risk like Refco was not a good candidate for leverage, the transaction was allowed to proceed because of the ready availability of RCM's cash – cash comprised of customer assets.

301.    It is clear that Deutsche and the other banks understood that Refco relied upon customer assets at Refco's non-regulated affiliates to provide the cash necessary to finance Refco's operations.

302.    When Deutsche decided to approve the LBO over CRM objection, the decision was based in part upon Refco's "strong free cash flow characteristics," an ironic conclusion given Deutsche's analysis just weeks earlier that Refco had a negative cash flow in 2003.  The

Leveraged Finance Credit Report specifically discussed Refco's "Ability to maintain sufficient liquidity – to support operations and/or repay debt," and noted that "clients provide essential liquidity for operations."  Thus, Deutsche understood that Refco drew upon customer assets to support its operations.  Handwritten notes created by Deutsche, dated April 20, 2004, further stated that Refco's "Growth not constrained by capital, customers provide the required financing."

303.    Again, Deutsche knew that Refco's regulated subsidiaries relied upon customer assets to sustain operations.  Through its due diligence, Deutsche knew that Refco was illicitly funding its operations with RCM customer assets, that RCM held between $1 and $2 billion in worthless intercompany IOUs, and that the LBO would altogether foreclose the Refco affiliates' ability to pay down the debt to RCM and jeopardize customer assets held by RCM, including SMFF's cash.

304.    Sources of cash was a key issue for all of the underwriters.  As early as May 2004, senior BofA Securities employees were questioning "how Refco use[d] its capital and how the company's net capital change[d] from period to period."

305.    As Deutsche and the other investment bankers knew but failed to disclose, Refco had to draw on RCM money to fund Refco's operations because the "customer-segregated funds" in the regulated entities were off-limits and had to be accounted for separately on Refco's balance sheet.  Indeed, in response to inquiries as to why certain customer assets were not being used to "pay down debt," one senior Credit Suisse executive explained that it is "[b]ecause it is restricted customer cash that must be held for regulatory purposes *i.e.* it is not the company's cash."  In stark contrast, the investment bankers were elated that Refco did not restrict access to and regularly drew on RCM customer funds that could be used to pay down Refco's LBO debt.

As one BofA Securities employee proclaimed in an email, "FYI . . . looks like Refco Capital Markets isn't regulated . . . that's good for us!"

306.    Indeed, the investment bankers, including Deutsche, were keenly aware of the difference between how Refco used cash at RCM and its regulated subsidiaries. They knew that SEC regulations limited the cash that Refco could have moved from its regulated operations and that Refco had to be drawing on customer assets from Refco's other operations—namely, RCM—to cover its operational expenses. Yet they did not consider how and when RCM's IOUs would ever be repaid given that the investment bankers were subordinating those IOUs to $1.4 billion in additional LBO debt. Indeed, none of the projections used by the investment bankers even factored this into the cash needs of Refco's LBO debt parties—despite the fact that RCM's largest receivables came from RGL and RCC, both of which were guarantors on the LBO debt.

307.    Even after Deutsche agreed to participate in the Refco deal, it continued to look at available cash. For example, in the May 12, 2004 underwriting committee memorandum, Deutsche executives characterized as key due diligence points the "segregated versus non-segregated funds by entity" issue and the issue of affiliate loans. That memorandum also described as a key distribution risk the "structural complexity reflecting regulatory oversight and restrictions" and stated that "we will need to convince the market that the company has a low risk business model where it acts as an intermediary, does not take proprietary risk and has very limited exposure to trading losses."

308.    In reviewing and commenting on the condensed financial information attached to the LBO offering prospectus, the S-4, the S-1 and the IPO prospectus, the investment bankers understood that at the time of the LBO there was over a billion dollars in payables owed to RCM by RGL and other guarantors on the LBO debt and that as of the IPO, the siphoned amount had climbed to over $2 billion.

309.    Deutsche received RCM's audited financials.  Footnote F discloses that as of February 29, 2004, RCM was owed approximately $1.1 billion by affiliated companies as "receivables from customers."  On Refco's consolidated balance sheet of the same date, an elimination of $998.1 million is shown that is apparently against Refco LLC's "payable to customers" of $3,958.4 million, suggesting that this was the amount owed to RCM.

310.    As the investment bankers recognized, given their detailed knowledge of Refco, the enormous "payables to customers" that were eliminated in consolidation were actually intercompany payables owed to RCM and, accordingly, the assumption (in order to pay Refco's insiders) of $1.4 billion of new debt by RGL and RCC would have a devastating impact on RCM and its customers, including SPhinX.  Indeed, Deutsche and the other investment bankers understood, as referenced in their own documents, that "payables to customers" constituted "obligations of Refco subsidiaries to repay client monies" and that, therefore, the intercompany loans made by RCM to RGL and its affiliates were comprised of RCM customer funds.

311.    The fraudulent diversion of RCM customer assets was fundamental to the operation and financing of Refco, and each of the investment bankers was fully aware that the LBO and IPO only worked by robbing RCM and leaving its receivables unpaid and unrecoverable, this virtually assuring that customer funds, including those of SPhinX, would be lost.

312.    Indeed, as Deutsche and the other investment bankers knew, the amounts stolen from RCM substantially outsized Refco's total capital.  By the time Refco filed for bankruptcy, RCM's net uncollectible receivables totaled over $2 billion, while RGL claimed only $515 million in capital in 2002, $566 million in 2003, $616 million in 2004, and only $150 million in 2005.  As Deutsche and the other investment bankers knew, and as their own projections

showed, there was no cash to pay down the receivable to RCM and even Refco's projected

"goodwill," was insufficient to meet Refco's obligations to RCM.

> **D.** **Impact On RCM Was Actively Concealed By Deutsche And The Other Investment Bankers.**

313.    The April 16, 2004 letter of intent regarding the LBO sent to Refco expressly

advised the company that all debt would be paid down in the LBO except "secured" financing

used for customer related activity:

> Our proposal is for a debt-free Company. Accordingly, we would expect that the Sellers would fund from their cash proceeds (or cause the Company to fund at Closing with a concomitant reduction in cash proceeds paid to the Sellers) all of the Company's indebtedness for borrowed money. . . . We understand that the secured financing (if any) used principally for customer related activity in the ordinary course of business will not be repaid.

314.    Similarly, the LBO Offering Circular, jointly prepared by the investment bankers,

falsely states that the LBO bond debt was "effectively junior to all existing and future liabilities

of our subsidiaries [including RCM] that have not guaranteed the notes." This simply was not

true. As Deutsche and the other investment bankers knew, the LBO layered on $1.4 billion in

debt to be paid off before RCM's intercompany loans could be paid. Nowhere did the Offering

Circular explain that RCM's assets were routinely diverted and distributed to other Refco entities

without security or collateral and without regard for RCM's obligations to its customers; that

RCM's most significant assets were approximately $2 billion of undocumented, uncollateralized

receivables from RGL and RCC – two of the entities obligated to repay the LBO borrowings;

and that the LBO transactions resulted in "priming" these receivables with $1.4 billion of third-

party bank and bond debt without regard for the interests of RCM.

315.    Despite statements in the Offering Circular to the effect that RCM would not be

harmed by the LBO, Section 7.03 of the August 5, 2004 Credit Agreement, to which Deutsche

was a party, states that if Refco incurs "Indebtedness" that constitutes an "Investment" (defined

to include an intercompany payable), then "all such Indebtedness" by any Refco entity obligated to repay the bank debt owing to a Refco entity that is not obligated (*i.e.*, RCM) "must be expressly subordinated to the Obligations" to repay the bank debt.  In other words, Deutsche and the other investment bankers knew that the borrower and guarantors on the LBO bank debt were also obligated to repay RCM, but they insisted that RCM's right to be repaid must be subordinated.

316.    Similarly, Section 4.04(b)(15) of the bond debt Indenture allowed RGL and the guarantor subsidiaries to repay "intercompany Indebtedness . . . provided that no Default has occurred and is continuing or would result therefrom."  Thus, as long as the LBO bond debt was not in default, RGL and RCC could – although they were not required to do so and arguably could not do so under the bank debt subordination requirements – repay the billions of dollars owed to RCM.  But if ever the bond debt were in trouble, RCM's right to be repaid would be trumped by the LBO debt, which is what ultimately happened following Refco's bankruptcy.

**E.    Deutsche Knew Regulated Assets Were Also At Risk.**

317.    It is clear that as a result of its due diligence review, Deutsche understood that Refco relied upon RCM customer assets to finance its operations.  However, and crucial to SPhinX's loss, Deutsche also understood that Refco moved customer money back and forth between regulated and unregulated affiliates and relied upon those regulated assets as well to finance Refco's operations.  Deutsche thus understood that not only were SPhinX assets deposited directly with RCM at risk, but SPhinX assets deposited with Refco LLC were also at risk.

318.    In a May 10, 2004 document titled, "Follow up credit materials" regarding Project Royce, the code name for Refco, Deutsche indicated that it "received updated financial information" regarding Refco, including "monthly segregated funds and net capital balances

since January 2002."   The document further represented that Deutsche had a follow-up call scheduled with Trosten to discuss "cash management policy, historical flow of funds among entities, related accounting treatment, and profitability by entity," as well as "re-confirming ability to dividend and/or make inter-company loans to transfer funds out of regulated entities" (emphasis added).

319.    Deutsche and the other underwriters focused on intercompany loans and the movement of assets between Refco regulated and non-regulated entities.   On April 29, 2004, Sawhney wrote and e-mail identifying "key issues" to include "money flows into and out of the regulated entities, affiliate loans to regulated entities, etc."   On May 5, 2004, Deutsche's Jamie Lewis wrote to a THL executive, "We're trying to understand more about the loans payable for the non-Refco LLC regulated entities.   Are non-regulated entities loaning funds into regulated entities?"   On May 10, 2004, Lewis wrote an e-mail regarding information Deutsche's Morrell required regarding the analysis of Refco and commented, "We talked in circles about the questions he wants answered when we speak with Rob today (call still not set up, though) – he wants us to identify where/if 'double' leverage exists by reviewing equity levels and intercompany transactions from unregulated entities into regulated entities at the subsidiary, parent company, and consolidated levels."

320.    On May 11, 2004, Lewis wrote a follow up e-mail, identifying "definite needs," including "segregated vs. non-segregated funds by entity," "affiliate loans/receivables by entity," and "dollar amount of loans, if any, from affiliates that are included in capital" at each of the regulated entities.   In a May 11, 2004 e-mail, Deutsche still considered the "segregated versus non-segregated funds by entity" issue outstanding and in need of review.

321.    Before the LBO closed, employees for the investment bankers continued to question how "money flow[ed] into and out of the regulated entities" and the magnitude of

"affiliate loans to regulated entities . . . ."  BofA Securities employees, for example, sought an explanation of capital flows over "eight quarters between regulated and non-regulated entities. What is the driver of capital movements and where is capital being used (besides what is in the regulated entity) and for what purpose?"

322.     Deutsche was forced to focus on Refco's cash position, particularly in light of the CRM's stated concerns regarding Refco's cash position.  This focus on cash demonstrates that Deutsche knew SPhinX assets were exposed at Refco.   Through its dealings with and investigations of SPhinX, Deutsche knew that SPhinX maintained hundreds of millions of dollars with Refco, and that those assets were maintained at Refco LLC and RCM.  Through its interactions with Refco, Deutsche knew that Refco moved money back and forth between regulated and non-regulated entities and relied upon customer assets for the liquidity to support its operations.

323.     Deutsche's CRM acknowledged the importance of performing a rigorous analysis by legal entity, in particular an analysis of intercompany loans from Refco's unregulated subsidiaries to its regulated subsidiaries in connection with the LBO diligence.

324.     The Deutsche CRM concerns were laid out in the minutes of the May 12, 2004 meeting where Deutsche's CRM declined the LBO financing:

> Structural subordination – lending to a holding company where cash flows for debt service are reliant on dividends and other payments from regulated subsidiaries – potential domino effect.
>
> Although [Refco] has a mix of both regulated and non-regulated subsidiaries, there are constant inter-company receivables/payables which can obscure the true capital position of any particular entity.  This type of liquidity deployment is of particular concern when the receivable is from a regulated subsidiary.  Should [Refco] enter into financial difficulty, regulators would not allow payment of these inter-company receivables which would adversely impact debt service from the unregulated subsidiary.  Moreover, dividends from the regulated subsidiaries would also be blocked.

325.    Deutsche's CRM recognized that the credit risk posed by regulators could restrict cash available from the non-regulated entities if they were owed substantial sums by the regulated entities.  In its June 19, 2004 Leveraged Finance Credit Report, Deutsche stated:

> Structural subordination – lending to a holding company with debt service reliant on dividends from regulated and non-regulated Subsidiaries.  Should Refco enter into financial difficulty, regulators could restrict dividend upstreaming which would adversely impact debt servicing ability of Refco (although inter company loans could be an alternative).  Refco's non-regulated subsidiaries generate EBITDA of $118 million which cover senior debt interest requirements by 2.95x.  [Deutsche] exposure is also supported by a pledge over the securities of all Refco subsidiaries and will benefit from guarantees from the unregulated subsidiaries.

326.    Deutsche's April 20, 2004 notes reflect Deutsche's knowledge that Refco had substantial "affiliated related receivables (exceed 100% of capital at times)."

327.    In an April 27, 2004 e-mail, a Deutsche banker wrote to a colleague following a meeting with Deutsche's Credit Risk Management Group: "Credit mtg. didn't go well.  Concerns about reputation, trading for their own account (they don't believe that the co takes no positions), and concerned that capital in regulated entities comes from loans from non regulated cos." (emphasis added).

328.    The Leveraged Finance Credit Report also noted that "Refco's regulated entities have the ability to transfer capital through intercompany loans," demonstrating Deutsche's understanding of transactions between Refco affiliates and the fact that assets deposited with regulated entities were transferred among affiliates.  Deutsche's April 20, 2004 notes state that Refco "Take[s] out the profits from the Regulated Entity thro intercompany distribution."  In a May 4, 2004 e-mail, Deutsche's Frauen commented, "Regulated subs don't trap cash and they don't even use cash, they generate excess capital through earnings and generate their own liquidity thru custy [custody] deposits and margin as they grow."  Frauen further commented, "we have received consolidating fin stmnts and will figure out where the cash is / what's available to lenders."

329.    As part of its due diligence, Deutsche requested and reviewed historical consolidating financials for fiscal years 2002, 2003 and 2004 in May 2004.  Because these financials lacked footnotes or information regarding the various intercompany accounts and eliminations, Deutsche submitted a follow-up information request seeking, among its "definite needs," information detailing "affiliate loans/receivables by entity."  Deutsche did not receive the requested information and did not follow up on the issue.

330.    This was a fundamental issue.  The fact that the underwriters, including Deutsche, did not demand such documentation was that they had no intention to fulfill their duties to the examine Refco with a skeptical eye.

### F.    The Harm Of The IPO To Refco

331.    The IPO Registration Statement became effective on August 10, 2005. In connection with the IPO, Refco Inc. issued 26.5 million shares of common stock to the public at $22/share.  The offering consisted of 12.5 million initial shares by Refco Inc. and 14 million shares of a secondary offering by THL, RGHI, Bennett and others.  An additional 3.975 million shares in overallotment were also issued.  The offering generated $258.5 million in proceeds for Refco Inc., approximately $289.52 million in proceeds for the selling shareholders and $82.2 million in greenshoe dividend.

332.    As the investment bankers had contemplated, and as provided in the IPO prospectus, on September 16, 2005, Refco Inc. used the majority of its IPO proceeds to pay $231,262,500 towards the redemption of $210 million of the principal amount of RGL's senior subordinated notes plus $18.9 million in accrued interest and prepayment penalty. As RGL was insolvent at the time, Refco Inc. was induced to make a $231 million contribution to RGL for no consideration.

333.    The investment bankers, including Deutsche, received their share of approximately $45 million in fees in connection with the LBO. The investment bankers further received their share of approximately $40 million more in fees in connection with the IPO.

## VII.    REFCO'S BANKRUPTCY FILING.

334.    Refco was forced to file for bankruptcy mere weeks after the IPO.

335.    During 2004 and 2005, RCM held as much as $560 million of SPhinX's cash in non-segregated accounts.  As of October 10, 2005, the day Refco disclosed the existence of the RGHI Receivable and the Refco fraud, approximately $312 million of SPhinX's cash was deposited at RCM.

336.    Only two months after consummation of the IPO in August 2005, Refco's entire fraudulent scheme fell apart when a newly hired, non-conspiring Refco employee discovered a $430 million receivable owed to Refco from RGHI.  Refco's fraud was revealed by a newly hired controller, who discovered the fraud within two months of being hired.  He testified that all he had to do was "follow the transactions" and apply "normal auditing procedures" to uncover the fraud.

337.    In a press release issued October 10, 2005, Refco announced that it had discovered, through an internal review, a $430 million receivable from an entity controlled by Bennett and that the receivable, "which may have been uncollectible," was not shown on the company's balance sheet as a related-party transaction.  As a result, Refco announced that "its financial statements, as of and for the periods ended February 28, 2002, February 28, 2003, February 28, 2004, February 28, 2005, and May 31, 2005, taken as a whole, for each of Refco Inc., Refco Group Ltd., Refco LLC and Refco Finance, Inc. should no longer be relied upon."

338.    On Tuesday, October 11, 2005, after news of Refco's "discovered" receivable became public, but before the Refco bankruptcy, PlusFunds director Christopher Sugrue stormed

into Refco's headquarters to demand that SMFF's cash held at RCM be immediately transferred to Refco LLC.  Within days, approximately $312 million of SMFF's cash held at RCM was transferred to SMFF's customer-segregated accounts at Refco LLC pursuant to Sugrue's demand.  PlusFunds then moved those assets to accounts at Lehman Brothers and elsewhere.

339.    On October 11, 2005, Refco's CEO, Phillip Bennett was arrested for his participation in the Refco fraud.  He was indicted on November 10, 2005, and pleaded guilty to criminal conspiracy and fraud charges on February 15, 2008.  He is currently serving a 16 year prison sentence.

340.    On October 12, 2005, Refco issued a second press release announcing that the $430 million RGHI obligation had remained concealed as a result of the actions of Bennett and others, who had caused Refco to engage in a series of transactions designed to hide and otherwise disguise the nature and extent of the RGHI Receivable.

341.    Once the fraud was revealed, the market for Refco stock plummeted, leading to well over $1 billion in lost market capitalization.  Refco was delisted by the New York Stock Exchange, and the company and its subsidiaries, including RCM, were forced into bankruptcy.

342.    On October 17, 2005, 23 Refco affiliates, including RCM, filed Chapter 11 bankruptcy petitions in the Southern District of New York.

343.    On December 16, 2005, the Official Committee of Unsecured Creditors of Refco commenced an adversary proceeding against SMFF seeking avoidance of the $312 million transfer from RCM to SMFF's accounts at Refco LLC, in order to recover that property for the benefit of RCM's bankruptcy estate.  That same day, the bankruptcy court issued an order of attachment and temporary restraining order freezing assets of SPhinX valued at $282 million pending resolution of the adversary proceeding.

344.    As a result of the disclosure of the fraud at Refco and the TRO, SPhinX suffered a flood of redemption requests.  The redemptions from the SPhinX Funds and the resulting drop in AUM caused a sharp decline in PlusFunds' revenues, leading to PlusFunds' Chapter 11 bankruptcy petition in the Southern District of New York on March 6, 2006.

345.    On or about April 21, 2006, SPhinX entered into a settlement agreement resolving the adversary proceeding.  As part of that agreement, SPhinX agreed to relinquish approximately $263 million of the $312 million that had been transferred from RCM to Refco LLC and further agreed to release certain claims against the Refco bankruptcy estate with respect to those funds.

## VIII.   CAUSATION.

346.    Deutsche's affirmative acts and omissions were a substantial cause contributing to the losses suffered by SPhinX, its investors and PlusFunds.

347.    SPhinX and PlusFunds reasonably relied upon false representations of Refco's financial strength in depositing customer assets at Refco.  PlusFunds' risk committee reviewed and relied upon publicly available financial information regarding Refco's financial condition and created risk guidelines based on that shadow rating.

348.    Each Wednesday, PlusFunds' risk committee met to review the risk report, which was generated by Deutsche, and monitor the Funds' exposure to their various counterparties, including Refco.  As a general matter, PlusFunds understood that SMFF's exposure to Refco was in the $10 to $25 million range because PlusFunds believed that SMFF's assets were held in customer-segregated accounts and were therefore not at risk for purposes of the risk reports.

349.    PlusFunds' risk committee was aware of Refco's LBO and IPO transactions and understood that prominent law firms, accountants and banks, including Deutsche, were involved in those transactions.  Innocent members of PlusFunds' team actually looked at Refco's public filings and disclosures in connection with the LBO and IPO transactions.

350.     Had Deutsche disclosed to SPhinX or PlusFunds that hundreds of millions of dollars of SMFF cash was maintained in unregulated, non-segregated accounts at RCM, innocent decisionmakers at PlusFunds and/or SPhinX would have taken action to move SMFF's cash to segregated accounts or other steps to protect SPhinX's customer assets.  Innocents at SPhinX and PlusFunds certainly would have ensured that no additional SMFF customer assets be deposited at RCM.

351.     Had Deutsche disclosed to SPhinX or PlusFunds that Refco was involved in a fraud or that the LBO or IPO should not have been consummated due to concerns about Refco's financial position or honesty of Refco, innocent decisionmakers at PlusFunds and/or SPhinX would have taken action to move SMFF's cash to segregated accounts or other steps to protect SPhinX's customer assets.  Innocents at SPhinX and PlusFunds certainly would have ensured that no additional SMFF customer assets be deposited at RCM.

352.     Had Deutsche disclosed to the public its knowledge of Refco's fraudulent scheme or that Refco was in poor financial condition, the LBO and IPO would not have been consummated, and Refco's insiders would not have been able to loot Refco and affiliated entities and plunge Refco deeper into bankruptcy.

## IX.     CAUSES OF ACTION.

## COUNT I

### (Breach of Fiduciary Duty)

353.     Plaintiffs incorporate by reference the allegations set forth above.

354.     As alleged in detail in Paragraphs 2 through 5, 98 through 129 and 131 through 133 above, SPhinX and PlusFunds reposed confidence and trust in Deutsche and relied upon Deutsche's superior expertise in the conduct of SPhinX and PlusFunds business.

355.   As alleged in detail in Paragraphs 5 and 97 through 133 above, a fiduciary relationship was created by virtue of the contractual and other relationships between SPhinX and PlusFunds on the one hand and Deutsche on the other such that Deutsche owed fiduciary duties to SPhinX and PlusFunds.

356.   As alleged in detail in Paragraphs 3 through 5, 18 through 20, 93, 134 through 139, 154 through 159 and 212 through 222 above, Deutsche owed SPhinX and PlusFunds fiduciary duties, including but not limited to duties of due care, disclosure and loyalty.

357.   Deutsche breached its fiduciary duties to SPhinX and PlusFunds through various acts and omissions described above, including but not limited to the following: (1) participating and seeking and obtaining benefits and profits in transactions in which Deutsche's actions and judgment were adversely affected by undisclosed conflicts of interest (*see* ¶¶ 137-39, 217-22, 274-76 above); (2) failing to disclose and affirmatively concealing the fact, and Deutsche's actual knowledge of the fact, that hundreds of millions of dollars of SPhinX customer assets were at risk and exposed in unregulated, non-customer-segregated accounts at RCM (*see* ¶¶ 20, 78, 217-22, 349, 352-53 above); (3) failing to disclose and concealing Refco's misappropriation, misuse and conversion of RCM customer assets, including SPhinX Funds assets; (4) failing to disclose and affirmatively concealing the fact, and Deutsche's actual knowledge of the fact, that Refco's reported financial condition was fraudulent, materially misstated and inaccurate (*see* ¶¶ 8-15, 17-19, 214-22, 230-31, 235-41 above); (5) failing to disclose and affirmatively concealing the fact, and Deutsche's actual knowledge of the fact, that Refco was financially unsound and/or insolvent (*see* ¶¶ 165-66, 242-73 above); (6) failing to disclose and affirmatively concealing the fact, and Deutsche's actual knowledge of the fact, that Refco and its professionals failed to disclose to, and affirmatively concealed material information from, the public and Refco's customers, including SPhinX and PlusFunds, material information regarding Refco's financial

103

condition, internal controls and operations, that should have been disclosed in Refco's financial statements, offerings and public filings in connection with the LBO, IPO and related transactions (*see* ¶¶ 10, 15, 134-39, 194-97, 274-78, 281-89, 303-305, 322-27 above); (7) failing to disclose and affirmatively concealing the fact, and Deutsche's actual knowledge of the fact, that the LBO and IPO and related transactions were inappropriate, unjustified and/or fraudulent given Refco's financial condition and operations (*see* ¶¶ 158-59, 242-88, 290-312 above); (8) failing to disclose and affirmatively concealing the fact, and Deutsche's actual knowledge of the fact, that Refco, its management, its professionals and conspirators were engaged in fraud, conversion, breach of fiduciary duty and other unlawful and tortious activity (*see* ¶¶ 6, 217-22, 267-78, 302-305 above); (9) approving, participating in, promoting and/or profiting from the LBO, IPO and related transactions with Refco (*see* ¶¶ 8-12, 14, 16-19, 214-17, 222, 224-29 above).

358.    Deutsche's breaches of fiduciary duty constituted intentional, knowing and fraudulent acts, willful misconduct, gross negligence and/or a violation of law.

359.    As a result of Deutsche's breaches of fiduciary duties, SPhinX and PlusFunds have been damaged in an amount to be proven at trial.

360.    The breaches of fiduciary duty by Deutsche were the proximate cause of the damages suffered by SPhinX, its investors and PlusFunds.

## COUNT II

### (Fraud/Misrepresentation)

361.    Plaintiffs incorporate by reference the allegations set forth above.

362.    For the reasons alleged in Count I, Deutsche owed fiduciary duties to SPhinX and PlusFunds including but not limited to the duty candidly to disclose all material facts to PlusFunds, SPhinX and their innocent decision-makers regarding issues relevant to the business of SPhinX and PlusFunds.

363.   Deutsche made a material misrepresentation of fact and/or failed to disclose material information that it had a duty to disclose through various acts and omissions described above, including but not limited to the following: (1) failing to disclose and affirmatively concealing the fact, and Deutsche's actual knowledge of the fact, that hundreds of millions of dollars of SPhinX customer assets were at risk and exposed in unregulated, non-customer-segregated accounts at RCM (*see* ¶¶ 20, 217-22, 224-25, 276-78, 302-305 above); (2) failing to disclose and concealing Refco's misappropriation, misuse and conversion of RCM customer assets, including SPhinX Funds assets; (3) failing to disclose and affirmatively concealing the fact, and Deutsche's actual knowledge of the fact, that Refco's reported financial condition was fraudulent, materially misstated and inaccurate (*see* ¶¶ 12, 138-39, 211-29, 264-67, 270-80, 289-95 above); (4) failing to disclose and affirmatively concealing the fact, and Deutsche's actual knowledge of the fact, that Refco was financially unsound and/or insolvent (*see* ¶¶ 96, 165-66, 296-315, 317-29 above); (5) failing to disclose and affirmatively concealing the fact, and Deutsche's actual knowledge of the fact, that Refco and its professionals failed to disclose to, and affirmatively concealed material information from, the public and Refco's customers, including SPhinX and PlusFunds, material information regarding Refco's financial condition, internal controls and operations, that should have been disclosed in Refco's financial statements, offerings and public filings in connection with the LBO, IPO and related transactions (*see* ¶¶ 281-312 above); (6) failing to disclose and affirmatively concealing the fact, and Deutsche's actual knowledge of the fact, that the LBO and IPO and related transactions were inappropriate, unjustified and/or fraudulent given Refco's financial condition and operations (*see* ¶¶ 275-76, 281-88, 290-330 above); (7) failing to disclose and affirmatively concealing the fact, and Deutsche's actual knowledge of the fact, that Refco, its management, its professionals and conspirators were engaged in fraud, conversion, breach of fiduciary duty and other unlawful and

tortious activity (*see* ¶¶ 10, 15-18, 20, 194-95 above); (8) approving, participating in, promoting and/or profiting from the LBO, IPO and related transactions with Refco (*see* ¶¶ 11, 14-19, 214-22, 225-29, 253-63 above); (9) failing to disclose its numerous conflicts of interest (*see* ¶¶ 137-39, 217-22, 274-76 above).

364.    As alleged in Paragraphs 12, 16, 17, 138, 158, 206 through 210, 230 through 234 and 298 through 303 above, Deutsche had knowledge of the falsity of its misrepresentations and/or that its omissions rendered its statements and statements by Refco and others materially inaccurate and misleading.

365.    As alleged in Paragraphs 97 through 107, 112, 122, 131-33 above, Deutsche intended to induce reliance by SPhinX and PlusFunds on its misrepresentations and/or omissions.

366.    As alleged in Paragraphs 3, 4, 8, 9, 36, 157 through 159,  347 through 352 above, SPhinX and PlusFunds reasonably and justifiably relied upon Deutsche's false representations and omissions.   PlusFunds' weekly risk committee and innocent members of PlusFunds' management and board actually reviewed and relied upon publicly available information regarding Refco's financial condition, the weekly credit reports prepared pursuant to SPhinX/PlusFunds' db RiskOffice Service Agreement with Deutsche and Refco's public filings and disclosures in connection with the LBO and IPO.

367.    As alleged in Paragraphs 154 through 159 above, SPhinX and PlusFunds relied upon these materials to calculate guidelines for acceptable risk in connection with depositing SPhinX customer assets at Refco.

368.    PlusFunds' risk committee met weekly to monitor SPhinX's exposure to counterparties, including Refco.  Had Deutsche disclosed the truth regarding SPhinX's actual exposure to Refco, Refco's true financial condition, the Refco fraud or other relevant facts

regarding Refco, innocent decision-makers at SPhinX and/or PlusFunds would have taken steps to protect SPhinX's customer assets, including but not limited to the removal of SMFF cash from non-segregated, commingled accounts at RCM.

369.   Deutsche's misrepresentations and/or omissions directly and proximately caused SPhinX, its investors and PlusFunds damages in an amount to be determined at trial.

## COUNT III

### (Aiding and Abetting Breach of Fiduciary Duty)

370.   Plaintiffs incorporate by reference the allegations set forth above.

371.   As alleged in Paragraphs 92 and 96 above, Refco owed fiduciary duties to SPhinX, its investors and PlusFunds in connection with the treatment and protection of customer assets.

372.   As alleged in Paragraphs 4 through 6 above, Deutsche knew about and understood Refco's fiduciary duties to SPhinX, its investors and PlusFunds.

373.   As alleged in Paragraph 115 through 119 above, the movement of SMFF's excess cash to non-segregated accounts at RCM constituted a breach of fiduciary duties owed to SPhinX, its investors and PlusFunds to maintain customer assets in protected, customer-segregated accounts.

374.   As alleged in Paragraphs 113, 115 through 119, 186, 216 and 217 above, Deutsche had actual knowledge that hundreds of millions of dollars of SMFF's excess cash had been diverted to non-segregated accounts at RCM in breach of the fiduciary duties owed to SPhinX, its investors and PlusFunds to maintain customer assets in protected, customer-segregated accounts.

375.   As alleged in Paragraphs 134 through 139, 186, 216 and 217 above, Deutsche provided substantial assistance to the fraud and breaches of fiduciary duty by Refco and its

conspirators through various acts and omissions described above, including but not limited to the following: (1) failing to disclose and affirmatively concealing the fact, and Deutsche's actual knowledge of the fact, that hundreds of millions of dollars of SPhinX customer assets were at risk and exposed in unregulated, non-customer-segregated accounts at RCM (*see* ¶¶ 113, 134-39, 216, 223 above); (2) failing to disclose and concealing Refco's misappropriation, misuse and conversion of RCM customer assets, including SPhinX Funds assets; (3) failing to disclose and affirmatively concealing the fact, and Deutsche's actual knowledge of the fact, that Refco's reported financial condition was fraudulent, materially misstated and inaccurate (*see* ¶¶ 15, 160-78, 236, 245-50, 264-73, 296-312 above); (4) failing to disclose and affirmatively concealing the fact, and Deutsche's actual knowledge of the fact, that Refco was financially unsound and/or insolvent (*see* ¶¶ 165-66, 236, 245-50, 264-73 above); (5) failing to disclose and affirmatively concealing the fact, and Deutsche's actual knowledge of the fact, that Refco and its professionals failed to disclose to, and affirmatively concealed material information from, the public and Refco's customers, including SPhinX and PlusFunds, material information regarding Refco's financial condition, internal controls and operations, that should have been disclosed in Refco's financial statements, offerings and public filings in connection with the LBO, IPO and related transactions (*see* ¶¶ 10, 15, 135, 194, 236, 245-50, 264-73, 276, 278, 289, 303, 322 above); (6) failing to disclose and affirmatively concealing the fact, and Deutsche's actual knowledge of the fact, that the LBO and IPO and related transactions were inappropriate, unjustified and/or fraudulent given Refco's financial condition and operations (*see* ¶¶ 159, 264-73 above); (7) failing to disclose and affirmatively concealing the fact, and Deutsche's actual knowledge of the fact, that Refco, its management, its professionals and conspirators were engaged in fraud, conversion, breach of fiduciary duty and other unlawful and tortious activity (*see* ¶¶ 6, 264-80,

289-95 above); (8) approving, participating in, promoting and/or profiting from the LBO, IPO and related transactions with Refco (*see* ¶¶ 11, 14, 16-19, 215, 222, 253-63 above).

376.    The breaches of fiduciary duty and aiding and abetting by the aforementioned parties proximately caused damages to SPhinX, its investors and PlusFunds in an amount to be determined at trial.

## COUNT IV

### (Aiding And Abetting Fraud)

377.    Plaintiffs incorporate by reference the allegations set forth above.

378.    As alleged in Paragraphs 31, 138 and 192 through 194 above, Refco and others acting in concert with them committed fraud in connection with the misrepresentation of Refco's financial condition.

379.    As alleged in Paragraphs 192 through 194, 201 through 205 and 300 above, Deutsche had actual knowledge of the fraud alleged herein.   In the alternative, Deutsche intentionally and consciously avoided the truth regarding the fraud.

380.    As alleged in Paragraphs 185-97, 203 through 205, 217 through 220 and 299 through 312 above, Deutsche provided substantial assistance to the fraud and breaches of fiduciary duty by Refco and its conspirators through various acts and omissions described above, including but not limited to the following: (1) failing to disclose and affirmatively concealing the fact, and Deutsche's actual knowledge of the fact, that hundreds of millions of dollars of SPhinX customer assets were at risk and exposed in unregulated, non-customer-segregated accounts at RCM (*see* ¶¶ 113, 186, 211-29 above); (2) failing to disclose and concealing Refco's misappropriation, misuse and conversion of RCM customer assets, including SPhinX Funds assets; (3) failing to disclose and affirmatively concealing the fact, and Deutsche's actual knowledge of the fact, that Refco's reported financial condition was fraudulent, materially

misstated and inaccurate (*see* ¶¶ 6, 160-78, 236, 245-50, 264-73, 296-312 above); (4) failing to disclose and affirmatively concealing the fact, and Deutsche's actual knowledge of the fact, that Refco was financially unsound and/or insolvent (*see* ¶¶ 96, 165-66, 236, 245-50, 264-73 above); (5) failing to disclose and affirmatively concealing the fact, and Deutsche's actual knowledge of the fact, that Refco and its professionals failed to disclose to, and affirmatively concealed material information from, the public and Refco's customers, including SPhinX and PlusFunds, material information regarding Refco's financial condition, internal controls and operations, that should have been disclosed in Refco's financial statements, offerings and public filings in connection with the LBO, IPO and related transactions (*see* ¶¶ 10, 15, 135, 194, 236, 245-50, 264-73, 278, 289, 303, 323 above); (6) failing to disclose and affirmatively concealing the fact, and Deutsche's actual knowledge of the fact, that the LBO and IPO and related transactions were inappropriate, unjustified and/or fraudulent given Refco's financial condition and operations (*see* ¶¶ 169, 264-73 above); (7) failing to disclose and affirmatively concealing the fact, and Deutsche's actual knowledge of the fact, that Refco, its management, its professionals and conspirators were engaged in fraud, conversion, breach of fiduciary duty and other unlawful and tortious activity (*see* ¶¶ 10, 14-16, 135-39, 169, 194-95, 216-20, 264-73, 276-78 above); (8) approving, participating in, promoting and/or profiting from the LBO, IPO and related transactions with Refco (*see* ¶¶ 11, 14, 16-19, 215, 222, 253-63 above).

381.   As a direct and proximate result of the fraud and aiding and abetting, SPhinX, its investors and PlusFunds were damaged in an amount to be proven at trial.

## COUNT V

### (Aiding And Abetting Conversion)

382.   Plaintiffs incorporate by reference the allegations set forth above.

383.    SMFF had a superior right of possession to cash and other assets held by Refco, Refco LLC and RCM.

384.    Refco, RAI, Refco LLC, RCM, Refco's officers and agents and conspirators converted SMFF's cash by (1) removing it from protected, customer-segregated accounts at Refco LLC and transferring it to commingled, non-segregated accounts at RCM; (2) transferring SMFF's cash from RCM throughout the Refco organization and to third-parties.  By doing so, Refco, RAI, Refco LLC, RCM, Refco's officers and directors and conspirators intentionally interfered with SMFF's cash to the exclusion of SMFF's property rights.

385.    As alleged in Paragraphs 10, 210, and 215 through 225 above, Deutsche had actual knowledge of the conversion of SMFF's cash and customer assets.  In the alternative, Deutsche intentionally and consciously avoided the truth regarding the conversion.

386.    As alleged in Paragraphs 211 through 229 above, Deutsche provided substantial assistance to the conversion of SMFF's cash by Refco and its conspirators through various acts and omissions described above, including but not limited to the following: (1) failing to disclose and affirmatively concealing the fact, and Deutsche's actual knowledge of the fact, that hundreds of millions of dollars of SPhinX customer assets were at risk and exposed in unregulated, non-customer-segregated accounts at RCM (*see* ¶¶ 10-11, 20, 113, 136, 186, 211-229, 317 above); (2) failing to disclose and concealing Refco's misappropriation, misuse and conversion of RCM customer assets, including SPhinX Funds assets (*see* ¶¶ 99, 183, 189, 303, 312 above); (3) failing to disclose and affirmatively concealing the fact, and Deutsche's actual knowledge of the fact, that Refco's reported financial condition was fraudulent, materially misstated and inaccurate (*see* ¶¶ 12, 15, 137-38, 160-78, 211, 236, 245-50, 264-73, 285, 288, 296-312 above); (4) failing to disclose and affirmatively concealing the fact, and Deutsche's actual knowledge of the fact, that Refco was financially unsound and/or insolvent (*see* ¶¶ 12, 15, 137-38, 165-66, 211, 236, 245-

111

50, 264-73, 285, 288 above); (5) failing to disclose and affirmatively concealing the fact, and Deutsche's actual knowledge of the fact, that Refco and its professionals failed to disclose to, and affirmatively concealed material information from, the public and Refco's customers, including SPhinX and PlusFunds, material information regarding Refco's financial condition, internal controls and operations, that should have been disclosed in Refco's financial statements, offerings and public filings in connection with the LBO, IPO and related transactions (*see* ¶¶ 10, 12, 15, 135, 138, 158, 166, 169, 189, 194, 236, 245-50, 264-73, 278, 289, 303, 323 above); (6) failing to disclose and affirmatively concealing the fact, and Deutsche's actual knowledge of the fact, that the LBO and IPO and related transactions were inappropriate, unjustified and/or fraudulent given Refco's financial condition and operations (*see* ¶¶ 12, 138, 158, 166, 169, 189, 264-73 above); (7) failing to disclose and affirmatively concealing the fact, and Deutsche's actual knowledge of the fact, that Refco, its management, its professionals and conspirators were engaged in fraud, conversion, breach of fiduciary duty and other unlawful and tortious activity (*see* ¶¶ 6, 206-335 above); (8) approving, participating in, promoting and/or profiting from the LBO, IPO and related transactions with Refco (*see* ¶¶ 11, 14, 16-19, 215, 222, 253-311 above).

387.    As a direct and proximate result of the conversion and aiding and abetting of SMFF's cash, SPhinX, its investors and PlusFunds were damaged in an amount to be proven at trial.

## COUNT VI

### (Breach Of Contract / Breach Of Covenant Of Good Faith And Fair Dealing)

388.    Plaintiffs incorporate by reference the allegations set forth above.

389.    Deutsche entered into a number of enforceable contracts with SPhinX and/or PlusFunds, including but not limited to the November 22, 2002 Distribution Agreement, the August 20, 2004 Memorandum of Agreement and the db RiskOffice Service Agreement.

390.    Each of these agreements, like all contracts, includes implied covenants of good faith and fair dealing, whereby each party agrees to refrain from behavior that would prevent any other party from enjoying rights due under the agreements.

391.    The db RiskOffice Service Agreement required Deutsche to "provide its db RiskOffice service" and "provide a weekly report" for SPhinX and/or PlusFunds "to model the Risks in the Fund's portfolio as exposures to a series of risk factors" and "to quantify the potential Value at Risk ('VAR') in the Fund as a function of its exposure to these factors."

392.    The db RiskOffice Service Agreement references SPhinX's offering memoranda, expressing the parties' understanding that the use of Deutsche's risk service could be disclosed to investors and Deutsche's understanding that its risk services were relevant to representations made to investors in SPhinX's offering materials.

393.    The November 22, 2002 Distribution Agreement appoints Deutsche as agent, representative and distributor of SPhinX and PlusFunds for the purpose of soliciting investments in SPhinX.

394.    The November 22, 2002 Distribution Agreement references SPhinX's offering memoranda and includes representations between the parties that the "Offering Memorandum does not contain any untrue statement of a material fact or any omission of a material fact."

395.    Deutsche in fact knew that hundreds of millions of dollars of SPhinX's customer assets were maintained in non-segregated accounts at RCM, that Refco used those assets to finance its operations and other activities, that Refco's reported financial condition was materially misstated and/or that Refco and conspirators were involved in other fraudulent and tortious activity alleged above.

396.    Deutsche breached its contractual duties to SPhinX and/or PlusFunds by failing to disclose the fact that hundreds of millions of dollars of SPhinX's cash were maintained in non-

segregated accounts at RCM, that Refco used those assets to finance its operations and other activities, that Refco's reported financial condition was materially misstated and/or that Refco and conspirators were involved in other fraudulent and tortious activity alleged above.

397.    Deutsche breached its contractual duties by producing reports to SPhinX and/or PlusFunds that Deutsche knew were inaccurate and materially misstated SPhinX's exposure to Refco.

398.    In the alternative, Deutsche breached the implied covenant of good faith and fair dealing implicit in its agreements with SPhinX and/or PlusFunds by failing to disclose Deutsche's knowledge that hundreds of millions of dollars of SPhinX assets were maintained in non-segregated accounts at RCM, that Refco used those assets to finance its operations and other activities, that Refco's reported financial condition was materially misstated and/or that Refco and conspirators were involved in the fraudulent and tortious activity alleged above.

399.    Deutsche's breaches of contractual and implied obligations constitute intentional, knowing and fraudulent acts, willful misconduct, gross negligence and/or a violation of law.

400.    SPhinX and PlusFunds fulfilled their material obligations under the Service Agreement.

401.    The breaches of contract and/or implied covenant of good faith and fair dealing caused SPhinX and PlusFunds damages in an amount to be proven at trial.

## COUNT VII

### (Declaratory Relief)

402.    Plaintiffs incorporate by reference the allegations set forth above.

403.    Deutsche has asserted and/or indicated its intent to assert claims for indemnity under the db RiskOffice Service Agreement and/or the November 22, 2002 Distribution Agreement.

404.    Deutsche's breaches of contractual and implied obligations and tortious activity as alleged herein constitute intentional, knowing and fraudulent acts, willful misconduct, gross negligence and/or a violation of law.

405.    The db RiskOffice Service Agreement and Distribution Agreement include limitations on damages, indemnity and disclaimer provisions that are void, unenforceable and/or inapplicable.

406.    Plaintiffs seek a declaration from the Court that Deutsche is not entitled to any such indemnity under any relevant agreement and that Deutsche's claims for indemnity are improper and unenforceable.   Plaintiffs further seek a declaration from the Court that any limitation of damages provision or similar disclaimer in the db RiskOffice Service Agreement, Distribution Agreement or other agreement are void, unenforceable and/or inapplicable.

WHEREFORE, Plaintiffs respectfully request judgment as follows:

i.      on the First Cause of Action, compensatory and punitive damages against Deutsche in an amount to be established at trial, together with interest, costs, and attorneys' fees as allowed by law;

ii.     on the Second Cause of Action, compensatory and punitive damages against Deutsche in an amount to be established at trial, together with interest, costs, and attorneys' fees as allowed by law;

iii.    on the Third Cause of Action, compensatory and punitive damages against Deutsche in an amount to be established at trial, together with interest, costs, and attorneys' fees as allowed by law;

iv.     on the Fourth Cause of Action, compensatory and punitive damages against Deutsche in an amount to be established at trial, together with interest, costs, and attorneys' fees as allowed by law;

v.      on the Fifth Cause of Action, compensatory and punitive damages against Deutsche in an amount to be established at trial, together with interest, costs, and attorneys' fees as allowed by law;

vi.      on the Sixth Cause of Action, compensatory and punitive damages against Deutsche in an amount to be established at trial, together with interest, costs, and attorneys' fees as allowed by law;

vii.      on the Seventh Cause of Action, a declaration from the Court that Deutsche is not entitled to any such indemnity under any relevant agreement, that Deutsche's claims for indemnity are improper and unenforceable, and that any limitation of damages provision or similar disclaimer in the db RiskOffice Service Agreement, Distribution Agreement or other agreement are void, unenforceable and/or inapplicable; and

viii.      for such other and further relief as the Court deems just and proper.

## X.      DEMAND FOR JURY TRIAL.

Plaintiffs hereby demand a trial by jury.

Dated: New York, New York
         June 17, 2010

BROWN RUDNICK LLP

By:_____
         David J. Molton (DM 1106)
         Andrew Dash (AD 7913)
      Seven Times Square
      New York, New York  10036
      Telephone: (212) 209-4800
      dmolton@brownrudnick.com
      adash@brownrudnick.com

- and -

**BEUS GILBERT PLLC**
Leo R. Beus
Dennis K. Blackhurst
4800 North Scottsdale Road, Suite 6000
Scottsdale, Arizona  85251
Telephone: (480) 429-3000
lbeus@beusgilbert.com
dblackhurst@beusgilbert.com

*Co-Counsel to Plaintiffs*